United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 24, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RELLIS CAMPUS DATA AND RESEARCH CENTER, LLC, *et al.*, [1] | Case No. 25-90666 |
| Debtors. | (Jointly Administered) |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF
### (Relates to ECF # 47)

The Court has reviewed and considered the motion (the "DIP Motion")[2] of RELLIS Campus Data and Research Center, LLC, and Optimus DataCenters, LLC, each a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1, 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures" and, together with the Bankruptcy Local Rules, the "Local Rules") promulgated by

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: RELLIS Campus Data and Research Center, LLC (9113), and Optimus DataCenters, LLC (1582). The Debtors' service address is 5010 Doss Road, Austin, Texas 78734.

[2] Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Motion or the DIP Term Sheet, as applicable.

the United States Bankruptcy Court for the Southern District of Texas (the "Court") seeking, among other things:

(A)     pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the DIP Motion to be held before this Court to consider entry of an order granting the DIP Motion on an interim basis (this "Interim Order");

(B)     authorization for the Debtors to obtain senior secured post-petition financing (the "DIP Facility") consisting of multi-draw term loans (the "DIP Term Loans") in the aggregate principal amount not to exceed $3,300,000 (the "DIP Term Loan Commitment") from Twelve Bridge Capital, LLC (the "DIP Lender") pursuant to that certain DIP Term Sheet agreement by and among the Debtors, as Borrowers, the DIP Lender, as Lender, (the "DIP Term Sheet" and, together with any definitive documents, instruments, amendments, schedules or exhibits among the parties, the "DIP Loan Documents"); $1,500,000 of which shall be available upon entry and subject to this Interim Order (the "Initial Draw") provided that the conditions precedent in the DIP Term Sheet are satisfied;

(C)     approval of the terms of the DIP Term Sheet and authorization for the Debtors to execute and enter into the DIP Term Sheet upon the terms and conditions for the DIP Facility and to perform such other and further acts as may be required by the DIP Lender in connection with any DIP Loan Document;

(D)     authorization for the Debtors, immediately upon entry of this Interim Order, to use the proceeds of the DIP Term Loans as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable approved Budget;

(E)     authorization for the Debtors to grant to the DIP Lender superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code payable from and

secured by Liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and post-petition property of the Debtors' estates and all proceeds thereof (except as otherwise expressly provided herein);

(F)    subject to entry of a Final Order, the waiver of the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code subject to the provisions set forth below;

(G)    subject to entry of a Final Order, the waiver of the equitable doctrine of "marshaling" and other similar doctrines as to the DIP Lender, in each case subject to the provisions set forth below;

(H)    modification of the automatic stay to the extent set forth herein and in the DIP Loan Documents; and

(I)    the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") approving the relief granted herein on a final basis and authorizing the Debtors to forthwith borrow from the DIP Lender under the DIP Loan Documents up to the full amount of the DIP Facility.

The Court has considered the DIP Motion, all pleadings related thereto, including all objections to the DIP Motion, as well as the evidence submitted, and the oral arguments of record made by the Debtors at the Interim Hearing held on December 19, 2025. After due deliberation and consideration, the Court finds and concludes that good and sufficient cause exists to enter this Interim Order, as follows:[3]

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

1.      Petition Date.  On November 5, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court commencing the Chapter 11 Cases.

2.      Debtors in Possession.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

3.      Jurisdiction and Venue.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Court may enter a final order consistent with Article III of the United States Constitution.

4.      Notice.  Proper, timely, adequate, and sufficient notice of the Interim Hearing and the relief requested in the DIP Motion has been provided to (a) the U.S. Trustee, (b) proposed counsel to the official committee of unsecured creditors, (c) counsel to the DIP Lender (Fishel Law Group), (d) all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (e) all parties entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

5.      Findings Regarding the DIP Term Loans.

(a)      *Need for Post-Petition Financing*.  The Debtors have an immediate and critical need to obtain the DIP Facility. The Debtors' ability to obtain the DIP Term Loans is

critical to their efforts to obtain the highest and best value for their assets pursuant to any financing or sale transactions to be effectuated by the Debtors in these Chapter 11 Cases.

(b)      *No Credit Available on More Favorable Terms*.  The DIP Lender has indicated a willingness to provide the Debtors with the DIP Term Loans on the terms and conditions set forth in this Interim Order and in the DIP Term Sheet. After considering all of the alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Term Loans to be provided by the DIP Lender pursuant to the terms of this Interim Order and the DIP Term Sheet represent the best financing presently available to the Debtors. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been unable to obtain credit on more favorable terms and conditions than those provided in this Interim Order.

(c)      *Priming of the Prepetition Liens*. The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Term Sheet and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors, and the Debtors would not be able to obtain debtors-in-possession financing in a sufficient amount without the Court granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Secured Creditors,  as set forth in this Interim Order pursuant to

sections 361, 363, and 364 of the Bankruptcy Code, are protected against any post-petition diminution in value of the Prepetition Secured Creditors' respective liens and interests in the Prepetition Collateral resulting from, among other things, (i) the use, sale, or lease by the Debtors of such collateral, (ii) the market value decline of such collateral, (iii) the imposition of the automatic stay, (iv) the subordination of the Prepetition Liens and Prepetition Secured Debt to the Carve-Out, the DIP Liens, and the DIP Obligations, in each case, as set forth in this Interim Order, and (vi) any other act or omission which causes diminution in the value of their respective liens or interests in the Prepetition Collateral (collectively, "Diminution").

(d)     *Good Cause Shown*.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2), and, to the extent it applies, Bankruptcy Rule 6003, as the Court finds that entry of this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Entry of this Interim Order is in the best interest of the Debtors, their estates, and creditors. The terms of the DIP Term Sheet are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(e)     *Good Faith*.  The Debtors and the DIP Lender have negotiated the terms and conditions of the DIP Term Sheet and this Interim Order in good faith and at arm's-length, and any credit extended and loans made to the Debtors pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

6.     Disposition.  The DIP Motion is approved on an interim basis on the terms and conditions set forth in this Interim Order. This Interim Order shall become effective immediately

upon its entry.  Any objections that were made to the DIP Motion or the entry of this Interim Order (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits. To the extent the terms of the DIP Term Sheet differ in any material respect from the terms of this Interim Order, this Interim Order shall control.

7.       <u>Approval of DIP Loan Documents</u>.  The terms and conditions of the DIP Term Sheet are hereby approved. The Debtors are hereby authorized to execute the DIP Term Sheet and such additional documents, instruments, and agreements as may be reasonably required by the DIP Lender to implement the terms or effectuate the purposes of this Interim Order; provided, however that such additional DIP Loan Documents shall be filed with the Court prior to the Final Hearing on the DIP Motion.

8.       <u>DIP Term Loans Authorized</u>.  Immediately upon entry of this Interim Order, the Debtors are hereby authorized to borrow the Initial Draw up to the principal amount of $1,500,000. If the Final Order is entered, the Debtors will be authorized to borrow the full amount of the DIP Commitment up to the aggregate principal amount of $3,300,000 under the terms of such DIP Loan Documents approved, and Final Order entered, by the Court.

9.       <u>DIP Collateral</u>.  As security for the DIP Obligations (as defined herein), effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and DIP Liens (defined below) on all of the Debtors' assets owned whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors (the "<u>DIP Collateral</u>"), including, without limitation, the data center located at 833 RELLIS Parkway, Bryan, Texas (the "<u>Data Center</u>") and all other buildings, inventory, accounts receivable, real and personal property, plants, equipment,

rights under leases and other contracts, patents, copyrights, licenses, trademarks, trade names and other intellectual property and capital stock of the Debtors, and the proceeds thereof (including, without limitation, proceeds from the disposition of real property, including non-residential leaseholds), whether relating to the Data Center or not.  For the avoidance of doubt, the DIP Collateral shall not include any actions, or the proceeds thereof, brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law or foreign law equivalents.

10.    <u>DIP Obligations</u>.  The DIP Term Loans include all loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Loan Documents, together with all fees and interest thereon, and all other fees and other liabilities owed by the Debtors to the DIP Lender under the DIP Loan Documents and this Interim Order (collectively,  the "<u>DIP Obligations</u>").  The DIP Term Loans shall: (i) bear interest payable at the rates set forth in the DIP Term Sheet; (ii) be secured in the manner specified herein; (iii) be payable in accordance with the terms of the DIP Term Sheet; and (iv) otherwise be governed by the terms set forth herein and in the DIP Term Sheet.  The DIP Liens and DIP Obligations shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each such case or proceeding, a "<u>Successor Case</u>"), and/or upon the dismissal of the Chapter 11 Cases. Subject to the entry of the Final Order, the DIP Liens shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code, section 506(c) of the Bankruptcy Code, or section 551 of the Bankruptcy Code.

11.    <u>DIP Liens</u>.  Effective immediately upon the entry of this Interim Order and subject to the Carve Out, as set forth more fully in this Interim Order, the DIP Lender is hereby granted

the following security interests and liens, which shall immediately be valid, binding, automatically perfected, continuing, enforceable, and unavoidable (all liens and security interests granted to the DIP Lender pursuant to this Interim Order and any Final Order, the "DIP Liens"):

(a)   Pursuant to Bankruptcy Code sections 507(b) and 364(c)(1), an allowed claim in the Chapter 11 Cases that has priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b); and

(b)   Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, fully perfected security interests in and first priority priming liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, which liens shall be subject to the Carve Out.

12.   Perfection of DIP Liens.  The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim Order without the requirement of any further action by the DIP Lender; *provided*, *however*, that if the DIP Lender determines to file any mortgages, financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

13.   DIP Lien Priority.  The DIP Liens shall secure all of the DIP Obligations, to the extent and subject to the priorities set forth herein, and shall at all times have a higher priority and shall remain senior to the rights of the Debtors, the Prepetition Secured Creditors, any chapter 7 or chapter 11 trustee, and any other secured, administrative priority, unsecured or other claims of

any party in the Chapter 11 Cases (subject only to the Carve Out or except as otherwise (and solely to the extent) expressly provided herein), and the DIP Liens and the DIP Super-Priority Claims (as defined herein) granted herein shall not be made or become subject, junior, or subordinated to any "priming" or other liens, nor made *pari passu* with any other lien, security interest, or claim heretofore or hereafter granted under section 364 of the Bankruptcy Code or otherwise, in the Chapter 11 Cases (subject only to the Carve Out) or any Successor Cases.

14. <u>DIP Super-Priority Claims</u>.   The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute allowed super-priority administrative expense claims (the "<u>DIP Super-Priority Claims</u>") of the DIP Lender against the Debtors and be payable from and have recourse to all assets and property of the Debtors.   Subject only to the Carve Out, the DIP Super-Priority Claims shall have priority over any and all other administrative expenses, adequate protection claims, diminution in value claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provisions of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(b), 506(c), 507(a), 507(b), 507(d), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.   The DIP Super-Priority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre- and post-petition assets and property, whether existing on the Petition Date or thereafter acquired, of the Debtors and all proceeds thereof.  Other than as

expressly provided herein with respect to the Carve Out, no costs or expenses of administration, including, without limitation, Professional Fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases or in any Successor Cases and no priority claims are or will be senior to, prior to, or *pari passu* with the DIP Liens, the DIP Super-Priority Claims, or any of the DIP Obligations or with any other claims of the DIP Lender arising hereunder or otherwise in connection with the DIP Facility.

15. <u>No Obligation to Extend Credit</u>. The DIP Lender shall have no obligation to make any loan under the DIP Term Sheet unless all of the conditions precedent under the DIP Term Sheet and this Interim Order have been satisfied in full or waived by the DIP Lender in its sole discretion in accordance with the terms of the DIP Term Sheet.

16. <u>Use of Proceeds of the DIP Term Loans</u>.  As a condition to providing the DIP Facility, the DIP Lender requires, and the Debtors have agreed, that all proceeds of the DIP Term Loans shall be used or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (as defined herein), including (i) for working capital and general corporate purposes of the Debtors; (ii) to fund costs and expenses related to these Chapter 11 Cases, including the sale of substantially all of the assets of the Debtors; (iii) to fund the payment of interest, fees, costs, and expenses related to the DIP Term Loans, including the reasonable and documented fees and expenses of the DIP Lender's professionals; and (iv) for any other purposes specifically set forth in the Approved Budget (as defined herein).

17. <u>Maturity Date</u>.  Pursuant to the DIP Term Sheet and any applicable DIP Loan Documents subsequently approved by the Court, on the applicable Maturity Date, all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the

applicable DIP Facility will terminate.

18.     Certain Events of Default.  The occurrence of any of the following events, unless

waived by the DIP Lender in writing, shall constitute an event of default (collectively, the "Events

of Default"): (a) any "Event of Default" identified in this Interim Order; (b) the failure of the

Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or

obligations under this Interim Order; or (c) the occurrence of an "Event of Default" under the DIP

Term Sheet.

19.     Rights and Remedies Upon Event of Default. The automatic stay provisions of

section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP

Lender to enforce all rights under the DIP Term Sheet and any applicable DIP Loan Documents

(subject to the terms of this Interim Order) and (i) upon the occurrence and during the continuation

of an Event of Default that has not been waived by the DIP Lender or the Maturity Date, declare

by written notice (A) the termination, reduction or restriction of any further DIP Commitment to

the extent any such DIP Commitment remains and (B) all DIP Obligations to be immediately due

and payable, without presentment, demand, protest, or other notice of any kind, all of which are

expressly waived by the Debtors (such notice, a "Termination Notice") (which notice shall be filed

on the docket of these Chapter 11 Cases) and (ii) upon the occurrence and during the continuation

of an Event of Default that has not been waived by the DIP Lender or the Maturity Date, after the

giving of five (5) business days' prior written notice (such five (5) business day period, the

"Remedies Notice Period") to counsel to the Debtors, counsel to the Committee, and the U.S.

Trustee, the DIP Lender may, subject to the terms of this Interim Order, exercise all rights and

remedies provided for in the DIP Term Sheet, applicable DIP Loan Documents and applicable law,

including (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and

any other DIP Loan Documents to use any cash collateral; (b) terminate the DIP Facility and any DIP Loan Documents as to any future liability or obligation of the DIP Lender but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Loan Documents. Following the delivery of such notice and prior to exercising remedies with respect to any DIP Collateral, the DIP Lender shall file a motion (the "Stay Relief Motion") seeking emergency relief from the automatic stay. In any hearing regarding any exercise of rights or remedies under the DIP Loan Documents, the Debtors may seek relief from the Court seeking to stay the DIP Lender's exercise of any rights and remedies. The Debtors shall not object to any request for such Stay Relief Motion to be heard on shortened notice. Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors shall continue to have the right to use cash collateral solely to pay necessary expenses to avoid irreparable harm to the Debtors' estates, fund the Carve Out in accordance with the terms of this Interim Order and the Approved Budget during the Remedies Notice Period and pending any final determination from the Court. As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of the same on the docket of the Chapter 11 Cases.

20.    <u>Adequate Protection for Prepetition Secured Creditors</u>.  The Prepetition Secured Creditors are entitled to adequate protection as set forth herein pursuant to sections 361, 362, and 364(d)(1) of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the Court finds that the total Prepetition Secured Debt, at most, totals approximately $24,752,536.59, and the Debtors' data center facility, including all rights, interests and agreements related thereto, has a net book value of $30,351,108.80, and a fair market value likely in excess of its net book value, and as such, the Prepetition Secured Creditors have an equity

cushion in excess of the DIP Facility on the data center facility and are thus adequately protected pursuant to 11 U.S.C. § 364(d)(1)(b).  Further, both Vantage and TPB have secured personal guaranty's from Sam Tenorio III, which evidences additional adequate protection on their prepetition secured debt.  Finally, the Debtors are to make adequate protection payments to Vantage Bank in the amount of the post-petition interest accruing on their loans, as set forth in the Approved Budget attached hereto.  Because the Court has determined that adequate protection exists for the Prepetition Secured Creditors, the Court finds that the terms contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties.

21.    <u>Binding Effect</u>.  Upon the entry of this Interim Order, or the execution and delivery of the DIP Term Sheet, whichever occurs first, the Interim Order or the DIP Term Sheet shall constitute valid, binding and continuing obligations of the Debtors, enforceable against each Debtor in accordance with the terms thereof. No obligation, payment, transfer or grant of security under the DIP Term Sheet, any DIP Loan Documents or this Interim Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

22.    <u>Amendment of the DIP Term Sheet</u>. The Debtors and the DIP Lender may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Term Sheet, in each case, in accordance with the terms of the applicable DIP Term Sheet and in such form as the Debtors and DIP Lender agree, in the DIP Lender's sole discretion, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Term Sheet (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP

Facility, (ii) increase the principal amount of or the rate of interest on the DIP Facility, or (iii) change any event of default, add any covenants, or amend the covenants to be materially more restrictive; provided, however, any such material amendment, waiver, consent, or other modification shall be subject to further Court approval. Copies of all amendments and modifications to and under the DIP Term Sheet, regardless of materiality, shall be provided to the U.S. Trustee, the Prepetition Secured Creditors, and the Committee, prior to any such amendment or modification becoming effective and binding on the Debtors and their Estates. No consent to any such amendment, waiver, consent, or modification shall be implied by any action, inaction, or acquiescence of the DIP Lender.

23.    Carve Out.  Notwithstanding anything to the contrary in this Interim Order, the DIP Facility shall be subject and subordinate to the carve out described herein (the "Carve Out"). The Carve Out is the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the Carve-Out Trigger Notice); and (iii) allowed and unpaid claims for fees, success fees, costs and expenses (the "Professional Fees") incurred by persons or firms (the "Professionals") retained by the Debtors or the Committee, whose retention is approved by the Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject to the terms of the Approved Budget, the Interim Order, the Final Order and any other interim or other compensation orders entered by the Court that are incurred:

(a)      at any time before delivery to the Debtors of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to the delivery of a Carve Out Trigger Notice, subject to any limits imposed by the Approved Budget, the Interim Order or Final Order; and

(b)      after the occurrence and during the continuance of an Event of Default (as defined below) and delivery of written notice thereof, (the "Carve Out Trigger Notice"), (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Committee, in an aggregate amount not to exceed $250,000 for the Debtors' Professionals and $50,000 for the Committee Professionals; *provided*, *however*, that nothing herein shall be construed to impair the ability of any party in interest with standing to object to the fees, expenses, reimbursement or compensation described in clauses (i) or (ii)(A) or (ii)(B) above, on any grounds.

24.    Reserve / Escrow for Professional Fees.  The Carve Out may be funded to an administrative reserve or escrow account (the "Professional Fee Account") in an amount not to exceed the amount budgeted for the respective Professionals in the Approved Budget, which account shall be used to pay Professional Fees. As cash flow permits, and assuming no issuance of a Carve Out Trigger Notice, the Debtors shall pay the amounts set forth in the Approved Budget for Professional Fees into the Professional Fee Account on a weekly basis.

25.    Approved Budget.  The Approved Budget attached hereto as **Exhibit 1** constitutes an "Approved Budget" and will be considered the "Initial Budget." On the Friday of every other week (every two weeks), commencing with December 26, 2025 (or more frequently by mutual agreement of the Debtors and DIP Lender to accommodate changes in business operating activity), an updated 13-week forecast for the subsequent 13 weeks of the Debtors' operations in a form consistent with past practice, broken down by week, which shall include the anticipated uses of the DIP Term Loans for such period (each, a "Proposed Budget"), which Proposed Budget shall

modify and supersede any prior Budget upon the approval of the DIP Lender in its reasonable discretion (which approval may be delivered by the DIP Lender by e-mail correspondence); *provided* that (i) the most recently delivered Proposed Budget shall be deemed approved three (3) Business Days following delivery thereof to the DIP Lender, unless the DIP Lender shall object to the same in writing on or before such date and (ii) if the DIP Lender objects to such Proposed Budget, the Debtors and the DIP Lender will work in good faith to reconcile the Proposed Budget; *provided, further,* that, for the avoidance of doubt, until the conditions for the most recently delivered Proposed Budget are met, the prior Approved Budget shall remain in full force and effect for all purposes.

26.     <u>Budget Compliance</u>.  The Debtors shall at all times comply with the Approved Budget and shall not conduct their business in a manner that causes cash disbursements for Operating Expenses in the Approved Budget to materially deviate upward (cumulative of all Operating Expense line items) by greater than fifteen percent (15.0%) (the "<u>Permitted Variances</u>") from the applicable Approved Budget.  In the event of a dispute between the Debtors and DIP Lender regarding Permitted Variances from the Approved Budget, the Court may, after notice and an expedited hearing, determine whether such variance constitutes and Event of  Default.

27.     <u>Reporting and Information</u>.  Following the Closing Date, the Debtors shall provide to the DIP Lender weekly submissions of customary financial reporting, including bank account cash balances, including receipts and disbursements, each in a form satisfactory to the DIP Lender and with at least as much detail as the forms of financial reporting that may be provided to any other creditor or party in interest (including the Committee) during the Chapter 11 Cases.  The Debtors shall provide the DIP Lender with a weekly sales process update in form and substance acceptable to the DIP Lender, including, but not limited to, written updates and telephonic or

virtual meetings.  The Debtors shall also make the Debtors' professionals reasonably available upon reasonable notice for telephonic or virtual meetings to update the DIP Lender and the DIP Professionals on all matters affecting the Debtors and the Chapter 11 Cases, including with respect to the efforts to market and sell the DIP Collateral.

28.     <u>Milestones</u>.  The Debtors shall comply with the Milestones set forth in the DIP Term Sheet (each of which may be extended or waived without further order of the Court upon the prior written consent of the DIP Lender in its discretion, which may be by email).

29.     <u>Section 364(e) Protections</u>.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (a) the validity of any DIP Obligations incurred pursuant this Interim Order, the DIP Term Sheet or applicable DIP Loan Documents, or (b) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or thereby. Notwithstanding any such reversal, modification, vacation or stay, the DIP Obligations shall be governed in all respects by the provisions of this Interim Order, the DIP Term Sheet and applicable DIP Loan Documents, and the DIP Lender shall be entitled to all of the rights, remedies, protections and benefits granted under Bankruptcy Code section 364(e), this Interim Order, the DIP Term Sheet and, to the extent not inconsistent with the forgoing, applicable DIP Loan Documents with respect to all incurrence of the DIP Obligations.

30.     <u>Approval of DIP Fees</u>.  In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Lender shall be paid all fees, expenses, and other amounts payable under the DIP Term Sheet as such become due, including, without limitation, the Commitment Fee (5.75%), the Funding Fee (3.0%), and the Exit Fee (2.25%).  In the event of a refinancing, as set forth herein, the DIP Lender shall be paid all

reasonable and documented out-of-pocket costs and expenses, including legal fees of the DIP Lender, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of counsel to the DIP Lender (all such fees, together, the "DIP Fees"). The DIP Fees shall be fully earned as set forth herein, and payable in accordance with the terms of the DIP Term Sheet in each case, without the need for any further order of this Court. Specifically, the Commitment Fee shall be fully earned, non-refundable and payable as of the date of entry of this Interim Order.  The Funding Fee shall be fully earned, non-refundable, and payable as draws are made in accordance with the DIP Term Sheet and Approved Budget. The Exit Fee shall be paid upon the amount of the DIP Term Loans outstanding at the closing of a sale, refinancing, or pursuant to a plan, if any, subject to final approval of such fee. The DIP Fees shall be part of the DIP Obligations.

31.     _Payment of DIP Lender's Fees and Expenses_.  The Debtors are authorized and directed to pay the reasonable and documented fees, costs, and expenses of the DIP Lender in connection with these Chapter 11 Cases, including any and all expenses of the DIP Lender's counsel and professional advisors (the "Lender Professionals"), and the Lender Professionals shall not be required to comply with the U.S. Trustee's fee guidelines; _provided_, _however_, that the DIP Lender shall submit such professional fee invoices to the Debtors, counsel for the Debtors, the U.S. Trustee, and counsel for the Committee.  Such invoices shall be sufficiently detailed as to enable a determination as to the reasonableness of such fees and expenses; _provided_, _however_, that the invoices may be reasonably redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the

attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege. If the Debtors, U.S. Trustee or the Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices, then any of the foregoing parties may file an objection with the Court and such objections shall be limited to the issue of reasonableness of the fees and expenses of the applicable invoice submitted by the Lender Professional. Any failure by any such party to timely file an objection within such ten (10) day period shall constitute a waiver of such party's right to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the amounts or particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms of this Interim Order all undisputed fees and expenses of the Lender Professionals, including any undisputed fees and expenses on any invoice to which an objection has been timely filed, and any amounts allowed by the Court after resolution of any such objection. Any and all reasonable fees, costs and expenses of any Lender Professionals owed and not yet paid by the Debtors in connection with the negotiation and preparation of the DIP Term Sheet and this Interim Order are hereby approved in full.

32. <u>Section 506(c) Claims</u>. Upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written

consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral.

33.     Section 552(b).  Upon entry of the Final Order, (a) the DIP Lender shall be entitled to all rights and benefits of section 552(b) of the Bankruptcy Code, (b) the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Prepetition Collateral, and (c) no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Prepetition Collateral under section 552(b) of the Bankruptcy Code.

34.     Credit Bidding.  Upon entry of the Final Order, the DIP Lender shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or other applicable law) on a dollar-for-dollar basis any or all of the full amount of the respective outstanding DIP Obligations up to the full amount of the DIP Obligations, in connection with any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for the Debtors in these Chapter 11 Cases (any of the foregoing sales or dispositions, a "Sale") and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. Without limiting the foregoing, the DIP Lender may assign all or any portion of the DIP

Obligations owed to it to an acquisition vehicle, affiliate, or any other Person (any such Person, the "Agent Assignee"). The Agent Assignee shall have the right to "credit bid" any prepetition or post-petition secured obligations so assigned to it or assigned to or owned by any of its affiliated entities in any sale of the Debtors' assets.

35.    No Marshaling. Subject to final order granting such relief, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral as applicable.

36.    Release of DIP Lender.  Upon entry of this Interim Order, the Debtors, on its own behalf and its Estate, forever and irrevocably: (i) releases, discharges, and acquits the DIP Lender and each of its former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into any DIP Documents; and (ii) waives, discharges and releases any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations. Provided, however, that the foregoing release and waiver with respect to the DIP Lender, DIP Liens, and DIP Obligations in this paragraph shall only cover such claims, causes of action, obligations, and defenses arising up to and including entry of the Interim Order and the Initial Draw.

37.     <u>Indemnification</u>.  The Debtors will indemnify and hold harmless the DIP Lender and its respective affiliates, officers, directors, employees, agents, advisors, attorneys, financial advisors, and representatives from and against all losses, liabilities (including coverage of environmental liabilities), claims, damages or other expenses arising out of or relating to the DIP Loan Documents and the Debtors' use of the financing provided thereunder. The indemnification will survive and continue for the benefit of all such persons or entities.

38.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Term Sheet, any other DIP Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

39.     <u>Miscellaneous Provisions</u>.  Immediately upon entry of this Interim Order, the provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors, and their respective successors and assigns. The provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive the entry of any order (i) confirming any chapter 11 plan in the Chapter 11 Cases that is not a DIP Lender approved plan, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the terms of this Interim Order, the DIP Term Sheet and any applicable DIP Loan Documents.

40.     <u>Texas A&M University System</u>.  Notwithstanding anything to the contrary in this Interim Order or the DIP Motion, the DIP Collateral shall not include, and the DIP Liens shall not

attach to, (i) the Debtors' leasehold interest in leases of nonresidential real property as a property interest, or (ii) the lease between The Texas A&M University System ("TAMUS") and the Debtors; *provided, however*, that nothing herein shall (A) limit or impair the attachment of the DIP Liens to proceeds of any assignment, transfer, assumption, rejection, monetization, or other disposition of any such leasehold interest or lease to the extent permitted by applicable law, or (B) preclude the DIP Lender or its designee from serving as an assignee or counterparty to such lease pursuant to section 365 of the Bankruptcy Code, subject to compliance with section 365 of the Bankruptcy Code and all rights of TAMUS to object to the same.

41.     Waiver of Stay.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

42.     Retention of Jurisdiction.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order or the DIP Term Sheet.

43.     General Authorization.  The Debtors and the DIP Lender are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

44.     Final Hearing.  The Court will hold the Final Hearing to consider entry of a Final Order granting the relief set forth in the DIP Motion and this Interim Order on a final basis on **January 14, 2026 at 1:00 p.m. (**Prevailing Central Time), with a status conference to be held the prior day at 9:00 a.m. (Prevailing Central Time) on January 13, 2026. Any objections (the "Objections") to entry of a Final Order must be filed with the Clerk of the Bankruptcy Court in these Chapter 11 Cases **no later than January 9, 2026 at 5:00 p.m.** (Prevailing Central Time)

(the "Objection Deadline"). If no timely Objections are filed on or before the Objection Deadline, the Court may enter the Final Order without the necessity of hearing or further notice.

45.     Final Hearing Notice.  The Debtors shall service notice of (i) entry of this Interim Order; (ii) the Final Hearing; and (iii) the Objection Deadline on (a) the parties having been given notice of the Interim Hearing; (b) any other party which has filed a request for notices with this Court; (c) and proposed counsel for the Committee.

Signed: December 24, 2025

Alfredo R Pérez
United States Bankruptcy Judge

# Exhibit 1

**RELLIS CAMPUS DATA RESEARCH CENTER (RCDRC), LLC ET AL**                    **Strictly Confidential**



Prepared at the direction of counsel, CONFIDENTIAL AND PRIVILEGED

**Table of Contents**

Thirteen Week Cash Flow (TWCF)

**CONFIDENTIALITY NOTICE AND PROFESSIONAL DISCLAIMER**

This document and all accompanying schedules, analyses, data, models, and exhibits (collectively, the "Confidential Information") are the exclusive property of Veritas Restructuring Group ("Veritas") and are furnished solely for the limited purpose of internal evaluation and case administration.

By accessing or reviewing this material, the recipient acknowledges and agrees to the following:

**1. Non-Reliance and No Expert Opinion**
This document is for information only and prepared solely for discussion purposes in connection with a potential or ongoing bankruptcy proceeding. This document should not be used for investment decisions. It does not constitute an expert opinion, testimony, or declaration under Rule 26 of the Federal Rules of Civil Procedure or any applicable bankruptcy rule.
No portion of this material should be construed as Veritas providing audit, attestation, valuation, or legal services.

**2. No Audit, Examination, or Assurance**
The financial information, projections, and analyses herein are based entirely on data and assumptions provided by management or counsel.
Veritas has not audited, reviewed, or examined the information in accordance with generally accepted auditing or attestation standards, and no assurance, certification, or representation is expressed or implied as to the accuracy, completeness, or fairness of the information.

**3. Limited Purpose and Use**
This material is preliminary and subject to revision. It may not be used, quoted, filed with the Court, or disclosed to any third party— including creditors, investors, or governmental agencies—without the express written consent of Veritas.
Any use or reliance by parties other than the client is strictly prohibited and at their own risk.

**4. No Fiduciary or Agency Role**
Veritas acts solely as a financial advisor to its client and does not undertake duties or obligations to any other party, including the Court, the U.S. Trustee, or any creditor constituency.

**5. No Representations or Warranties**
All analyses and conclusions are based on information believed to be reliable but may contain errors or omissions.
Veritas expressly disclaims any and all representations, warranties, or guarantees, whether express or implied, and shall have no responsibility or liability for the use of or reliance on this information.

**6. Limitation of Liability**
In no event shall Veritas, its members, employees, or affiliates be liable for any direct, indirect, incidental, or consequential losses arising from this material or any reliance placed upon it.
This limitation applies to the fullest extent permitted by law.

**7. Confidentiality and Return**
This material is strictly confidential and may not be disclosed, reproduced, or distributed without authorization. Upon request, all copies must be returned or permanently destroyed.

**8. Unauthorized Access**
If you are not the intended recipient, you are hereby notified that any review, dissemination, or use of this document is strictly prohibited. Please notify the sender immediately and delete all copies.

RELLIS CAMPUS DATA RESEARCH CENTER (RCDRC), LLC ET AL.

**Thirteen Week Cash Flow (TWCF)**
$ in Actuals

| | | F | F | F | F | F | F | F | F | F | F | F | F | F | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning of Period** | 12/21/2025 | | | | | | | | | | | | | | |
| *Actual (A)/ Forecast (F)* | | | | | | | | | | | | | | | |
| Start Date | | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 3/1 | 3/8 | 3/15 | |
| End Date | | 12/27 | 1/3 | 1/10 | 1/17 | 1/24 | 1/31 | 2/7 | 2/14 | 2/21 | 2/28 | 3/7 | 3/14 | 3/21 | |
| Week Number | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **Cash Receipts** | | | | | | | | | | | | | | | |
| Cash Deposits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Received- A/R Collections | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Cash Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Financing | | 1,500,000 | - | - | - | - | - | 1,000,000 | - | - | - | 800,000 | - | - | 3,300,000 |
| **Total Cash Receipts** | | **1,500,000** | **-** | **-** | **-** | **-** | **-** | **1,000,000** | **-** | **-** | **-** | **800,000** | **-** | **-** | **3,300,000** |
| **(-) Operating Cash Disbursements** | | | | | | | | | | | | | | | |
| Payroll & Benefits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent, Lease & Utilities | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | | (3,593) | - | - | - | (3,593) | - | - | - | (3,593) | - | - | - | (3,593) | (14,371) |
| Materials & Supplies | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repairs & Maintenance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subcontractors & Outside Services | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Freight & Logistics (Fuel) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equipment Rentals | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes & Permits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| IT & Communications | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Miscellaneous & Contingency Reserves | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Cash Disbursements** | | **(3,593)** | **-** | **-** | **-** | **(3,593)** | **-** | **-** | **-** | **(3,593)** | **-** | **-** | **-** | **(3,593)** | **(14,371)** |
| **Net Operating Cash Flow** | | **1,496,407** | **-** | **-** | **-** | **(3,593)** | **-** | **1,000,000** | **-** | **(3,593)** | **-** | **800,000** | **-** | **(3,593)** | **3,285,629** |
| **(-) Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| **Financing Activity** | | | | | | | | | | | | | | | |
| Debt Service & Interest Payments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Principal Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Financing Details | | | | | | | | | | | | | | | |
| Commitment Fee | | (189,750) | - | - | - | - | - | - | - | - | - | - | - | - | (189,750) |
| Funding Fee [1] | | (45,000) | - | - | - | - | - | (30,000) | - | - | - | (24,000) | - | - | (99,000) |
| Exit Fee | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Financing Activity** | | **(234,750)** | **-** | **-** | **-** | **-** | **-** | **(30,000)** | **-** | **-** | **-** | **(24,000)** | **-** | **-** | **(288,750)** |
| **Bankruptcy / Restructuring Expenses** | | | | | | | | | | | | | | | |
| Restructuring & Professional Fees (FA) | | (100,000) | - | (50,000) | - | (50,000) | - | (50,000) | - | (50,000) | - | (50,000) | - | (50,000) | (400,000) |
| Debtor Counsel Fees | | (250,000) | - | (100,000) | - | (100,000) | - | (100,000) | - | (100,000) | - | (100,000) | - | (100,000) | (850,000) |
| Committee Professionals & Legal Counsel | | (100,000) | - | - | - | (100,000) | - | - | - | (100,000) | - | - | - | (100,000) | (400,000) |
| Investment Banking Professionals | | - | - | - | - | - | - | - | - | - | - | (350,000) | - | - | (350,000) |
| DIP Counsel Fee | | (50,000) | - | - | - | (50,000) | - | - | - | (50,000) | - | - | - | (50,000) | (200,000) |
| Claims Agent | | - | - | - | - | (50,000) | - | - | (50,000) | - | - | - | - | - | (100,000) |
| Secured Loan- Vantage Interest | | (120,000) | - | - | - | (120,000) | - | - | - | (120,000) | - | - | - | - | (360,000) |
| Estimated US Trustee Fees | | - | - | - | - | - | - | - | - | - | - | - | - | (25,000) | (25,000) |
| Contingency/ Misc. Fees | | - | - | (100,000) | - | - | - | - | (100,000) | - | - | - | (100,000) | - | (300,000) |
| **Total Bankruptcy / Restructuring Expenses** | | **(620,000)** | **-** | **(150,000)** | **(100,000)** | **(300,000)** | **(170,000)** | **(150,000)** | **(100,000)** | **(300,000)** | **(170,000)** | **(500,000)** | **(100,000)** | **(325,000)** | **(2,985,000)** |
| **Total Non-Operating Cash Disbursements** | | **(854,750)** | **-** | **(150,000)** | **(100,000)** | **(300,000)** | **(170,000)** | **(180,000)** | **(100,000)** | **(300,000)** | **(170,000)** | **(524,000)** | **(100,000)** | **(325,000)** | **(3,273,750)** |
| **Net Cash Flow** | | **641,657** | **-** | **(150,000)** | **(100,000)** | **(303,593)** | **(170,000)** | **820,000** | **(100,000)** | **(303,593)** | **(170,000)** | **276,000** | **(100,000)** | **(328,593)** | **11,879** |
| **Cash Balance** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | - | 641,657 | 641,657 | 491,657 | 391,657 | 88,064 | (81,936) | 738,064 | 638,064 | 334,472 | 164,472 | 440,472 | 340,472 | |
| Net Cash Flow | | 641,657 | - | (150,000) | (100,000) | (303,593) | (170,000) | 820,000 | (100,000) | (303,593) | (170,000) | 276,000 | (100,000) | (328,593) | 11,879 |
| **Ending Cash Balance** | | **641,657** | **641,657** | **491,657** | **391,657** | **88,064** | **(81,936)** | **738,064** | **638,064** | **334,472** | **164,472** | **440,472** | **340,472** | **11,879** | **11,879** |

**Disclosures**

Pursuant to the financing facility, the Debtor anticipates making borrowings of approximately $1.5 million during the first week following the effective date, an additional $1.0 million during week seven, and approximately $0.8 million during week eleven. [1]

PRIVILEGED AND CONFIDENTIAL