United States Bankruptcy Court
Southern District of Texas
**ENTERED**
July 06, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RELLIS CAMPUS DATA AND RESEARCH CENTER, LLC, *et al.*, | Case No. 25-90666 |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, OTHER THAN PERMITTED ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of RELLIS Campus Data and Research Center, LLC and Optimus DataCenters, LLC, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**" or "**Sellers**"), for entry of an order (this "**Order**") in the above-captioned chapter 11 cases of the Debtors (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Section B of Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "**Complex Case Procedures**"), authorizing (a) the sale (the "**Sale**") of all or substantially all of the Debtors' assets (the "**Acquired Assets**") free and clear of all liens, claims, interests and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), on the terms set

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are: RELLIS Campus Data and Research Center, LLC (9113), and Optimus DataCenters, LLC (1582). The Debtors' service address is 5010 Doss Road, Austin, Texas 78734.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Asset Purchase Agreement (as defined below), as applicable.

forth in that certain Asset Purchase Agreement (the "**Asset Purchase Agreement**") by and among the Sellers and ThisWay Global, Inc. (together with any Purchaser Designee as provided in Section 30 of the Asset Purchase Agreement, the "**Purchaser**"),[3] annexed hereto as **Exhibit 1**, (b) the assumption and assignment of the Assigned Contracts (as defined below) in connection therewith, and (c) granting related relief, each as more fully set forth in the Motion; and the Debtors having determined, after a sale and marketing process in accordance with the bidding procedures (the "**Bidding Procedures**") approved by the Bidding Procedures Order, that the Purchaser has submitted the highest or otherwise best bid for the Acquired Assets and is the successful bidder (the "**Successful Bidder**") and the Asset Purchase Agreement constitutes the successful bid (the "**Successful Bid**"); and this Court having provided the opportunity for a hearing to consider the transactions contemplated under the Asset Purchase Agreement (the "**Sale Transactions**") on July 1, 2026 (the "**Sale Hearing**"), at which all interested parties were offered an opportunity to be heard with respect to the Sale Transactions; and upon consideration of the *Declaration of Pablo Bonjour in Support of the Sale* [Docket No. 210-1] and *Declaration of Gerry Willinger in Support of the Sale* [Docket No. 210-2]; and all objections to the Sale and this Order having been withdrawn, resolved, or overruled on the merits; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court being able to issue a final order consistent with Article III of the United States Constitution; and due and sufficient notice of the Motion, the proposed Sale Transactions, and the terms of this Order having been given under the particular

[3] For the avoidance of doubt, any reference in this Order to Purchaser shall be read to include any Purchaser Designee or assignees, whether or not such Purchaser Designee or assignees are expressly included in such reference.

circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion and that consummation of the Sale Transactions consistent with the Asset Purchase Agreement and this Order is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**THIS COURT HEREBY FINDS AND DETERMINES THAT**:

A. *Fed. R. Bankr. P. 7052.* The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing.

B. *Jurisdiction and Venue.* Pursuant to 28 U.S.C. §§ 1334(b) and 157, this Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Acquired Assets to be sold, transferred, and conveyed pursuant to the Asset Purchase Agreement. Without limiting the generality of the foregoing, this Court has exclusive in rem jurisdiction over the Acquired Assets pursuant to 28 U.S.C. § 1334(e), as such Acquired Assets are property of the Debtors' chapter 11 estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order hereon under Article III of the United States Constitution. Venue of these Chapter 11 Cases and approval of the Sale Transactions

contemplated by the Asset Purchase Agreement is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *Statutory Predicates.* The statutory authorization for the relief granted herein is found in sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the Complex Case Procedures.

D. *Sale and Marketing Process.* The Debtors and their professionals marketed the Acquired Assets in accordance with the Bidding Procedures Order. The sale and marketing process set forth in the Bidding Procedures Order afforded all potential bidders a full, fair, and reasonable opportunity to submit a higher or otherwise better offer to purchase the Acquired Assets and participate in the Sale Transactions contemplated hereby.

E. *Selection of Successful Bidder*. On May 26, 2026, this Court entered the Bidding Procedures Order [Docket No. 189], which, among other things, approved the Bidding Procedures and authorized the Debtors to designate a Stalking Horse Purchaser (as defined in the Bidding Procedures Order). Pursuant to the Bidding Procedures, on June 1, 2026, the Debtors filed the *Notice of Selection of Stalking Horse Purchaser* [Docket No. 191] (the "**Stalking Horse Designation Notice**"), designating the Purchaser as the Stalking Horse Purchaser. On June 8, 2026, the Debtors filed a *Certificate of No Objection* [Docket No. 192] confirming that no objection to the Stalking Horse Designation Notice was received by the Debtors or their advisors. The Debtors did not receive any competing Qualified Bids by the deadline established in the Bidding Procedures Order and, accordingly, no Auction was held and the Purchaser was deemed the Successful Bidder with respect to the Sale Transactions pursuant to the Bidding Procedures Order. The Purchaser was selected as Stalking Horse Purchaser in conformity with the Bidding

Procedures Order, and Purchaser, to the extent applicable, is entitled to the Bid Protections pursuant to the terms and conditions in, and subject to, the Asset Purchase Agreement.

F. *Incorporation by Reference.* Findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

G. *Adequate and Reasonable Notice.* As evidenced by the affidavits of service filed with this Court, including but not limited to that *Certificate of Service of Sale Notice and Cure Notice* [Docket No. 193], *Certificate of Service of Supplemental Sale Notice* [Docket No. 194], *Affidavit of Publication of Sale Notice* [Docket No. 196], and *Certificate of Service of Supplemental Cure Notice* [Docket No. 205], and based upon the record in these Chapter 11 Cases, and as previously determined by this Court in the Bidding Procedures Order, (i) due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, and the Sale Transactions has been provided to all parties in interest; (ii) such notice was and is good, sufficient, and appropriate under the circumstances and reasonably calculated to reach and apprise all holders of liens, Claims, Encumbrances (as defined below), and other interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities of their right to appear and be heard, and was provided in accordance with the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedural due process requirements of the United States Constitution; and (iii) no other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion, the Sale Hearing, the Asset Purchase Agreement, the Sale Transactions, or of the entry of this Order is necessary or shall be required.

H. *Final Order.* This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule

54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and authorizes the closing of all transactions contemplated hereby without regard to any stay or delay in its implementation.

I. *Good Faith Purchaser.* The Debtors, the Purchaser, and their respective agents, representatives, employees, officers, counsel and advisors, have negotiated, proposed, and entered into the Asset Purchase Agreement and the Sale Transactions contemplated thereby in good faith, without collusion, and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. The Purchaser has proceeded in good faith in all respects. The terms of the Asset Purchase Agreement, including the consideration in respect of the Acquired Assets as set forth in Section 7(a) of the Asset Purchase Agreement (the "**Purchase Price**"), were not controlled by any agreement among potential bidders and neither the Debtors, the Purchaser, nor any other parties in interest have engaged in collusion or any conduct that would cause or permit the Asset Purchase Agreement to be challenged, avoided, or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or any other applicable law. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under applicable law. The Purchase Price represents fair and reasonably equivalent value for the Acquired Assets. Neither the Debtors nor the Purchaser are entering into the Asset Purchase Agreement or consummating the Sale Transactions with any fraudulent or otherwise improper purpose. The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in section 101

of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Purchaser and the Debtors.

J. The Sale Transactions, which include the transfer of the Acquired Assets pursuant to the Asset Purchase Agreement and all covenants in and conditions thereto, are an integrated transaction, meaning that each component is an essential part of every other component and that the Sale Transactions can be consummated only if all of the components are consummated. Accordingly, each component of the Sale Transactions is subject to, and is protected by, the provisions of section 363(m) of the Bankruptcy Code.

K. *Highest or Otherwise Best Offer.* The Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets. No other Person, or group of Persons, has offered to purchase the Acquired Assets for an amount that would give equal or greater value to the Debtors than the value provided by the Purchaser pursuant to the Asset Purchase Agreement. The Asset Purchase Agreement is the best means available to the Debtors to maximize the return to their stakeholders and limit losses. No alternative to the Sale Transactions exists that would provide a greater value to the Debtors, their creditors, or other parties in interest.

L. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for consummation of the Sale Transactions pursuant to the Asset Purchase Agreement and all other Transaction Documents, outside of the ordinary course of business and in accordance with the requirements of section 363(b) of the Bankruptcy Code.

M. The Debtors' decision to enter into the Asset Purchase Agreement with the Purchaser was a due and proper exercise of the Debtors' business judgment and was authorized pursuant to the Bidding Procedures Order.

N. The Sale of the Acquired Assets pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code upon the terms and conditions set forth in the Asset Purchase Agreement is the optimal means to create value for the benefit of the Debtors' estates. The Sale Transactions maximize the value of the Acquired Assets for the benefit of all creditors and parties in interest. Unless the Sale is concluded expeditiously, as provided for in the Motion and the Asset Purchase Agreement, creditor recoveries may be substantially diminished.

O. *Fair Purchase Price.* The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (i) is fair and adequate; (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and similar laws); and (iii) will provide an equal or greater recovery for the Debtors' stakeholders than would be provided by any other reasonably practicable available alternative. The terms of the Asset Purchase Agreement, the Transaction Documents, and the Sale Transactions are fair and reasonable under the circumstances of the Debtors' Chapter 11 Cases, and the Debtors' determination to proceed with such Sale Transactions constitutes a valid and sound exercise of the Debtors' business judgment.

P. *Sale Free and Clear under Section 363(f).* The Debtors are authorized to sell the Acquired Assets free and clear of any liens, claims, defenses (including rights of setoff and recoupment), and interests, in each case, in, on, or related to the Acquired Assets, including security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, mechanics' and materialman's liens, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic Governmental Authority, taxes

(including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, offsets, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Acquired Assets (including all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights and claims arising out of the Debtors' continued operations following the Closing Date including any Encumbrances as defined in the Asset Purchase Agreement (collectively, "**Encumbrances**"), other than Permitted Encumbrances and Assumed Liabilities. The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transactions contemplated thereby if the Sale to the Purchaser and the assumption of any Assumed Liabilities by the Purchaser were not free and clear of all Encumbrances other than the Assumed Liabilities and Permitted Encumbrances. The Debtors may sell the Acquired Assets free and clear of any Encumbrances of any kind or nature whatsoever (other than Permitted Encumbrances and Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Each entity with an Encumbrance in the Acquired Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrance; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of such Encumbrances who did not object, or withdrew their objections, to the Motion are

deemed, subject to the terms of this Order, to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) are adequately protected, and will not suffer any undue burden or prejudice, by having their Encumbrances attach to the proceeds received by the Debtors that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances, with the same validity, force, and effect, and in the same order of priority, which such Encumbrances now have against the Acquired Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates may possess with respect thereto. The Purchaser shall have no obligations with respect to any Encumbrances against the Debtors (other than Permitted Encumbrances and Assumed Liabilities).

Q. *No Successor, Transferee, or Similar Liability.* By virtue of the consummation of the Sale Transactions contemplated under the Asset Purchase Agreement: (a) the Purchaser is not a continuation of the Sellers and their respective estates, there is not substantial continuity between the Purchaser and the Sellers, and there is no continuity of enterprise between the Sellers and the Purchaser; (b) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their estates; (c) the Sale Transactions do not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates; and (d) the Purchaser is not a successor or assignee of the Debtors or their estates for any purpose including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or common law, or under any product warranty liability law or

doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Purchaser shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "**WARN Act**"), 29 U.S.C. §§ 2101 et seq. or the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**") and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act. Except for the Assumed Liabilities and Permitted Encumbrances, (i) the transfer of the Acquired Assets to the Purchaser and (ii) the assumption and assignment to the Purchaser of the Assigned Contracts do not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity including, without limitation, any theory of antitrust or successor or transferee liability.

R. The Purchaser and the Debtors are not entering into the Asset Purchase Agreement and Transaction Documents or consummating the Sale Transactions for the fraudulent purpose of escaping liability for the Debtors' obligations or to defraud creditors in any way.

S. *Order Required by the Purchaser.* Entry of this Order approving the Asset Purchase Agreement is a requirement of the Asset Purchase Agreement and such requirement is an appropriate condition precedent to the Purchaser's consummation of the Sale Transactions.

T. *Property of the Estate.* The Acquired Assets are owned by the Debtors and constitute sole and lawful property of the Debtors, and the Debtors' estates and title thereto are vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors have all title, interest, and/or rights in the Acquired Assets required to transfer and to convey the Acquired Assets to the Purchaser, as required by the Asset Purchase Agreement.

U. *Corporate Authority.* Subject to the entry of this Order, (i) the Debtors have full corporate power and authority to perform all of their obligations under the Asset Purchase Agreement and the Transaction Documents, and the Debtors' prior execution and delivery of, and/or performance of obligations under, the Asset Purchase Agreement and the Transaction Documents is hereby ratified; (ii) the Debtors have all of the corporate power and authority necessary to consummate the Sale Transactions; (iii) the Debtors have taken all corporate actions necessary to authorize, approve, execute, and deliver the Asset Purchase Agreement and the Transaction Documents and to consummate the Sale Transactions, except for the closing conditions expressly provided in the Asset Purchase Agreement and the Transaction Documents; and (iv) no consents or approvals are required to consummate the Sale Transactions or otherwise perform the obligations under the Asset Purchase Agreement or the Transaction Documents, except for the closing conditions expressly provided therein.

V. *Sale in Best Interests.* The relief requested in the Motion and set forth in this Order is in the best interests of the Debtors, their creditors, estates, and all other parties in interest in the Debtors' Chapter 11 Cases.

W. *Prompt Consummation.* To maximize the value of the Acquired Assets, it is essential that the Sale Transactions occur within the timeframe set forth in the Asset Purchase Agreement, except as otherwise agreed by the Debtors and Purchaser pursuant to this Order. Time

is of the essence in consummating the Sale Transactions and the Debtors and the Purchaser intend to close the Sale Transactions as soon as possible. Accordingly, there is cause to lift the stays established by Bankruptcy Rules 6004 and 6006 with regards to the Sale Transactions and the assignment of the Acquired Assets.

X. *Non-Debtor Material Contracts and Non-Debtor Material Assets*. Certain contracts and assets material to the ownership, use, and operation of the Acquired Assets as a going-concern data center facility are held in the name of, or beneficially owned by, Persons other than the Debtors (the "**Non-Debtor Material Contracts**" and "**Non-Debtor Material Assets**," respectively, as each is defined in the Asset Purchase Agreement). The assignment and transfer of the Non-Debtor Material Contracts and conveyance of the Non-Debtor Material Assets to the Purchaser is necessary for the Purchaser to acquire the full benefit of the Acquired Assets and to operate the RELLIS data center facility on a going-concern basis following the Closing.

Y. *TAMUS Contracts*. Prior to the Petition Date, RELLIS Campus Data and Research Center, LLC (the "**RELLIS Debtor**") and The Board of Regents of the Texas A&M University System (the "**Ground Landlord**" or "**TAMUS**") entered into that certain Ground Lease, dated as of June 1, 2020, as amended by (i) that certain Amendment to Ground Lease, dated as of June 9, 2023, and (ii) that certain Second Amendment to Ground Lease, dated as of November 14, 2024 (as may be further amended, supplemented, or otherwise modified from time to time, the "**Ground Lease**"). In connection with the Ground Lease, the RELLIS Debtor and TAMUS entered into the TAMU Easement Agreements (collectively with the Ground Lease, the "**TAMUS Contracts**"). Prior to the Petition Date, the Ground Landlord provided notice to the RELLIS Debtor of certain defaults under the Ground Lease, including: (i) failure to diligently pursue construction to completion, as required by Sections 7.08(a) and 7.09(d) of the Ground Lease; and (ii) failure to

keep the Premises free of liens, as required by Section 7.10 of the Ground Lease (collectively, the "**Specified Defaults**"). The cure amount required under section 365(b)(1) of the Bankruptcy Code is $1,050,000.00 ( the "**TAMUS Cure Amount**"), which amount is sufficient to cure all defaults under the TAMUS Contracts, including the Specified Defaults.

Z. The Purchaser's obligation to consummate the Sale Transactions is expressly conditioned upon, among other things, the execution and delivery, at or prior to the Closing, of an amended and/or restated Ground Lease and amended and/or restated TAMU Easement Agreements (collectively, the "**Amended TAMUS Contracts**"), each in form and substance acceptable to the Purchaser and the Ground Landlord; *provided*, *however*, for the avoidance of doubt, that the TAMUS Cure Amount will be payable solely from the Purchase Price. TAMU's consent to any amendment to, or assignment of, the Ground Lease is expressly subject to TAMU's receipt of commercially reasonable information related to Purchaser's adequate assurance of future performance under the Ground Lease (as amended as contemplated under the Asset Purchase Agreement and this Order) prior to the closing of the Sale Transactions (the "**TAMUS CP**").

AA. *The TAMU Easement Agreements*. The TAMU Easement Agreements constitute material agreements that are integral to the ownership, use, and operation of the Acquired Assets, and the continued effectiveness of the TAMU Easement Agreements is necessary to preserve the value of the Acquired Assets and to permit the Purchaser to operate and develop the Premises as a going concern. Upon assumption and assignment of the TAMU Easement Agreements to Purchaser pursuant to this Order and the Asset Purchase Agreement, the TAMU Easement Agreements, as amended by the Amended TAMUS Contracts, shall be effective, valid, binding, and enforceable against all parties thereto and their respective successors and assigns as of the Closing Date.

BB. *Required Amendments*. The Purchaser's obligation to consummate the Sale Transactions is expressly conditioned upon, among other things, the negotiation, execution, and effectiveness of certain Required Amendments with applicable counterparties pursuant to Section 22(g) of the Asset Purchase Agreement, including: (i) an amendment to and/or assignment of the Ground Lease and the TAMU Easement Agreements, with the written consent of TAMUS which amendment and/or assignment shall provide, among other things, that the Purchaser may access the Leased Real Property and commence construction and operations on the Premises immediately upon the Closing Date without additional approvals, waiting periods, or administrative prerequisites imposed by TAMUS or the RELLIS Campus administration; (ii) an amendment to and/or assignment of the ESA, with the written consent of BTU; (iii) an amendment to and/or assignment of the City Agreements, with the written consent of the City of Bryan, Texas; (iv) an amendment to and/or assignment of the County Agreements, with the consent of Brazos County; and (v) an amendment to and/or assignment of the ICA, with the consent of BTU.

CC. *Tax Abatement Agreements*. The City Abatement Agreement and the County Abatement Agreement (collectively, the "**Tax Abatement Agreements**") constitute material Assigned Contracts and Intangible Property included in the Acquired Assets and the economic development incentives, tax abatements, and related benefits provided under the Tax Abatement Agreements are integral to the value of the Acquired Assets and to the Purchaser's willingness to consummate the Sale Transactions.

DD. *Electrical Service Continuity*. The Purchaser's obligation to consummate the Sale Transactions is expressly conditioned upon, among other things, the Debtors' delivery of written confirmation from BTU, in form and substance reasonably acceptable to the Purchaser, with respect to the ESA (as amended by the applicable Required Amendment) that (i) electrical service

to the Premises will continue without interruption through and after the Closing Date at the full contracted capacity provided under the ESA; (ii) no curtailment, disconnection, or material reduction in such contracted capacity is pending or, to the Debtors' knowledge, threatened; and (iii) such contracted capacity has not been reallocated, redirected, or diverted to any other property, customer, or account and remains available to serve the Premises.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. *Motion is Granted.* The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein, and the Sale Transactions contemplated by the Asset Purchase Agreement are hereby approved, subject to the terms and conditions contained herein.

2. *Objections Overruled.* Except as expressly stated herein, all objections to, or reservation of rights regarding, the relief requested in the Motion, the entry of this Order, or the relief granted herein that have not been withdrawn, waived, settled, or adjourned as provided below or otherwise, or that have not otherwise been resolved pursuant to the terms hereof are hereby denied and overruled on the merits with prejudice. All Persons that failed to timely object, or withdrew their objections, to the Motion or the entry of this Order are deemed to consent to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code. No appeal, motion to reconsider, or similar pleading has been filed with respect to the Bidding Procedures Order, and such order is a final order of this Court, has not been vacated, withdrawn, rescinded, or amended and remains in full force and effect. No objection or reservation of rights regarding the selection of the Purchaser as the Stalking Horse Purchaser has been filed or asserted, and the selection of the Purchaser as the Stalking Horse Purchaser is approved pursuant to the Bidding Procedures Order and as set forth herein, with Bid Protections

approved in favor of the Purchaser pursuant to the terms and conditions of the Asset Purchase Agreement.

3. *Notice.* Notice of the Motion and Sale Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 and the Bidding Procedures Order, and as such no further or other notice is required or appropriate.

4. *Approval and Authorization.* The Sale of the Acquired Assets to the Purchaser on the terms and conditions contained herein and in the Asset Purchase Agreement and the Transaction Documents is hereby approved in all respects pursuant to sections 105(a), 363(b), (f), and 365 of the Bankruptcy Code (including the transfer of the Debtors' right, title and interest in the Acquired Assets to the Purchaser, on an "as is, where is" and "with all faults" basis). Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform all obligations under and make all payments required or contemplated by the Asset Purchase Agreement and the Transaction Documents as and when due thereunder without further order of this Court. The Debtors, the Purchaser, and each of their respective officers, employees, and agents are hereby authorized to (i) execute the Asset Purchase Agreement and the Transaction Documents, and any prior execution of such agreements, documents, and instruments, including the Transaction Documents, is hereby ratified; (ii) perform all obligations under or related to the Asset Purchase Agreement and the Transaction Documents, including, without limitation, to consummate any required deeds, assignments, and other instruments of transfer, satisfy any indemnification obligations under the Asset Purchase Agreement in favor of the Purchaser, and to consummate the Sale Transactions, and any prior performance of such obligations or any prior consummation of such Sale Transactions is hereby ratified; and (iii) take all other and further

actions as may be reasonably necessary or appropriate (as determined in good faith by the Purchaser) to consummate and implement the Sale Transactions and to perform all obligations under the Asset Purchase Agreement and the Transaction Documents, without any further corporate action or order of this Court. Subject to the terms of the Asset Purchase Agreement, at any time that is at least twenty-four (24) hours prior to the Closing, Purchaser shall have the right, exercisable in Purchaser's sole and absolute discretion, by providing written notice to Sellers, to designate any of the Acquired Assets as Excluded Assets.

5. Except as otherwise expressly provided in the Asset Purchase Agreement, all Persons presently on or after the Closing Date in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request. All Persons are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to Purchaser in accordance with the Asset Purchase Agreement and this Order.

6. *No Sub Rosa Plan.* Neither the Asset Purchase Agreement nor the Sale Transactions constitutes a sub rosa chapter 11 plan or an element of such plan for which approval has been sought without the protection that a disclosure statement would afford. Neither the Asset Purchase Agreement nor the Sale Transactions impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of any subsequent chapter 11 plan of the Debtors.

7. *Valid Transfer; Free and Clear.* As of the Closing Date, the consummation of the Sale Transactions shall effect a legal, valid, and enforceable transfer of the Acquired Assets to the Purchaser, and shall vest the Purchaser with all legal, equitable, and beneficial right, title, and interest in and to the Acquired Assets, free and clear of all Encumbrances (other than Permitted

Encumbrances and Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code, notwithstanding any requirement for approval or consent by any Person. The Encumbrances shall attach to the proceeds of the Sale Transactions with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances encumbered the Acquired Assets immediately prior to the entry of this Order, subject to any claims, defenses, and objections the Debtors or their estates may possess. The Asset Purchase Agreement, the Transaction Documents, and the Sale Transactions themselves shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, their estates, their creditors, all counterparties to the Acquired Assets, all parties in interest, and any chapter 11 or chapter 7 trustee, and shall not be subject to rejection or avoidance by any party.

8. *Release of Encumbrances.* On, before, or after the Closing Date, each of the Debtors' creditors, or such other Person holding or asserting an interest in the Acquired Assets, are authorized and directed to execute such documents, releases, or terminations, and take all other actions as may be necessary, desirable, or appropriate (as determined by the Purchaser) to release, effective as of the Closing Date, their respective Encumbrances of any kind against the Acquired Assets, as such Encumbrances may have been recorded or may otherwise exist. If any Person that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing any Encumbrances against or on the Acquired Assets and shall not have delivered to the Debtors on or prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all liens, and any other documents necessary, desirable, or appropriate (as determined by the Purchaser) for the purpose of documenting the release of all Encumbrances that the Person has or may assert with respect to the Acquired Assets, the Debtors and the Purchaser are hereby authorized to execute

and file such statements, instruments, releases, terminations, and other documents on behalf of such Person with respect to the Acquired Assets. The Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order or any other appropriate or desirable documents, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances or liabilities against the Acquired Assets.

9. *Sale Free and Clear of Litigation Claims*. Notwithstanding the pendency of that certain adversary proceeding styled *Satterfield & Pontikes Construction, Inc. v. Rellis Campus Data and Research Center, LLC et al.*, Adv. Proc. No. 25-03830, pending in the U.S. Bankruptcy Court for the Southern District of Texas (the "**S&P Adversary Proceeding**"), and notwithstanding any rights, interests, liens, claims, encumbrances, remedies, causes of action, notices, lis pendens, equitable interests, constructive trusts, resulting trusts, rights of setoff or recoupment, or other asserted interests of any kind or nature, whether known or unknown, asserted or unasserted, liquidated or unliquidated, contingent or non-contingent, arising from, relating to, or otherwise connected with the S&P Adversary Proceeding or the facts, transactions, agreements, property, or conduct at issue therein (the "**S&P Claims**"), the Acquired Assets shall be sold, transferred, and conveyed to the Purchaser at Closing free and clear of the S&P Claims pursuant to sections 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, to the extent any S&P Claims constitute Encumbrances against the Acquired Assets, such Encumbrances shall attach solely to the net proceeds of the Sale Transactions received by the Debtors' estates, with the same validity, priority, force, and effect as such Encumbrances had against the Acquired Assets immediately prior to the Closing, and subject to any claims, defenses, and objections of the Debtors and all other parties in interest with respect thereto.

10. Upon consummation of the Sale and the occurrence of the Closing, no person or entity, including Satterfield & Pontikes Construction, Inc. ("**S&P**") or any other party to or claimant in the S&P Adversary Proceeding, shall have or retain any right, interest, lien, claim, encumbrance, remedy, or other interest arising from, relating to, or otherwise connected with the S&P Adversary Proceeding that attaches to, follows, burdens, encumbers, or is enforceable against the Acquired Assets, the Purchaser, or any successor or assign of the Purchaser. All S&P Claims are hereby forever barred, released, discharged, and terminated as against the Acquired Assets, the Purchaser, and any successor or assign of the Purchaser, and shall not survive the Closing or otherwise affect the Purchaser's title to, use of, or ownership of the Acquired Assets. S&P and all other parties asserting S&P Claims are hereby permanently enjoined from asserting, prosecuting, or otherwise pursuing any S&P Claims against the Purchaser, the Acquired Assets, or any affiliate, successor, or assign of the Purchaser, which injunction is in addition to and not in limitation of the injunction set forth in paragraph 11 of this Order.

11. *Injunction.* All Persons holding Encumbrances of any kind or nature whatsoever against or in the Debtors or the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Debtors' Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to the Debtors, the operation of the Debtors' business prior to the Closing Date, the Acquired Assets, or the transfer of the Acquired Assets to the Purchaser (including any rights or claims based on any successor, transferee, derivative, or vicarious liabilities), shall be and hereby are forever barred, estopped, and permanently enjoined from (a) asserting, prosecuting, or otherwise pursuing any Encumbrances against the Purchaser,

any affiliate, successor, or assign of the Purchaser, the property of the Purchaser or any affiliate, successor, or assign of the Purchaser, or the Acquired Assets transferred to the Purchaser, (b) interfering with the Purchaser's title to, or use and enjoyment of, the Acquired Assets, or (c) taking any actions or steps in furtherance of items (a) and (b) of this sentence. All Persons are further prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Purchaser in accordance with the Asset Purchase Agreement, the Transaction Documents, and this Order.

12. *No Successor, Transferee, or Similar Liability.* (a) The Purchaser is not a continuation of the Sellers and their respective estates, there is not substantial continuity between the Purchaser and the Sellers, and there is no continuity of enterprise between the Sellers and the Purchaser; (b) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their estates; (c) the transactions do not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates; and (d) the Purchaser is not a successor or assignee of the Debtors or their estates for any purpose including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Purchaser shall have no liability or obligation under the WARN Act, 29 U.S.C. §§ 2101 et seq. or CERCLA and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age

Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act. Except for the Assumed Liabilities and Permitted Encumbrances, (i) the transfer of the Acquired Assets to the Purchaser and (ii) the assumption and assignment to the Purchaser of the Assigned Contracts do not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity including, without limitation, any theory of antitrust or successor or transferee liability. The transfer of title and possession of the Acquired Assets shall be free and clear of any Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) pursuant to any successor or successor-in-interest liability theory, and the Purchaser and each of its affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Encumbrances, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, liquidated or unliquidated, asserted derivatively or vicariously, or asserted based on the Purchaser's status as a transferee, successor, or otherwise.

13. Other than Assumed Liabilities and Permitted Encumbrances, the Purchaser is not assuming, and shall not be liable or responsible for, as a successor or otherwise, any liabilities of the Debtors, including any liabilities relating to or arising from the Debtors' ownership or use of the Acquired Assets prior to the Closing Date, any liabilities calculable by reference to the Debtors

or their operations, or any liabilities relating to conditions existing on or prior to the Closing Date, which liabilities are hereby extinguished insofar as they may give rise to liability against the Purchaser or any affiliate of the Purchaser. Except as otherwise provided in the Asset Purchase Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all Persons—including the Debtors, all debt holders, equity security holders, employees or former employees, Governmental Authorities, lenders, parties to or beneficiaries under any benefit plan, and all other creditors—holding an Encumbrance against, in, or with respect to the Debtors or the Acquired Assets, shall be forever barred and estopped from asserting such Encumbrance, including any right of setoff or subrogation, against the Purchaser or any of its affiliates, successors, assigns, or their respective officers, directors, employees, partners, or representatives, with respect to the Acquired Assets. All Persons, governmental units (as defined in section 101(27) of the Bankruptcy Code), or other Governmental Authorities, and all holders of liens based upon or arising out of liabilities retained by the Debtors, may not take any action against the Purchaser or the Acquired Assets to recover on account of any liabilities of the Debtors.

14. *Release, Discharge, and Termination of Encumbrances.* This Order shall be effective as a determination that, on the closing of the Sale, all Encumbrances with respect to the Acquired Assets of any kind or nature whatsoever existing prior to the closing of the Sale Transactions have been unconditionally released, discharged, and terminated as to the Acquired Assets (other than the Encumbrances that attach to the net proceeds of the Sale) and that the conveyances described herein have been effected.

15. *Assumption and Assignment of Assigned Contracts.* Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors are authorized to assume and assign the Assigned Contracts to the Purchaser, and the assumption and assignment of such Assigned Contracts,

including the TAMUS Contracts, as amended by the Amended TAMUS Contracts (and the associated Leasehold Interest in the Leased Real Property), the ESA, the City Agreements, the County Agreements, the ICA, and the TAMU Easement Agreements, the assumption and assignment of which is subject, in each case, as applicable, to the execution of the applicable Required Amendment, as set forth in Section 22(g) of the Asset Purchase Agreement, is hereby approved. The Assigned Contracts shall be transferred and assigned to, and following the Closing Date, remain in full force and effect for the benefit of, Purchaser in accordance with the Asset Purchase Agreement, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Purchaser of each Assigned Contract, in accordance with the Asset Purchase Agreement and subject to the TAMUS CP, have been satisfied.

16. The Debtors shall pay, or cause to be paid, all Cure Claims, including all Cure Claims related to the Assigned Contracts. For the avoidance of doubt, the Purchaser shall have no obligation to pay the Cure Claims to the counterparties, any Cure Claims in connection with the assumption and assignment of the Assigned Contracts shall be payable solely from the consideration paid by the Purchaser to the Debtors pursuant to the Asset Purchase Agreement, and under no circumstance shall any Cure Claims or any other amounts payable on account of Cure Claims or in connection with the assumption and assignment of the Assigned Contracts require the Purchaser to pay any consideration in excess of the Purchase Price. Upon the Closing Date and subject to the TAMUS CP, the Debtors and the Purchaser shall be deemed to have cured all defaults under any Assigned Contract and provided adequate assurance of future performance under the

Assigned Contracts within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

17. The Cure Claims designated in the affidavits of service filed at Docket Nos. 193 and 194[4] are deemed the amounts necessary to "cure" (within the meaning of Bankruptcy Code section 365(b)(1)) all "defaults" (within the meaning of Bankruptcy Code section 365(b)) under the Assigned Contracts listed thereon. Unless otherwise represented by the Debtors in a separate pleading, included in this Order, in open court at the Sale Hearing, or pursuant to a contract or lease amendment entered into by the Debtors, Purchaser, and the appropriate contract or lessor counterparty (any such amendment being deemed approved by this Order), the Cure Notice reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment to Purchaser of the Assigned Contracts in accordance with the Asset Purchase Agreement. Any objections to such Cure Claims, to the extent not otherwise resolved, are hereby overruled; *provided* that, in the event of any dispute with respect to a Cure Claim relating to any Assigned Contract (a "**Disputed Cure Claim**"), the Purchaser shall have the right and is hereby authorized, in its sole and absolute discretion, to elect to consummate the Closing notwithstanding such Disputed Cure Claim, in which case (i) such Assigned Contract shall be deemed validly assumed and assigned to the Purchaser at Closing, and (ii) the Debtors are authorized to pay or reserve from the proceeds of the Sale Transactions an amount sufficient to satisfy such Disputed Cure Claim. Payment of the Cure Claims, as provided herein and in the Asset Purchase Agreement, is reasonable and appropriate and is deemed to fully and finally satisfy the Debtors' obligations under Bankruptcy Code sections 365(b) and 365(f). All Cure Claims

[4] **NTD**: to update accordingly, if applicable.

against the Purchaser or the Acquired Assets arising out of or related to any default under any Assigned Contract that occurred prior to the Closing Date are hereby forever barred, and no counterparty to any Assigned Contract shall have any right to assert any additional claims against the Purchaser or the Acquired Assets on account of any pre-Closing defaults, cure obligations, or other monetary claims under any Assigned Contract.

18. Upon assignment of the Assigned Contracts to Purchaser in accordance with the terms of the Asset Purchase Agreement and this Order, including the occurrence of the TAMUS CP, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, and the Debtors shall have no further liability or obligation under such Assigned Contracts. Without limiting the foregoing, each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any Assigned Contracts has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. Upon the reasonable request of Purchaser, as applicable, all counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transactions.

19. Other than with respect to Assumed Liabilities and Permitted Encumbrances, the Purchaser shall have no liability or obligation for any (a) defaults or breaches under any Assigned Contracts that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing, or (b) claims, counterclaims, offsets, setoffs, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to any Assigned Contracts that relate

to any acts or omissions that arose or occurred prior to the Closing. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contracts shall not be a waiver or amendment of such terms or conditions, or of the Debtors' or Purchaser's respective rights to enforce every term and condition of such Assigned Contracts.

20. Notwithstanding anything herein to the contrary and subject to the Asset Purchase Agreement and TAMUS CP, Purchaser may, in its sole and absolute discretion, (a) at any time prior to the Closing Date, upon written notice to the Debtors, designate any Contract as an Assigned Contract, and upon receipt of such notice, the Debtors are authorized and directed to use commercially reasonable efforts to assume and assign such Contract to the Purchaser in accordance with sections 365(a) and 365(f) of the Bankruptcy Code, and, upon such designation, such Contract shall be deemed an Assigned Contract and included in the Acquired Assets; (b) at any time prior to the Closing Date, amend, supplement, add to, or remove from the list of Assigned Contracts, and any Contract not designated as an Assigned Contract as of the Closing Date, as such list may be amended in accordance with the Asset Purchase Agreement, shall be deemed an Excluded Asset for all purposes under the Asset Purchase Agreement. In the event that the Debtors or the Purchaser identify any Contract prior to or after the Closing Date that was not previously disclosed to the Purchaser, the Purchaser may elect, in its sole and absolute discretion, to have such Contract treated as an Assigned Contract, and the Debtors are authorized and directed to use commercially reasonable efforts, at their sole cost and expense, to assume and assign such Contract to the Purchaser as promptly as practicable, without any adjustment to the Purchase Price. Any Contract designated as an Assigned Contract after service of the initial Cure Notice shall be subject to the Supplemental Cure Notice procedures set forth in the Bidding Procedures Order. For the avoidance of doubt, as set forth in paragraph 15 of this Order, the Purchaser shall have the right

and is hereby authorized, in its sole and absolute discretion, to elect to consummate the Closing notwithstanding any Disputed Cure Claim, in which case (i) such Assigned Contract shall be deemed validly assumed and assigned to the Purchaser after the applicable notice and objection period runs, and (ii) the Debtors are authorized to pay or reserve from the proceeds of the Sale Transactions an amount sufficient to satisfy such Disputed Cure Claim.

21. *Ipso Facto Clauses Ineffective*. With respect to the Assigned Contracts and Leased Real Property, and with respect to the Sale of the Acquired Assets to the Purchaser, (a) the Debtors may assume each of the Assigned Contracts, including the TAMUS Contracts (as amended by the Amended TAMUS Contracts), in accordance with section 365 of the Bankruptcy Code, (b) the Debtors may assign each Assigned Contract, including the TAMUS Contracts (as amended by the Amended TAMUS Contracts), in accordance with the Asset Purchase Agreement (including, for the avoidance of doubt, any Required Amendments and other conditions to assignment expressly set forth therein), the TAMUS CP, and sections 363 and 365 of the Bankruptcy Code, and, to the extent provided in section 365 of the Bankruptcy Code, such assignment may occur notwithstanding and without giving effect to any provisions in any Assigned Contract and Leased Real Property that prohibit or condition the assignment of such Assigned Contract and Leased Real Property or allow the party to such Assigned Contract and Leased Real Property to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract and Leased Real Property, which provisions constitute unenforceable anti-assignment or ipso facto provisions which are void and of no force and effect, (c) all applicable requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment, as applicable, to the Purchaser of each Assigned Contract and Leased Real Property have been satisfied, subject to the

Required Amendments, the TAMUS CP, and other conditions expressly set forth in the Asset Purchase Agreement, and (d) effective upon the Closing Date, the Assigned Contracts and Leased Real Property shall be transferred and assigned to, and from and following the Closing Date remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any Assigned Contract and Leased Real Property that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts and Leased Real Property after such assumption and assignment to the Purchaser, except as provided in the Asset Purchase Agreement. To the extent that any provision in any Assigned Contract and Leased Real Property assumed and assigned pursuant to this Order (y) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption and assignment or assignment (including, without limitation, any "change of control" provision), or (z) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the Chapter 11 Cases, (ii) the insolvency or financial condition of any of the Debtors at any time before the closing of the Chapter 11 Cases, (iii) the Debtors' assumption and/or assignment of such Assigned Contract and Leased Real Property, (iv) a change of control or similar occurrence, or (v) the consummation of the Sale, then such provision shall be deemed modified so as not to entitle the non-Debtor affiliated party thereto to prohibit, restrict, or condition such assumption and assignment or assignment, to modify, terminate, or declare a breach or default under such Assigned Contract and Leased Real Property, or to exercise any other default-related rights or remedies with respect thereto. With respect to the Sale of the Acquired Assets to the Purchaser, all such provisions constitute unenforceable anti-assignment or ipso facto provisions

that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

22. *Continuation of Existing Approvals.* The Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, certificate of occupancy, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets (subject, in each case, to the terms of the Asset Purchase Agreement), and all such licenses, permits, registrations, and governmental authorizations or any other approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date. For the avoidance of doubt, the authorization set forth in this paragraph shall extend to all Permits and all rights under the Assigned Contracts and Intangible Property included in the Acquired Assets, and each applicable Governmental Authority and counterparty is hereby authorized and directed to recognize and give effect to the transfer to the Purchaser of such Permits and Assigned Contracts, in each case effective as of the Closing Date and without the need for any further action, approval, or consent. Upon the satisfaction of the applicable conditions precedent to Closing and obtaining of such Required Amendments and consents in accordance with the Asset Purchase Agreement, (i) all Permits and Assigned Contracts shall be deemed fully transferred to Purchaser as of the Closing Date, (ii) all policies, procedures, insurance requirements, and administrative prerequisites applicable thereto shall be deemed satisfied without any further action by the Purchaser, and (iii) no Governmental Authority or counterparty shall impose any additional approvals, requirements, waiting periods, or administrative conditions as a prerequisite to the Purchaser's exercise of its rights thereunder. To the maximum extent permitted by section 525 of the Bankruptcy Code, no Governmental Authority may revoke or suspend, or in any way challenge or fail to consent to any

renewal of any permit or license relating to the operation of the Acquired Assets because of the filing or pendency of the Debtors' Chapter 11 Cases or the consummation of the Sale Transactions.

23. *General Assignment.* As of the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Acquired Assets and/or a bill of sale or assignment transferring indefeasible title and interest in the Acquired Assets to the Purchaser. Each and every federal, state, and local governmental agency or department, or any other Governmental Authority, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transactions and to reflect the effectiveness of the transfer.

24. *Recording and Release of Liens*. If any Person that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens*, or other documents or agreements evidencing interests with respect to the Debtors and/or the Acquired Assets shall not have delivered to the Debtors or the Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Encumbrances which the Person has with respect to the Debtors, the Acquired Assets, or otherwise (except Assumed Liabilities and Permitted Encumbrances) then (a) the Purchaser is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to the Acquired Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of (but not a necessary condition to) the release of all such Encumbrances, against, or with respect to the Debtors and/or the Acquired Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency,

department, or office, or any other Governmental Authority. Notwithstanding the foregoing, the provisions of this Order and the transfer of the Acquired Assets to the Purchaser free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) shall be and are self-executing without the necessity of any recording or filing of any document.

25. *Exemption from Recording, Stamp, and Similar Taxes.* Notwithstanding anything to the contrary in the Asset Purchase Agreement, the Sale Transactions contemplated by the Asset Purchase Agreement and this Order, and the execution, delivery, and/or recordation of any and all documents or instruments necessary or desirable to consummate the Sale Transactions, are exempt from any and all stamp taxes, and/or sales, transfer, or other similar taxes, and any transfer fees or other similar costs incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) to the maximum extent permitted by applicable law, including section 1146 of the Bankruptcy Code. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, all Persons, governmental units (as defined in section 101(41) of the Bankruptcy Code) are hereby enjoined from taking any action against the Purchaser, any affiliate, successor, or assign of the Purchaser, the property of the Purchaser or any affiliate, successor, or assign of the Purchaser, or the Acquired Assets to recover any claim which such Person or governmental unit has or may assert against the Debtors (as such claims exist immediately prior to the Closing Date) relating to a stamp, transfer tax, or similar tax arising from the transfer of the Acquired Assets to the Purchaser. The so-called "bulk sales," "bulk transfer," or other similar laws (i) do not apply to the Sale Transactions contemplated by the Asset Purchase Agreement and this Order and the execution, delivery, and/or recordation of any and all documents or instruments necessary or desirable to consummate the Sale Transactions or (ii) the Debtors complied with such laws. For the avoidance of doubt, any Transfer Taxes or other fees, taxes, or costs referred to herein shall

not be the obligation of the Purchaser, and shall be the sole and exclusive liability of the Debtors or their respective estates.

26. *Good Faith of the Purchaser.* The Sale Transactions specified in the Asset Purchase Agreement and herein are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transactions contemplated by the Asset Purchase Agreement shall not affect the validity of the sale. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

27. *No Avoidance of Asset Purchase Agreement.* Neither the Debtors nor the Purchaser have engaged in any conduct that would cause, allow or permit the Asset Purchase Agreement to be avoided or for costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Asset Purchase Agreement and the Sale Transactions contemplated thereby shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement.

28. *Non-Debtor Material Contracts and Non-Debtor Material Assets*. To the fullest extent permitted by applicable law, the Debtors are hereby authorized to take all actions necessary to cause the conveyance, assignment, transfer, and delivery to the Purchaser, as of the Closing Date, of all right, title, and interest in and to each Non-Debtor Material Contract and Non-Debtor Material Assets, including, without limitation, by using commercially reasonable efforts to cause each non-Debtor party to such Non-Debtor Material Contract or Non-Debtor Material Asset to

execute and deliver all assignments, consents, joinders, conveyances, and other instruments necessary to effectuate such transfer.

29. *TAMUS Contracts*. The Debtors are hereby authorized to take any and all actions necessary to assume and assign the TAMUS Contracts, as amended by the Amended TAMUS Contracts, to the Purchaser in connection with the Sale Transactions pursuant to sections 365(a) and 365(f) of the Bankruptcy Code. Upon the Closing and the TAMUS CP, the Debtors and the Purchaser shall be deemed to have (a) cured all defaults required to be cured under section 365(b)(1) of the Bankruptcy Code, including the Specified Defaults, under the TAMUS Contracts and (b) provided adequate assurance of future performance under the TAMUS Contracts within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. The TAMUS Cure Amount shall be paid solely from Purchase Price in full satisfaction of the Debtor's cure obligations under section 365(b)(1) of the Bankruptcy Code with respect to the TAMUS Contracts; *provided, however,* for the avoidance of doubt, the Purchaser shall have no obligation to pay the TAMUS Cure Amount to the Ground Landlord or any other party in connection with the assumption and assignment of the TAMUS Contracts, as amended by the Amended TAMUS Contracts, other than as expressly provided in this Order and the Asset Purchase Agreement, and (iii) under no circumstances shall the TAMUS Contracts or any other amounts payable in connection with the assumption and assignment of the TAMUS Contracts, as amended by the Amended TAMUS Contracts, shall require the Purchaser to pay consideration in excess of the Purchase Price. Upon payment of the TAMUS Cure Amount and the occurrence of the TAMUS CP, the requirements of section 365(b)(1) of the Bankruptcy Code shall be deemed satisfied, and the Ground Landlord shall be forever barred from asserting any additional claims against the

Purchaser or the Acquired Assets arising from or related to any defaults occurring prior to the Closing, including the Specified Defaults.

EE. *TAMU Easement Agreements*. The TAMU Easement Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser as of the Closing Date, and shall be deemed validly assigned, transferred, and vested in the Purchaser as of the Closing Date without any lapse, termination, abandonment, or impairment of the rights granted thereunder. From and after the Closing Date, the TAMU Easement Agreements, as amended by the Amended TAMUS Contracts, shall be in full force and effect and shall be binding upon the Ground Landlord and Purchaser and their respective successors and assigns, and neither the Ground Landlord nor any other party may declare a default under, terminate, or otherwise impair either TAMU Easement Agreement based on any act, omission, or condition that arose prior to the Closing Date, including as a result of termination, lapse, or abandonment thereof.

30. *Required Amendments*. The Debtors are hereby authorized to take all actions necessary to obtain, or cause to be obtained, the Required Amendments, including by negotiating, executing, and delivering, at or prior to the Closing Date, the amendments, assignments, consents, and related documentation contemplated by Section 22(g) of the Asset Purchase Agreement, including (i) an amendment to and/or assignment of that certain Ground Lease and the TAMU Easement Agreements, with the written consent of TAMUS, which amendment and/or assignment shall provide, among other things, that the Purchaser may access the Leased Real Property and commence construction and operations on the Premises immediately upon the Closing Date without additional approvals, waiting periods, or administrative prerequisites imposed by TAMUS or the RELLIS Campus administration; (ii) an amendment to and/or assignment of the ESA, with the written consent of BTU; (iii) an amendment to and/or assignment of the City Agreements, with

the written consent of the City of Bryan, Texas; (iv) an amendment to and/or assignment of the County Agreements, with the consent of Brazos County; and (v) an amendment to and/or assignment of the ICA, with the consent of BTU.

31. *Tax Abatement Agreements*. The Debtors are hereby authorized to assume and assign the Tax Abatement Agreements to the Purchaser, subject to the applicable Required Amendment. The assignment of the Tax Abatement Agreements shall not constitute a default, breach, or termination event thereunder and the economic development incentives, tax abatements and related benefits provided for under the Tax Abatement Agreements shall continue in accordance with their terms in favor of the Purchaser from and after the Closing Date, subject to the Purchaser's compliance with the terms and conditions and performance of the obligations thereunder.

32. *Electrical Service Continuity*. The Debtors are hereby authorized to obtain and deliver, and shall have obtained and delivered to Purchaser on or prior to the Closing Date, written confirmation, in form and substance reasonably acceptable to the Purchaser, with respect to the ESA (as amended by the applicable Required Amendment) that: (i) electrical service to the Premises will continue without interruption through and after the Closing Date at the full contracted capacity provided under the ESA; (ii) no curtailment, disconnection, or material reduction in such contracted capacity is pending or, to the Debtors' knowledge, threatened; and (iii) such contracted capacity has not been reallocated, redirected, or diverted to any other property, customer, or account and remains available to serve the Premises.

33. *Conditions Precedent.* Neither the Purchaser nor the Debtors shall have an obligation to close the Sale Transactions until all conditions precedent in the Asset Purchase

Agreement to each of their respective obligations to close the Sale Transactions have been satisfied or waived in accordance with the terms of the Asset Purchase Agreement.

34. *Purchaser Releases*. The releases set forth in Section 18 of the Asset Purchase Agreement are fair, reasonable, and in the best interests of the Debtors, their creditors, estates, and all other parties in interest in the Debtors' Chapter 11 Cases, and are binding on the Debtors and their estates, and no Person shall be permitted or authorized to pursue or assert, directly or indirectly, any Released Claims against the Purchaser Released Parties.

35. *Modifications and Amendments*. The Asset Purchase Agreement, the Transaction Documents, and any related agreements, documents, or instruments may be modified, amended, or supplemented by the parties thereto in a writing duly executed by the parties in accordance with the terms thereof, without further order of this Court, so long as any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates and does not otherwise conflict with the terms of this Order. For the avoidance of doubt, the Debtors and the Purchaser may, subject to the terms of the Asset Purchase Agreement, mutually agree to extend the Closing Date and/or Outside Closing Date without further order of this Court; *provided* that the Debtors must first consult with Vantage Bank and the Official Committee of Unsecured Creditors with respect to such extensions, and the Debtors shall promptly file notice of such extensions with this Court.

36. *Binding Effect.* This Order and the Asset Purchase Agreement shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other Persons who may be required by operation of law, the duties of their

office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets. The terms and provisions of the Asset Purchase Agreement, the Transaction Documents, the Bidding Procedures Order, and this Order shall be binding in all respects upon the Debtors and their affiliates and subsidiaries and such parties' successors and assigns, the Debtors' estates, all creditors thereof (whether known or unknown), all holders of equity interests in the Debtors, holders of Encumbrances in, against, or on all or any portion of the Acquired Assets, all non-Debtor parties to the Acquired Assets, the Purchaser, and their respective successors and assigns, and any and all third parties, notwithstanding any subsequent appointment of any trustee, examiner, "responsible person" or other fiduciary (collectively, the "**Trustee**") of the Debtors under any chapter of the Bankruptcy Code, as to which Trustee such terms and provisions likewise shall be binding, and the Asset Purchase Agreement (including the Acquired Assets) shall not be subject to rejection or avoidance under any circumstances.

37. *Subsequent Order, Plan Provisions and DIP Payoff.* Notwithstanding anything to the contrary contained in any chapter 11 plan confirmed in the Debtors' Chapter 11 Cases or any subsequent order of this Court, including, without limitation, any order confirming any such chapter 11 plan, any order authorizing the sale of assets of the Debtors pursuant to any section of the Bankruptcy Code, and any order approving the wind-down or dismissal of the Debtors' Chapter 11 Cases or any subsequent chapter 7 case, nothing in such plan or order shall change, supersede, abrogate, nullify, restrict, or conflict with the provisions of the Asset Purchase Agreement, the Transaction Documents, or this Order, or in any way prevent or interfere with the consummation or performance of the Sale Transactions contemplated therein. All net proceeds of the Sale shall

be subject to and distributed in accordance with the terms of any chapter 11 plan confirmed in the Debtors' Chapter 11 Cases.

38. At the Closing, and as a condition to consummation of the Sale Transactions, the Debtors shall pay, or cause to be paid, to the DIP Lender (as defined in the DIP Order) in immediately available funds, in full and without deduction: (a) the DIP Payoff Amount; and (b) all DIP Lender Professional Fees. For purposes of this Order, "DIP Payoff Amount" means all obligations owing to the DIP Lender under the DIP Order and the DIP Term Sheet (as defined in the DIP Order), including, without limitation, all outstanding principal, accrued and unpaid interest, Commitment Fees, Funding fees, Exit fees, expenses, and all other fees, charges, and obligations due and owing thereunder; provided that the DIP Payoff Amount shall be separate from, and in addition to, the DIP Lender Professional Fees. "DIP Lender Professional Fees" means all accrued and unpaid fees and expenses of the DIP Lender's professionals incurred in connection with these Chapter 11 Cases. Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Order, or any other Transaction Document, no Closing shall occur unless, simultaneously with such Closing, the DIP Lender receives in immediately available funds the DIP Payoff Amount and the DIP Lender Professional Fees in full. The Debtors and any escrow agent or other closing agent are authorized and directed to make the payments required by this paragraph in accordance with a payoff letter and closing statement delivered by the DIP Lender.

39. The Debtors are authorized and directed to make such payments at Closing without further order of this Court. No portion of the Purchase Price, Sale Proceeds, or other consideration payable in connection with the Sale Transactions, whether paid directly, through escrow, or otherwise, shall be paid, distributed, released, reserved, or applied for the benefit of any Person unless and until the DIP Payoff Amount and the DIP Lender Professional Fees have been paid in

full. Upon payment in full of the DIP Payoff Amount and the DIP Lender Professional Fees, the DIP Lender's obligations under the DIP Facility shall be deemed satisfied and the DIP Lender shall release its DIP liens and claims in accordance with the DIP Order and the DIP Documents. All remaining net Sale proceeds shall be subject to and distributed in accordance with the terms of any chapter 11 plan confirmed in the Debtors' Chapter 11 Cases.

40. *Debtor Release of DIP Lender*. Upon the DIP Lender's receipt in full, in immediately available funds, of the DIP Payoff Amount and the DIP Lender Professional Fees, and such payments becoming final and indefeasible, each Debtor, on behalf of itself and its estate, and each of their respective successors and assigns, shall be deemed to have irrevocably released, acquitted, and forever discharged the DIP Lender and each of its respective current and former affiliates, subsidiaries, predecessors, successors, assigns, officers, directors, managers, members, partners, employees, agents, advisors, attorneys, consultants, and other representatives (collectively, the "**DIP Lender Released Parties**") from any and all claims, causes of action, liabilities, obligations, demands, damages, rights, remedies, defenses, offsets, recoupments, setoffs, suits, controversies, agreements, promises, costs, expenses, and losses of any kind or nature whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, suspected or unsuspected, arising on or prior to the Closing Date or relating in any way to the DIP Facility, the DIP Order, the DIP Documents, the Chapter 11 Cases, the Sale Transactions, the negotiation, documentation, approval, administration, funding, enforcement, or repayment of the DIP Facility, or any act, omission, transaction, occurrence, or matter relating thereto; provided, however, that nothing in this paragraph shall release any claim or cause of action arising from the gross

negligence, willful misconduct, or fraud of a DIP Lender Released Party, as finally determined by a court of competent jurisdiction.

41. *Failure to Specify Provisions.* The failure to specify or include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Asset Purchase Agreement and the assignment of the Acquired Assets be authorized and approved in their entirety.

42. *Automatic Stay.* The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary to (i) allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement, (ii) allow the Purchaser to take any actions to enforce the Asset Purchase Agreement and (iii) allow the Purchaser to take any and all actions permitted under the Asset Purchase Agreement in accordance with the terms and conditions thereof. The automatic stay imposed by section 362 of the Bankruptcy Code shall be modified solely to the extent necessary to implement the preceding sentence, and this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

43. *Bankruptcy Rules Satisfied or Waived.* The requirements set forth in Bankruptcy Rules 6004 and 6006 have been satisfied or are otherwise deemed to be waived. The terms of this Order shall be effective and enforceable immediately upon entry, and shall not be subject to stay provisions contained in Bankruptcy Rules 6004(h) and 6004(d). Time is of the essence in closing the Sale Transactions and the Debtors and the Purchaser intend to close the Sale Transactions as soon as possible.

44. *Conflicts Between Order and Asset Purchase Agreement.* To the extent anything contained in this Order conflicts with a provision in the Asset Purchase Agreement or Transaction Documents, this Order shall govern and control. Notwithstanding the foregoing, nothing in this

Order shall modify or waive any closing conditions or termination rights in the Asset Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms, *provided*, *however*, that, notwithstanding Section 8(a) of the Asset Purchase Agreement, (i) upon entry of this Order, $500,000 of the Initial Deposit shall be released to the Debtors, deemed as non-refundable, and constitute property of the Debtors' estates, and the Debtors are authorized to use the First Released Deposit, as necessary, to fund unpaid and allowed claims for fees, costs and administrative expenses allowed by the Bankruptcy Code or as otherwise authorized by the Court and (ii) on or about July 31, 2026, unless the Asset Purchase Agreement has been terminated on or prior to July 31, 2026 in accordance with its terms, the remaining $500,000 of the Initial Deposit shall be released to the Debtors, deemed as non-refundable, and constitute property of the Debtors' estates, and the Debtors are authorized to use the Released Deposit, as necessary, to fund unpaid and allowed claims for fees, costs and administrative expenses allowed by the Bankruptcy Code or as otherwise authorized by the Court (together, the "**Released Deposit**"); *provided*, *further*, that the release and use of the Released Deposit shall not reduce, impair, or otherwise affect the credit of the full amount of the Released Deposit against the Purchase Price pursuant to the Asset Purchase Agreement. In the event either the Chapter 11 Cases is converted to chapter 7, or a chapter 11 trustee or examiner with increased powers is appointed in the Chapter 11 Cases, the Released Deposit shall constitute an allowed superpriority administrative expense claim against each of the Debtors' Estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code, *pari passu* with the highest administrative expense claims (other than the DIP Superpriority Claims, which shall be senior to the Bid Protections) against the Debtors' Estates.

45. *Provisions Nonseverable and Mutually Dependent.* The provisions of this Order, the Asset Purchase Agreement, and the Transaction Documents are non-severable and mutually dependent.

46. *Retention of Jurisdiction.* This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of the Asset Purchase Agreement, the Transaction Documents, the Bidding Procedures Order, and this Order, and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned to the Purchaser by the Debtors, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transactions, the Assigned Contracts, or the Acquired Assets. This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect the Purchaser and its assets, including the Acquired Assets, against any Encumbrances or successor or transferee liability and to enter orders, as appropriate, pursuant to sections 105(a), 363, or 365 (or other applicable sections) of the Bankruptcy Code necessary to transfer the Acquired Assets to the Purchaser. In the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter referenced in this paragraph or is without jurisdiction, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

Signed: July 06, 2026

Alfredo R Pérez
United States Bankruptcy Judge

# Exhibit 1

## Asset Purchase Agreement

***Execution Version***

**ASSET PURCHASE AGREEMENT**

***(Stalking Horse Agreement)***

**RELLIS CAMPUS DATA AND RESEARCH CENTER**

This Asset Purchase Agreement (the "Agreement") is dated as of July 2, 2026, by and between **RELLIS Campus Data and Research Center, LLC**, a Texas limited liability company ("RELLIS"), and **Optimus DataCenters, LLC**, a Texas limited liability company ("Optimus", and together with RELLIS, collectively, "Sellers," and each a "Seller"), and **ThisWay Global, Inc.**, a Delaware corporation, or its designee, having an address at 801 Barton Springs Rd., Austin, Texas 78704 ("Purchaser," and together with Sellers, the "Parties").

**WITNESSETH**

**WHEREAS**, pursuant to that certain Ground Lease by and between The Board of Regents of the Texas A&M University System ("TAMU"), as landlord, and RELLIS, as tenant, dated June 1, 2020, as amended by that certain Amendment to Ground Lease, dated June 9, 2023, and as further amended by that certain Second Amendment to Ground Lease, dated November 14, 2024 (as amended or modified, the "Ground Lease"), RELLIS maintains a leasehold interest in certain real property located in Brazos County, Texas as more particularly set forth in the Ground Lease (the "Leased Real Property");

**WHEREAS**, Sellers' Affiliate, RCDRC Power, LLC, a Texas limited liability company ("RCDRC Power"), and the City of Bryan, Texas, a home rule municipal corporation (the "City"), that owns and operates a municipal electric utility system, d/b/a "Bryan Texas Utilities" ("BTU"), are parties to that certain Second Agreement for Electric Service, dated August 16, 2024, as assigned to RELLIS pursuant to that certain Assignment and Assumption Agreement for Electric Service, dated as of January 19, 2026, by and between RCDRC Power, as assignor, and RELLIS, as assignee (as amended or modified, the "ESA");

**WHEREAS**, RELLIS and BTU are parties to that certain Interconnection Agreement, dated June 4, 2025 (as amended or modified, the "ICA");

**WHEREAS**, RELLIS and the City are parties to (i) that certain Chapter 380 Economic Development Program Agreement, dated March 12, 2021 (as amended or modified from time to time, the "Chapter 380 Agreement"), and (ii) that certain Tax Abatement Agreement, dated April 22, 2025 (as amended or modified, the "City Abatement Agreements," and together with the Chapter 380 Agreement, the "City Agreements");

**WHEREAS**, RELLIS and the County of Brazos, Texas (the "County") are parties to (i) that certain Chapter 381 Economic Development Program Agreement, dated April 26, 2022 (as amended or modified from time to time, the "Chapter 381 Agreement"), and (ii) that certain Tax Abatement Agreement, dated April 24, 2025 (as amended or modified, the "County Abatement Agreement", and collectively with the Chapter 381 Agreement, the "County Agreements");

**WHEREAS**, on November 5, 2025 (the "Petition Date"), Sellers (in their capacity as debtors in possession, collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of

the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), commencing chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), which cases are being jointly administered, for procedural purposes, under the caption *In re RELLIS Campus Data and Research Center, LLC*, Case No. 25-90666 (Bankr. S.D. Tex. 2025), and are pending before the Honorable Alfredo R. Pérez;

**WHEREAS**, on May 20, 2026, the Debtors filed their *Emergency Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Stalking Horse Protections; (IV) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (V) Approving Form of Notice Thereof; (B) Entry of an Order After the Sale Hearing (I) Authorizing the Debtors to Sell Their Assets; and (II) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 182] (the "Bidding Procedures Motion"), seeking, among other things, entry of an order approving (i) certain bidding procedures governing the marketing and sale of the Acquired Assets, and (ii) the Debtors' right to designate a stalking horse purchaser and offer customary bid protections to such stalking horse purchaser;

**WHEREAS**, on May 26, 2026, the Bankruptcy Court entered that *Order (A) Approving Bidding Procedures; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Stalking Horse Protections; (D) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (E) Approving Form of Notice Thereof; and (F) Granting Related Relief* [Docket No. 189] (the "Bidding Procedures Order"), approving, among other things, the Bidding Procedures and the right to offer Stalking Horse Protections (as defined in the Bidding Procedures Order) to any Stalking Horse Purchaser (as defined in the Bidding Procedures Order) designated by the Debtors on or before June 1, 2026;

**WHEREAS**, on May 31, 2026, the Debtors and Purchaser entered into that *Letter of Intent: Proposed Acquisition of Substantially All Assets of RELLIS Campus Data and Research Center, LLC, et al.* (as amended or modified, the "Letter of Intent"), pursuant to which Sellers and Purchaser agreed to, among other things, negotiate and enter into this Agreement and pursue consummation of the Transactions contemplated hereby;

**WHEREAS**, the Debtors, in the exercise of their sound business judgment and after consultation with their advisors and the Consultation Parties, have designated Purchaser as the Stalking Horse Purchaser;

**WHEREAS**, to induce Purchaser to serve as the Stalking Horse Purchaser, to expend the time and resources required to negotiate and execute this Agreement, and to permit its bid to be exposed to overbids in accordance with the Bidding Procedures, the Debtors have agreed to provide Purchaser with certain Bid Protections as set forth herein;

**WHEREAS**, on June 1, 2026, the Debtors filed that *Notice of Selection of Stalking Horse Purchaser* [Docket No. 191] (the "Stalking Horse Designation Notice"), which, pursuant to the Bidding Procedures Order, set June 6, 2026, as the deadline for filing objections to the Bid Protections in favor of the Stalking Horse Purchaser;

**WHEREAS**, no timely objections were filed with respect to the Stalking Horse Designation Notice, and the Bid Protections in favor of Purchaser are now binding under the Bidding Procedures Order pursuant to the terms hereof;

**WHEREAS**, the Parties have, consistent with the Letter of Intent, negotiated this Agreement at arm's length and in good faith for the sale of the Acquired Assets to Purchaser, subject to higher or otherwise better bids in accordance with the Bidding Procedures and the Bidding Procedures Order; and

**WHEREAS**, Sellers desire to sell the Acquired Assets to Purchaser, and Purchaser desires to purchase the Acquired Assets, free and clear of any Encumbrances, other than the Permitted Encumbrances, subject to and in accordance with the terms and conditions set forth in this Agreement, the Bidding Procedures, the Bidding Procedures Order, and the Sale Order, pursuant to sections 105, 363, and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Purchaser, intending to be legally bound, do hereby agree as follows:

**1.** **Definitions**. Capitalized terms used, but not defined herein, shall have the meanings ascribed to them in **Annex 1**.

**2.** **Sale and Purchase**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and subject to the entry into and terms of the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests, and other assets of Sellers, whether tangible or intangible, real, personal, or mixed, located at or off the Premises or related to the operation, ownership, possession, enjoyment or control of the business currently conducted and proposed to be conducted by Sellers (the "Business"), and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by Sellers in connection with the Premises after the date hereof and prior to the Closing, and including but not limited to Sellers' right, title, and interest in and to, as of the Closing, the following assets of Sellers, but excluding in all cases the Excluded Assets:

(a) Sellers' leasehold interest in the Leased Real Property, as lessee under the Ground Lease (the "Leasehold Interest");

(b) all of Sellers' right, title and interest in and to any buildings, structures, and improvements located on the Leased Real Property, and any fixtures contained therein (collectively, the "Improvements");

(c) all of Sellers' right, title and interest, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Leased Real Property and all other appurtenances to the Leased Real Property and Improvements, including, without limitation, all water rights, mineral rights (or waivers thereof), air rights, development rights, stormwater management infrastructure, drainage

easements, and stormwater retention and detention facilities appurtenant to the Leased Real Property, and all right, title and interest of Sellers in and to any award made or to be made in lieu thereof and in and to any unpaid award for damages to the Leased Real Property and Improvements by reason of change of grade of any street (the "Appurtenances"; and collectively with the Leasehold Interest and the Improvements, the "Premises");

(d) all of Sellers' right, title and interest in and to data center infrastructure, equipment, and systems, including, without limitation, all power distribution units (PDUs), uninterruptible power supply (UPS) systems, generators and backup power systems, switchgear, transformers, automatic transfer switches, on-site or dedicated electrical substations, switchyards, dedicated utility feeders, and all associated interconnection and service agreements, cooling systems (including HVAC, CRAC, and chilled water systems), fire detection and suppression systems, raised flooring, structured cabling (including copper and fiber optic cabling), rack and cabinet infrastructure, building management systems (BMS), environmental monitoring systems, physical security systems (including access control, surveillance, and intrusion detection), and all other mechanical, electrical, and plumbing (MEP) systems and equipment relating to the Premises or the Business;

(e) all of Sellers' right, title and interest in and to the Ground Lease and the ESA, in each case with such amendments or modifications required and agreed by Purchaser, in its sole and absolute discretion, as a condition to Closing (the "Priority Assigned Contracts");

(f) all of Sellers' right, title and interest in and to the Contracts listed on Schedule 2(f), attached hereto, including, without limitation, the City Agreements, the ICA, the County Agreements, the TAMU Easement Agreements, and any other Contracts which Purchaser designates in accordance with Section 12 of this Agreement, in each case with such amendments or modifications required and agreed by Purchaser, in its reasonable discretion, as a condition to Closing (together with the Priority Assigned Contracts, the "Assigned Contracts");

(g) all inventories and work-in-progress of Sellers related to the Business or located on or at the Premises identified on Schedule 2(g);

(h) all personal property of Sellers (the "Personal Property"), including any personal property located on the Premises as of the Effective Date, and all Tangible Personal Property, but excluding the cash in any of Sellers' bank accounts, other than security deposits and cash and cash equivalents listed on Schedule 2(h) ("Transferred Cash");

(i) all of the Intellectual Property and Intellectual Property Rights that are owned (or purported to be owned) or controlled by Sellers including, but not limited to, the Intellectual Property and Intellectual Property Rights identified on Schedule 2(i), together with all related goodwill (and including URLs and tradenames identified on Schedule 2(i));

(j) all assignable warranties and guaranties of contractors, manufacturers or materialmen that relate to the Premises, and other intangible property used exclusively in connection with the Premises, including (i) any and all Permits issued by any Governmental Authority which are currently held by Sellers with respect to the Premises (or otherwise related to or necessary for the use or operation of

the Acquired Assets), including, without limitation, any environmental, air, or emissions permits relating to generators or other equipment, identified in Schedule 2(j), (ii) all building plans and specifications regarding the Improvements, (iii) all approved site plans, approved construction drawings, architectural plans, and engineering plans relating to the Premises or the Improvements, (iv) all development entitlements, zoning approvals, and land use authorizations relating to the Premises, and (v) all rights to use, copy, reproduce, modify, and otherwise exploit all drawings, construction documents, engineering reports and calculations, architectural plans, specifications, shop drawings, and as-built drawings relating to the Premises or the Improvements (collectively, the "Project Documents"), in each case free and clear of any restriction (including any restriction arising under copyright law), together with an unrestricted, irrevocable, royalty-free license (or, to the extent owned by Sellers, an assignment of all right, title and interest including all copyrights) in and to the Project Documents, permitting Purchaser and its successors and assigns to use the Project Documents without limitation and without violating any copyright or other intellectual property right of any Person (collectively, the "Intangible Property");

(k) all Documents related to the Acquired Assets, including copies of any Tax and accounting records (including Tax Returns but not including any flow-through income Tax Returns of Sellers) related to the Acquired Assets and rights under any confidentiality agreements involving the sale of the Acquired Assets;

(l) all Tax deposits, prepayments, credits, and refunds relating to Purchaser's share of Property Taxes as set forth in Section 6(b);

(m) all Causes of Action (other than Avoidance Actions that are not Assigned Avoidance Actions), lawsuits, judgments and claims of any nature available to Sellers (whether or not such cause of action, lawsuit, judgment or claim is being pursued), whether arising by way of counterclaim, set off, rights of self-help or otherwise, to the extent arising from or related to the Acquired Assets or the Business;

(n) all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by Sellers (regardless of whether such rights are currently exercisable), to the extent arising from or related to the Acquired Assets or the Business;

(o) all insurance benefits (including proceeds) in respect of claims in existence on the Closing Date or based on loss or other coverable claim as of the Closing Date (regardless of whether asserted or submitted to any insurance carrier, broker, or any other Person as of the Closing Date), including, to the fullest extent assignable, all rights to refunds of any premiums paid and other amounts payable under or in respect of Sellers' insurance policies, in each case solely to the extent the underlying Liabilities in respect of such claims are Assumed Liabilities;

(p) without limiting the foregoing, all deposits, prepayments and similar assets of Sellers held by third parties, including trade, insurance, utility and other deposits (but excluding, for the avoidance of doubt, any professional fee retainers of Sellers' Retained Professionals);

(q) all goodwill associated with the operation and conduct of the Business;

(r) any and all other assets, properties, and rights of Sellers, whether or not specifically listed herein, that are used in, held for use in, or necessary for the operation, ownership, possession, enjoyment, or control of the Acquired Assets or the Business; and

(s) any and all rights of Sellers with respect to finished or unfinished goods, equipment, property, or other assets that are or were, prior to the Effective Date, subject to purchase orders, contracts, or other agreements (regardless of whether in good standing, default, or terminated) with respect to the production, development, creation, fabrication, delivery, or transfer to Sellers, regardless of whether such goods, equipment, property or other assets constitute property of Sellers or the Estates as of the Effective Date (collectively, the "Pending Asset Orders"), in each case to the extent identified by Purchaser prior to the Closing Date.

**3. Assumed Liabilities.** In partial consideration for the transfer of the Acquired Assets by Sellers to Purchaser, and upon the terms, and subject to the conditions of, this Agreement, Purchaser agrees, upon consummation of, and effective as of the Closing, to assume, pay, perform, and discharge when due the following Liabilities and obligations (collectively, the "Assumed Liabilities"):

(a) any Liabilities and obligations of Sellers under the Assigned Contracts that arise and become due from and after the Closing Date and only to the extent arising out of facts, circumstances, conditions or events that are first in existence after the Closing Date (excluding (i) any Liabilities that arise from or relate to any breaches under such Assigned Contracts, or any facts, circumstances, conditions or events that are in existence, on or prior to the Closing Date, and (ii) any Liabilities arising out of or relating to any Cure Claims);

(b) any Liabilities arising out of ownership of the Acquired Assets by Purchaser after the Closing Date, only to the extent arising out of facts, circumstances, conditions or events that are first in existence after the Closing Date; and

(c) the Liabilities for Purchaser's share of the Property Taxes as set forth in Section 6(b).

**4. Excluded Liabilities.** Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers or any Affiliate thereof of any kind whatsoever, whether now or hereinafter existing, whether accrued, absolute, contingent or otherwise, whether known or unknown, whether due or to become due, whether related to the Business or the Acquired Assets and whether disclosed on the schedules attached hereto, and regardless of when or by whom asserted, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, Purchaser shall not be deemed a successor to Sellers or Sellers' Estates for any purpose, and no theory of successor liability, transferee liability, de facto merger, substantial continuity, or similar theory shall apply to Purchaser or any of its Affiliates with respect to any Excluded Liabilities. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Sellers; *provided* that, in the event of a conflict between the terms of clauses of this Section 4 and Section 3 hereof, such conflict shall be resolved in Purchaser's favor:

(a) any Liabilities arising out of or relating to any Excluded Asset;

(b) any Liabilities for Taxes (i) of or with respect to the Acquired Assets or Assumed Liabilities for any Pre-Closing Tax Period (as determined in accordance with Section 6(b)), (ii) of Sellers of any kind or description, including any Liability for Taxes of Sellers (or any stockholder or Affiliate of Sellers) that becomes a Liability of Purchaser under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law, (iii) all Taxes of or with respect to the Excluded Assets or Excluded Liabilities for any taxable period, and (iv) all Transfer Taxes;

(c) any Liabilities arising out of or relating to any employment agreement, severance obligation, pension, benefit plan, or other employee-related obligation of Sellers;

(d) any Liabilities of Sellers arising under the WARN Act, the Employee Retirement Income Security Act of 1974, and similar Laws relating to the termination of any current or former employee or contractor of any Seller, or any Affiliate of any Seller, and including any current, threatened or potential claims for compensation or benefits, in each such case, to the extent related to employment or contracting with Sellers (or any of their Affiliates) or termination thereof, whether arising prior to, on or after the Closing Date;

(e) any Liabilities at any time arising under, pursuant to or in connection with any Employee Benefit Plans (whether arising prior to, on or after the Closing Date) and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" (as such term is defined in 26 C.F.R. § 54.4980B-9);

(f) any Liabilities arising out of or relating to any act or omission by Sellers, their Affiliates, or any of their respective officers, directors, managers, members, employees, or agents, including arising out of or related to any wrongful act or omission, negligence, fraud, willful misconduct, or intentional misrepresentation;

(g) any Liabilities arising out of or relating to any data privacy or cybersecurity breach, incident, or violation from or relating to any breaches or any facts, circumstances, conditions or events that are in existence on or prior to the Closing Date;

(h) any Liabilities arising under, pursuant to or in connection with Environmental Laws (whenever arising, whether before, on, or after the Closing Date), including such Liabilities (i) that are dischargeable, or capable of being sold free and clear, pursuant to section 363 of the Bankruptcy Code, (ii) that are otherwise dischargeable pursuant to section 1141 of the Bankruptcy Code, (iii) from which the Acquired Assets are otherwise released as of the Closing Date pursuant to an Order of the Bankruptcy Court, (iv) any Environmental Condition, and (v) all Liabilities arising from the release, disposal, or transportation of, contamination by, or exposure of any Person to any Hazardous Materials at, on, under, or from the Premises or any other location to which Hazardous Materials were sent from the Premises, in each case to the extent arising from or relating to events, conditions, or operations occurring prior to or as of the Closing Date;

(i) any Liabilities owing to any contractor, subcontractor, materialman, or supplier (including S&P) for work performed or materials furnished to Sellers or their Affiliates or on or related to the Premises, the Business or the Acquired Assets, in each case prior to the Closing Date;

(j) any Liabilities arising out of or relating to any warranty, representation, or guarantee made by Sellers to any third party prior to the Closing Date (other than under the Assigned Contracts);

(k) any Liabilities of Sellers or of any of their predecessors associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of Sellers or any of their respective Affiliates' or any of their respective predecessors' obligations, and including any guarantee obligations or imputed Liability through veil piercing or similar theories or laws incurred by or through Sellers or any of their Affiliates or their respective predecessors;

(l) any Liabilities of Sellers or of their respective predecessors associated with payments for the purchase of goods for the period prior to the Closing Date, including but not limited to customer deposits and prepaid amounts;

(m) any Liabilities of Sellers or of any of their predecessors to their respective equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;

(n) any Liabilities outstanding as of and arising after the Closing Date for any Contract for delivery of or returns of products previously sold to customers, whether or not any customer has provided a deposit for the sale except for under any Assigned Contract or other Acquired Asset;

(o) any Liabilities of Sellers or of any of their predecessors arising out of any Contract, Permit, or claim that is not transferred to Purchaser hereunder;

(p) any Liabilities arising from or relating to any litigation, Action, proceeding, investigation, arbitration, or claim pending as of or relating to any facts, circumstances, conditions or events that are in existence on or prior to the Closing Date;

(q) any Liabilities of Sellers or any of their Affiliates related to any Government Contract relating to the Business that is not being assumed by Purchaser;

(r) any Liabilities of Sellers owed to the U.S. Government or any other Governmental Authority that are not expressly included in the Assumed Liabilities;

(s) any Liabilities of Sellers arising under any theory of successor liability, transferee liability, de facto merger, mere continuation, substantial continuity, or similar theory, whether arising under federal, state, or foreign Law, including under antitrust, environmental, labor, employment, or Tax Laws;

(t) any Liabilities arising out of or relating to any intercompany obligations among Sellers and their Affiliates;

(u) any Liabilities arising out of or relating to any buy-out obligation, put right, call right, or similar obligation of Sellers or their Affiliates;

(v) any Liabilities arising out of or relating to any Cure Claims;

(w) any Liabilities arising out of or relating to any professional fees, administrative expenses, or other costs of the Debtors' Estates; and

(x) any Liabilities arising out of or relating to any violation of Law by Sellers based on or related to any facts, circumstances, conditions or events that are in existence, on or prior to the Closing Date.

For the avoidance of doubt, any obligations that are attributable to or arise from any breach or default by Sellers under any Assigned Contract shall be deemed an Excluded Liability.

**5. Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign or convey, and Purchaser shall not purchase, acquire, or accept, and Sellers shall retain all right, title and interest to, and in, any asset, property, right and/or interest of Sellers which is not an Acquired Asset, including, without limitation (collectively, the "Excluded Assets"):

(a) any Contract that is not an Assigned Contract and any Contract terminated, not assumed or expired (according to its terms) prior to the Closing Date in accordance with the terms of such Contract in the ordinary course of business (so long as such Contract is not contemplated as an Assigned Contract);

(b) bank accounts and any cash or cash equivalents, other than the Transferred Cash;

(c) (i) all rights under or pursuant to any and all warranties, representations, and guarantees made by suppliers, manufacturers, and contractors relating to products sold, or services provided, to Sellers to the extent such rights, warranties, representations, and guarantees do not relate to Acquired Assets or Assigned Contracts, and (ii) all rights, claims, or Causes of Action with respect to or arising in connection with Excluded Assets;

(d) all Tax deposits, prepayments, credits and refunds owing to Sellers, other than any such Tax deposits, prepayments, credits, or refunds relating to Purchaser's share of Property Taxes as set forth in Section 6(b);

(e) Avoidance Actions, other than the Assigned Avoidance Actions;

(f) Sellers' rights, claims, and causes of action under this Agreement and each other Transaction Document, and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions of this Agreement and each other Transaction Document;

(g) any rights of Sellers under or arising out of insurance policies or proceeds thereof that are not Acquired Assets, including any directors and officer liability insurance policies;

(h) any shares of capital stock or other equity interest of Sellers or any securities convertible into, exchangeable, or exercisable for shares of capital stock or other equity interest of Sellers;

(i) the certificates of incorporation, qualifications to conduct business as a foreign corporation, taxpayer and other identification numbers, minute books, stock ledgers, corporate seals, stock certificates, work papers and other records relating to the organization or maintenance of corporate existence of Sellers and any other records that Sellers are required by Law to retain;

(j) all Contracts with Sellers' Retained Professionals, and all retainers held by Sellers' legal and other professionals;

(k) all employment agreements, warrant agreements, option agreements, and like agreements, except to the extent any such Contracts are Assigned Contracts;

(l) (i) equipment leased by Sellers and the interest of Sellers in any equipment provided to the Premises for use, but not owned or leased by Sellers, or (ii) property owned or leased by any tenant, subtenant or guest, employee or other person furnishing goods or services to the Premises; or (iii) property and equipment owned by Sellers, which in the ordinary course of business of the Premises is not used exclusively for the business, operation or management of the Premises; and

(m) all trademarks, trade names, service marks, logos, domain names, and other proprietary marks of Sellers or their Affiliates (including the names "RELLIS," "Optimus," "Optimus DataCenters," and any derivations thereof), together with all goodwill associated therewith (collectively, the "Sellers Marks"); *provided*, *however*, that Purchaser shall have the right, for a period not to exceed ninety (90) days following the Closing Date, to use the Sellers Marks solely to the extent reasonably necessary to effect an orderly transition of the Acquired Assets, after which period Purchaser shall cease all use of the Sellers Marks.

At any time that is at least twenty-four (24) hours prior to the Closing, Purchaser shall have the right, exercisable in Purchaser's sole and absolute discretion, by providing written notice to Sellers, to designate any of the Acquired Assets as Excluded Assets; *provided, however,* that Purchaser shall not designate any Acquired Asset as an Excluded Asset if such redesignation would (i) cause a default or breach under any Assigned Contract, or (ii) result in the failure of any condition to Closing set forth in Section 22 hereof. The Parties acknowledge and agree that there shall be no increase or reduction in the Purchase Price if Purchaser elects to designate any Acquired Asset as an Excluded Asset pursuant to the preceding sentence. Upon any such redesignation, Sellers shall have no further obligation to convey or deliver such Excluded Asset, and such Excluded Asset shall be retained by Sellers free and clear of any claim by Purchaser.

**6. Prorations.**

(a) **Rent, Utilities, Prepaid Expenses**. All rent, utilities, and prepaid expenses pertaining to the Acquired Assets shall be prorated on a daily basis between Sellers and Purchaser as of the Closing Date, with Sellers being responsible for any such amounts for any days up to and including the Closing Date and Purchaser being responsible for any such amounts for any days after the Closing Date. All obligations due in respect of periods prior to and including the Closing Date shall be the obligations of

Sellers, and all obligations due in respect of periods after the Closing Date shall be the obligations of, and shall be paid in full or otherwise satisfied by, Purchaser in the ordinary course of business.

(b) **Proration of Taxes.** For purposes of this Agreement, all Taxes and Tax Liabilities with respect to the Business and the Acquired Assets that relate to a Straddle Period shall be apportioned between the Pre-Closing Tax Period and Post-Closing Tax Period as follows: (i) in the case of Property Taxes and similar Taxes on a per-diem basis, as set forth in Section 6(c), (ii) in the case of all other Taxes (other than Transfer Taxes), as though the taxable year terminated at the close of business on the Closing Date, and in the case of Transfer Taxes, as set forth in Section 6(d).

(c) **Property Taxes**. All Property Taxes levied or assessed against any of the Acquired Assets by any Governmental Authority shall be prorated between Purchaser and Sellers on the basis of the latest available Tax assessments, with Sellers responsible for all such Property Taxes accruing prior to and including the Closing Date and Purchaser responsible for all such Property Taxes accruing after the Closing Date. The apportionment of Property Taxes shall be based upon (i) the Tax rate for the current calendar year of Closing (or the last preceding year if the current year's statements are not available) applied to the latest assessed valuation, and (ii) if the Leased Real Property is assessed as part of a larger Tax parcel, then such Property Taxes attributable to the Leased Real Property shall be prorated based on the relative acreage of the Leased Real Property as a percentage of the total land area included in the Tax parcel; and adjustments in the prorations shall be made if necessary upon receipt of the Tax statements for the year of Closing, and the Parties agree that payment of the amount of such adjustments shall be made within thirty (30) days of receipt of such Tax statements for the year of Closing. Notwithstanding the foregoing, Sellers shall be responsible for and shall indemnify Purchaser against any and all rollback Taxes and other Taxes assessed from and after Closing which are attributable to any period prior to Closing due to a change in land use, ownership, or otherwise; *provided, however,* that (x) such indemnification obligation shall be limited to rollback Taxes directly resulting from actions taken by Sellers (or their predecessors in interest) prior to Closing, and (y) Sellers' aggregate liability under this Section 6(c) shall not exceed the net sale proceeds actually received and retained by Sellers from the sale of the Acquired Assets after payment of all secured claims and administrative expenses of the Debtors' Estates.

(d) **Transfer Taxes**. Any and all U.S. federal, state, local, and non-U.S., sales Tax, consumption sales, use, excise, value added, registration, real property, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other similar Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be solely borne and timely paid by Sellers when due. Sellers shall timely file all Tax Returns related to any Transfer Taxes with the appropriate taxing authority. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available under the Bankruptcy Code unless otherwise indicated in the Sale Order. The Parties will cooperate in good faith prior to the Closing Date to determine the amount of Transfer Taxes required to be paid in connection with the transactions contemplated by this Agreement, and shall cooperate in good faith to reduce the amount of Transfer Taxes payable, including by soliciting and providing appropriate resale exemption certificates or other evidence acceptable to Purchaser or Sellers, as appropriate, of exemption from such Transfer Taxes and by discussing in good faith whether adjustments to the Transaction structure may be warranted to minimize the liability for Transfer Taxes arising hereunder.

(e) **Tax Withholding.** Purchaser shall be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, as Purchaser is required to deduct and withhold under any applicable Tax law; provided, that if Purchaser believes any such deduction or withholding of Tax (other than any deduction or withholding resulting from failure of Sellers to deliver the Seller Tax Forms) is required, Purchaser shall reasonably endeavor to provide notice to Sellers prior to making such deduction or withholding and shall reasonably cooperate with Sellers to reduce or eliminate the requirement to deduct and withhold Tax. Such withheld amounts that are paid to the appropriate taxing authority shall be treated for all purposes of this Agreement as having been paid to the applicable Seller in respect of whom such deduction or withholding was made.

(f) **Allocation of Purchase Price**. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with section 1060 of the Tax Code and analogous provisions of applicable Law. As soon as commercially practicable, but no later than 120 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets (the "Allocation"). Sellers and Purchaser shall work in good faith to resolve any disputes relating to the Allocation within fifteen (15) days. If Sellers and Purchaser are unable to resolve any such dispute, such dispute shall be resolved promptly by a nationally recognized accounting firm acceptable to Purchaser and Sellers, the costs of which shall be borne by Sellers. If, within fifteen (15) days after receiving the Allocation, Sellers have not objected, the Allocation shall be final and binding. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 6(f)) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code.

(g) **Termination of Existing Tax Sharing Agreements**. Following the Closing, (i) except for the City Agreements and County Agreements, the Acquired Assets shall not be subject to any obligations pursuant to any Tax sharing agreements (whether written or not) between or among Sellers and their Affiliates (excluding any commercial Contracts not primarily relating to Taxes) and (ii) none of Sellers shall have any further rights or Liabilities thereunder.

(h) **Survival.** The provisions in this Section 6 shall survive the Closing.

**7. Purchase Price**.

(a) **Cash Purchase Price**. Upon the terms, and subject to the conditions set forth, in this Agreement, at the Closing, Purchaser agrees to purchase from Sellers all of the Acquired Assets, free and clear of any and all Encumbrances, other than Permitted Encumbrances, and as consideration therefor, at the Closing, Purchaser will pay to Sellers an aggregate cash purchase price of Forty Million Dollars ($40,000,000.00), less any Transfer Taxes (the "Purchase Price"). For the avoidance of doubt, the amount of the Purchase Price paid in cash by Purchaser at the Closing shall be reduced by the Deposit and any Transfer Taxes.

(b) **Cure Claims/Closing Deliverables**. Contemporaneous with the Closing, Sellers shall satisfy from available cash or cash proceeds of the Purchase Price, among other things, (i) all Cure Claims, and (ii) any other fees, costs, buy-out rights, or other amounts required in order for Sellers to transfer, assign, and convey to Purchaser the Acquired Assets and Assigned Contracts. For the avoidance of doubt, any such amounts in the immediately preceding sentence shall not increase the amount of the Purchase Price.

**8. Deposit**.

(a) **Payment of Deposit**. Following the execution of the Letter of Intent, Purchaser deposited, in immediately available funds, One Million Dollars ($1,000,000.00) (representing 2.50% of the Purchase Price) (the "Initial Deposit") in a segregated non-interest bearing sub-account with the Debtors. Upon the Debtors' selection of Purchaser as the Stalking Horse Purchaser, the Initial Deposit became non-refundable, except as otherwise set forth herein. On June 8, 2026, Purchaser deposited an additional Three Million Dollars ($3,000,000.00) (representing 7.50% of the Purchase Price) (the "Additional Deposit") in immediately available but refundable funds in the segregated sub-account with the Debtors. Together, these two payments total Four Million Dollars ($4,000,000.00) (constituting 10% of the Purchase Price) (the "Deposit"). Pursuant to the Bidding Procedures Order, the Deposit shall not constitute property of the Estates unless and until (i) the Closing occurs, in which case the Deposit shall be applied against and reduce the amount of the Purchase Price to be paid by Purchaser at Closing, or (ii) the Deposit is forfeited to Sellers pursuant to the terms and conditions of this Agreement, in which case the Deposit shall be retained pursuant to the terms herein.

(b) **Return of Deposit**. The Deposit shall be returned to Purchaser promptly (and in any event within three (3) Business Days) upon any of the following: (i) (A) any termination of this Agreement by Purchaser pursuant to the Early Termination Right or any other termination right of Purchaser set forth herein, including but not limited to pursuant to Section 26(b) or (d); (B) termination of this Agreement by reason of Sellers' material breach or failure of any condition to Closing other than one incapable of satisfaction solely by reason of Purchaser's breach; (C) Sellers' selection of, or the Bankruptcy Court's approval of, a competing bid as the Successful Bid; (D) failure of the Sale Order to become a Final Order in the required form by the Outside Closing Date; (E) failure to consummate the Closing by the Outside Closing Date other than by reason of Purchaser's breach of its obligations to consummate the Closing, all other conditions to its obligations to close having been satisfied or waived; (ii) termination of this Agreement by Sellers pursuant to Sections 26(c)(i), (c)(iii) or (d); or (iii) termination of this Agreement by the mutual consent of the Parties pursuant to Section 26(a); *provided*, *however*, that, unless otherwise provided as a result of Purchaser's exercise of the Early Termination Right pursuant to Section 14, Purchaser shall not be entitled to a return of the Deposit if the Closing does not occur solely because Purchaser has not agreed to any proposed Required Amendment that is commercially reasonable. Unless otherwise provided herein, the Deposit shall be subject to forfeiture only if Purchaser, having become the Successful Bidder and having received a Sale Order in the required form that is a Final Order, willfully and materially breaches its obligations to consummate the Closing, all conditions to its obligation to close having been satisfied or waived. At Closing, the Deposit shall be released to Sellers and credited against the Purchase Price. The Deposit shall be disbursed in accordance with Section 25 (Default) and Section 26 (Termination), and Purchaser's obligation to fund and Debtors' obligation to maintain the Deposit in escrow in accordance with the Bidding Procedures Order shall survive any termination of this Agreement until the

Deposit has been finally disbursed. For the avoidance of doubt, in the event a Party exercises its rights under Section 33, then the Deposit shall be preserved pending final resolution of such action.

**9. Bid Protections.**

(a) **Bid Protections Generally**. As an inducement to Purchaser to enter into this Agreement and serve as the Stalking Horse Purchaser, to expend the time and resources required to negotiate this Agreement, to conduct the due diligence required to permit Purchaser to commit to this Agreement, and to permit Purchaser's bid to be exposed to overbids in accordance with the Bidding Procedures, Sellers have agreed to pay to Purchaser, on the terms and subject to the conditions set forth in this Section 9, (i) a breakup fee in an amount equal to two and one-half percent (2.5%) of the Purchase Price (the "Breakup Fee") and (ii) reimbursement of Purchaser's actual, reasonable, and documented out-of-pocket fees, costs, and expenses (including reasonable fees and expenses of Purchaser's outside legal counsel and other professional advisors) incurred in connection with the negotiation, documentation, and pursuit of the Letter of Intent, this Agreement, and the Transactions, in an aggregate amount not to exceed Two Hundred Thousand Dollars ($200,000.00) (the "Expense Reimbursement", and together with the Breakup Fee, the "Bid Protections").

(b) **Triggering Events**. Purchaser shall be entitled to, and Sellers shall be obligated to pay to Purchaser, the Bid Protections in immediately available funds upon termination of this Agreement pursuant to Section 26(b), Section 26(c)(iii) or Section 26(d) and upon consummation of an Alternative Transaction; *provided, however*, that Purchaser shall not be entitled to the Bid Protections if, at the time of termination (other than termination pursuant to Section 26(b)(xii) or Section 26(c)(iii)), (i) Purchaser is in material breach of this Agreement as of the date of such termination at the time of such termination, (ii) such termination is solely a result of Sellers' inability to satisfy a milestone, deadline, or other closing condition as a result of Purchaser's failure to use commercially reasonable efforts to satisfy conditions within Purchaser's control, or (iii) such termination is solely a result of Purchaser not agreeing to any proposed Required Amendment that is commercially reasonable. Notwithstanding anything herein to the contrary, the Bid Protections shall be paid solely and directly from the proceeds of any Alternative Transaction, and in the event an Alternative Transaction is not consummated, Purchaser shall not be entitled to, and Sellers shall not be obligated to pay to Purchaser, the Bid Protections.

(c) **Administrative Expense Priority**. Sellers' obligation to pay the Bid Protections, if and when due in accordance with this Section 9, shall constitute an allowed superpriority administrative expense claim against each of the Debtors' Estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code, *pari passu* with the highest administrative expense claims (other than the DIP Superpriority Claims, which shall be senior to the Bid Protections) against the Debtors' Estates. The allowance and payment of the Bid Protections shall not be subject to any defense, claim, counterclaim, offset, recoupment, reduction, surcharge, or subordination, and shall not be subject to any further order of the Bankruptcy Court unless a Stalking Horse Objection is filed on or before June 6, 2026. Sellers acknowledge that (i) the Bid Protections are an integral part of the Transactions; (ii) in the absence of Sellers' obligation to pay the Bid Protections, Purchaser would not have entered into this Agreement; (iii) the entry of Purchaser into this Agreement is beneficial to Sellers because it will enhance Sellers' ability to maximize the value of their assets for the benefit of its creditors; and (iv) the Bid Protections are reasonable in relation to Purchaser's efforts and lost opportunities resulting from the Transactions.

(d) **No Bid Protections; Withdrawal**. Notwithstanding anything to the contrary in this Agreement, Purchaser shall not be entitled to the Bid Protections (i) if Purchaser is the Successful Bidder at the Auction and the Transactions contemplated by this Agreement are consummated; (ii) if a Stalking Horse Objection is timely filed and sustained by the Bankruptcy Court pursuant to a Final Order; (iii) if Purchaser withdraws its bid (other than pursuant to a termination right expressly afforded to Purchaser under this Agreement); (iv) if Purchaser fails to participate in the Auction in accordance with the Bidding Procedures (other than by reason of being designated the Successful Bidder without the need for an Auction); or (v) if this Agreement is terminated by mutual consent pursuant to Section 26(a).

(e) **Survival**. The obligations set forth in this Section 9 shall survive termination of this Agreement until the Bid Protections (if any) are paid in full or are no longer payable hereunder.

**10. Auction; Higher and Better Bids; Bidding Procedures**.

(a) **Agreement Subject to Bidding Procedures**. Purchaser acknowledges and agrees that this Agreement and the Transactions contemplated hereby are subject in all respects to (i) the right of Sellers to receive, evaluate, negotiate, and accept higher or otherwise better bids for the Acquired Assets (or any portion thereof) from Qualified Bidders in accordance with the Bidding Procedures and subject to an Auction, (ii) the designation of Purchaser as the Successful Bidder by the Debtors in accordance with the Bidding Procedures, and (iii) the entry by the Bankruptcy Court of the Sale Order. Purchaser acknowledges that the Bidding Procedures and the Bidding Procedures Order govern the conduct of the sale process and that Sellers may exercise their rights thereunder, including to extend applicable deadlines, adjourn the Auction, and otherwise administer the Auction, in each case in accordance with the Bidding Procedures and the Bidding Procedures Order. Notwithstanding anything herein to the contrary, Sellers may not (A) extend the Bid Deadline (as defined in the Bidding Procedures), (B) modify the requirements for constituting a Qualified Bid (as defined in the Bidding Procedures), (C) extend the date of the Auction (if any), or (D) modify the amount and requirements of the initial Subsequent Bid (as defined in the Bidding Procedures), in each case without the advance written consent of Purchaser.

(b) **Stalking Horse Bid**. The transactions set forth in this Agreement shall constitute the "Stalking Horse Bid" for purposes of the Bidding Procedures, and shall serve as the floor against which competing bids shall be measured.

(c) **Participation at Auction**. Purchaser shall be deemed a Qualified Bidder under the Bidding Procedures without further action and shall be entitled to participate in the Auction (if held). At any Auction, Purchaser may, but shall not be obligated to, submit one or more bids in addition to the bid reflected in this Agreement. Any such overbid by Purchaser shall be on terms and conditions no less favorable to Sellers than those set forth in this Agreement (other than as to purchase price and as Purchaser may otherwise specify). In determining the value of any competing bid against Purchaser's bid, Sellers shall credit Purchaser, dollar-for-dollar, with the amount of the Breakup Fee plus the maximum Expense Reimbursement.

(d) **Successful Bidder**. If, following the Auction (or, if no Auction is held, the deadlines specified in the Bidding Procedures), Sellers designate Purchaser as the Successful Bidder, then this Agreement shall, subject to entry of the Sale Order, be the definitive agreement for the sale of the

Acquired Assets. For the avoidance of doubt, Purchaser shall have the sole and absolute discretion to decide whether to serve as Back-Up-Bidder (as defined in the Bidding Procedures).

(e) **No Restriction on Process**. Sellers shall be permitted (and shall not be deemed in breach of this Agreement) to (i) solicit, evaluate, negotiate, and execute one or more alternative transactions in accordance with the Bidding Procedures and (ii) consummate any Alternative Transaction approved by the Bankruptcy Court; *provided*, *however*, that neither Sellers nor any of their officers, directors, equity holders, agents, or professionals shall solicit, discuss, or enter into any alternative transaction involving a different stalking horse purchaser with respect to any of the Acquired Assets without the express written consent of Purchaser.

**11. [Reserved]**

**12. Assigned Contracts**. At any time prior to the Closing Date, Purchaser may designate any Contract of Sellers as an Assigned Contract, and, upon receipt of any such notice, Sellers shall use commercially reasonable efforts to effectuate the assumption and assignment of such Contracts by Sellers to Purchaser in accordance with the Bankruptcy Code and such Contract shall become an Assigned Contract and be assigned, transferred, and conveyed to Purchaser. Notwithstanding anything to the contrary herein, Purchaser may at any time prior to the Closing Date (the "Assigned Contract List Modification Deadline"), amend the list of Assigned Contracts, appended hereto as Schedule 2(f), to add or remove one or more Contracts. Any Contracts that are not identified on Schedule 2(f) as of the Assigned Contract List Modification Deadline, as such list may be amended in accordance with this Agreement, shall be an Excluded Asset for all purposes herein. In the event there exists a Disputed Cure Claim, Purchaser shall determine whether to Close notwithstanding such Disputed Cure Claim, in which case the applicable Assigned Contract may be assigned to Purchaser pursuant to this Agreement so long as sufficient cash proceeds of the Purchase Price exist to satisfy or reserve for such Disputed Cure Claim. In the event Sellers or Purchaser become aware of a Contract that was not identified to Purchaser prior to Closing, at the election of Purchaser, in its sole and absolute discretion, Sellers shall use all commercially reasonable efforts to assign such Contract to Purchaser at Sellers' sole cost and expense and without any modification to the Purchase Price.

**13. [Reserved]**

**14. Early Termination Right**. Notwithstanding anything herein to the contrary, from the date hereof through the dates set forth below in subsections (i) and (ii) of this Section 14 (the "Early Termination Outside Date"), Purchaser shall have the right, (i) to terminate this Agreement for any reason, exercisable in its sole and absolute discretion by written notice to Sellers on or before July 2, 2026, or (ii) to terminate this Agreement if Purchaser is not able to reach definitive agreements, binding on the counterparties to the Priority Assigned Contracts, with respect to the amendment and/or assignment of the Priority Assigned Contracts, in each case in form and substance acceptable to Purchaser in its sole and absolute discretion, on or before July 2, 2026 (together, the "Early Termination Right"). Upon exercise of the Early Termination Right, Purchaser shall be entitled to the prompt return of the Additional Deposit (but in no event later than three (3) Business Days following the exercise of the Early Termination Right), with Sellers entitled to retain the Initial Deposit as liquidated damages. Following expiration of the Early Termination Outside

Date, Purchaser shall not be entitled to terminate this Agreement except to the extent expressly set forth as result of failure to satisfy a closing condition or pursuant to any termination right in this Agreement.

**15. Due Diligence/Title**.

(a) **Right to Diligence**. Through and including the Early Termination Outside Date, Purchaser shall be entitled to reasonable access, on customary terms and subject to existing confidentiality obligations, to (i) a virtual data room containing Sellers' corporate, contractual, financial, operational, environmental, regulatory, and litigation records (which data room shall be updated by Sellers on a rolling basis with any new or modified documents); (ii) Sellers' management, the Chief Restructuring Officer, and Sellers' advisors for diligence calls, with responses to diligence inquiries to be provided within two (2) Business Days; and (iii) the facilities comprising the Acquired Assets for one or more on-site inspections, on mutually convenient dates and on terms that minimize disruption to operations.

(b) **Right to Access**. Through and including the Early Termination Outside Date, at all reasonable times upon not less than two (2) Business Days' prior written notice to Sellers, Purchaser and its authorized representatives (including engineers, environmental consultants, surveyors, and other professionals) shall have the right to enter upon and access the Premises for the purpose of conducting inspections, tests, investigations, environmental assessments (including Phase I and, if warranted by the results of a Phase I, Phase II environmental site assessments), infrastructure evaluations, and such other examinations of the Acquired Assets as Purchaser may reasonably deem necessary or desirable; *provided*, *however*, that (i) such access shall be conducted during normal business hours and in a manner that does not unreasonably interfere with Sellers' operations at the Premises, (ii) Purchaser shall restore any damage to the Premises caused by such inspections or tests to substantially the condition existing prior thereto, (iii) Purchaser shall maintain (or cause its representatives to maintain) commercially reasonable insurance covering any such entry, and (iv) Purchaser shall indemnify and hold harmless Sellers from and against any Liabilities arising directly from the negligence or willful misconduct of Purchaser or its representatives in connection with such access (but not from any pre-existing conditions discovered thereby). Sellers shall reasonably cooperate with Purchaser in connection with such access, including by making available Sellers' on-site personnel and providing access to all Building Systems, utility infrastructure, and fiber and telecommunications facilities at the Premises.

(c) **Title**. Purchaser may order at its cost (i) a title insurance commitment (the "Title Commitment") for an ALTA Owner's Policy of title insurance issued by a reputable title company of Purchaser's choice (the "Title Company") in the amount of the Purchase Price for purposes of insuring title to the Premises, and (ii) a survey of the Premises to be made by a registered professional surveyor licensed to practice in the state where the Premises are located and to be certified by Sellers, Purchaser, and Title Company (such updated or new survey, the "Survey").

(d) **Limitations on Access**. Sellers' obligations under this Section 15 shall be subject to (y) any restrictions imposed by order of the Bankruptcy Court (including any protective order, order to seal, or order restricting access to the Premises), and (z) applicable legal privilege and work product protection, and in either case under subsections (y) or (z) hereof, Sellers shall provide Purchaser with prompt written notice of any such limitation and shall use commercially reasonable efforts to provide alternative means of access or information to the extent consistent with any applicable Court order.

**16. [Reserved]**

**17. Representations and Warranties of Sellers**. Sellers represent and warrant to Purchaser as follows:

(a) **Organization, Execution and Power**. Sellers have (subject to entry of the Sale Order) full power to execute, deliver, and carry out the terms and provisions of this Agreement and have taken all necessary action to authorize the execution, delivery, and performance of this Agreement and to consummate the Transactions. Neither the execution and delivery of this Agreement by Sellers, nor the incurrence by Sellers of the obligations herein set forth, nor the consummation by Sellers of the Transactions herein contemplated, nor compliance by Sellers with the terms of this Agreement, will conflict with or result in a breach of any of the terms, conditions, or provisions of, or constitute a default under, the articles of organization, operating agreement, or by-laws of Sellers or any bond, note, or other evidence of indebtedness, contract, indenture, mortgage, deed of trust, loan agreement, lease, or other Contract, agreement or instrument to which any of Sellers is a party or by which any of Sellers' properties may be bound, or, to the best of Sellers' knowledge after reasonable inquiry, any constitutional provision or statute or any order, rule, or regulation of any Governmental Authority having jurisdiction over Sellers or any of their activities or property.

(b) **Title to Acquired Assets; Sufficiency of Assets**. Sellers own, and have good and valid title to, all of the Acquired Assets. The Acquired Assets will constitute all of the assets necessary and sufficient to enable Purchaser to conduct the Business in the manner in which the Business is currently being conducted and proposed to be conducted by Sellers. Upon the entry and effectiveness of the Sale Order, Sellers will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to Purchaser the Acquired Assets, free and clear of all Encumbrances except for Permitted Encumbrances. Other than Encumbrances that will be released upon the entry and effectiveness of the Sale Order, Sellers own or have rights to, and upon delivery to Purchaser at the Closing will transfer to Purchaser, good title to or a valid leasehold interest in all of the Acquired Assets, free and clear of all Encumbrances except for Permitted Encumbrances.

(c) **Consents and Approvals**. No Seller was, is, or will be required to make any filing with or give any notice to, or to obtain any consent from, any Person in connection with the execution and delivery by Sellers of any of this Agreement or the consummation or performance by Sellers of this Agreement, except any such filings, notices or consents that have been made or obtained (as applicable) prior to the Closing, as listed on Schedule 17(c) hereto.

(d) **Real Property; Leases; Occupancy**. Except for the Assigned Contracts and the Intangible Property, there are no leases, subleases, licenses, or other occupancy agreements (written or oral) which grant any possessory interest in or to the Premises, or which grant any other rights with respect to the use of any of the Premises that will remain in effect after Closing, and there are no parties in possession of the Premises. Other than the Leasehold Interest, Sellers do not have any other direct or indirect interest in Real Property, whether owned, leased, or otherwise.

(e) **Compliance of Premises; Environmental Matters**. The Premises, to Sellers' knowledge, materially comply with all applicable Laws, and, to Sellers' knowledge, the present

maintenance, operation, and use of the Premises does not materially violate any Laws, including, without limitation, environmental, zoning, subdivision, building, or similar Laws affecting the Premises. Sellers have not received any written notice of any Claims or complaints against Sellers or the Premises with respect to any violation of any Laws, including, without limitation, any Environmental Law, any releases of Hazardous Materials, or with respect to any corrective or remedial action for, or cleanup of, the Premises or any portion thereof. Sellers shall provide to Purchaser, promptly following Sellers' receipt thereof, any such written notices received by Sellers from and after the Effective Date.

(f) **Ground Lease**. The Ground Lease is in full force and effect and has not been amended, modified, or supplemented except as disclosed in this Agreement. To Sellers' knowledge, (i) no default or event of default by any party thereto exists under the Ground Lease, and no event has occurred that, with the giving of notice or the passage of time or both, would constitute a breach, default or event of default thereunder, or permit the termination, modification or acceleration of rent thereunder, (ii) no party to the Ground Lease has delivered or received any written notice of termination, cancellation, or non-renewal thereof, and (iii) Sellers have delivered to Purchaser true, correct, and complete copies of the Ground Lease (including all amendments thereto). The current use and operation of the Premises as a data center facility is a permitted use under the Ground Lease. Sellers shall use commercially reasonable efforts to obtain any consent of TAMU required in connection with the assignment of the Ground Lease to Purchaser (including any modifications to the Ground Lease requested by Purchaser) and the consummation of the Transactions contemplated by this Agreement, such that upon Closing, Purchaser shall be able to immediately begin or continue construction of data center Improvements on the Premises, and shall promptly notify Purchaser in writing of any communication from TAMU regarding such consent or any objection thereto.

(g) **Electrical Service Agreement; Power Infrastructure**. (i) The ESA provides for an aggregate committed electrical capacity of not less than ten (10) megawatts ("MW") to the Premises, (ii) the electrical infrastructure located on the Premises (including switchgear, transformers, uninterruptible power supply systems, backup generators, and power distribution units) is sufficient to support the contracted capacity under the ESA and is in good working order and condition, ordinary wear and tear excepted, (iii) the ESA is in full force and effect and has not been amended, modified, or supplemented except as disclosed in this Agreement, (iv) neither Sellers nor RCDRC Power has received any written notice from BTU or the City of any default, curtailment, or planned interruption of service under the ESA (other than routine maintenance), (v) except as otherwise expressly stated herein, there are no ancillary agreements, third-party consents, or approvals from any Governmental Authorities required, the absence of which would prevent the full performance of either Purchaser or BTU under the ESA, (vi) to Sellers' knowledge, BTU has not reallocated, redirected, diverted, or reduced the committed electrical capacity under the ESA to any other property, customer, or account, and the full contracted capacity under the ESA remains exclusively committed and available to the Premises, and (vii) to the extent any agreements, consents, or approvals that, prior to the Petition Date, benefited Sellers and/or the Premises were transferred to any other Person, such agreements, consents, or approvals have been transferred or assigned to Sellers, and shall be assigned to Purchaser pursuant to this Agreement. Sellers shall use commercially reasonable efforts to obtain any consent of BTU required in connection with the assignment of the ESA to Purchaser and the consummation of the transactions contemplated by this Agreement, and shall promptly notify Purchaser in writing of any communication from BTU regarding such consent or any objection thereto.

(h) **Telecommunication and Fiber Infrastructure**. To Sellers' knowledge, (i) all fiber optic and telecommunications infrastructure servicing the Premises (including fiber routes, points of entry, conduit, and connectivity to carrier hotels, internet exchange points, or other network access points) is in good working order and condition, ordinary wear and tear excepted, (ii) Sellers have made available to Purchaser a true, correct, and complete list of all Contracts relating to fiber optic and telecommunications services at the Premises (including dark fiber leases, lit services agreements, and carrier agreements), (iii) no party to any such Contract has delivered or received any written notice of termination, cancellation, or material default thereunder, (iv) except as otherwise expressly stated herein, there are no ancillary agreements, third-party consents, or approvals from any Governmental Authorities required, the absence of which would prevent Purchaser and any other party to such Contract from fully performing under such Contract, and (v) to the extent any agreements, consents, or approvals that, prior to the Petition Date, benefited Sellers and/or the Premises were transferred to any other Person, such agreements, consents, or approvals have been transferred or assigned to Sellers, and shall be assigned to Purchaser pursuant to this Agreement. Sellers shall use commercially reasonable efforts to obtain any consent required from any party to such Contract in connection with the assignment of such Contract to Purchaser and the consummation of the transactions contemplated by this Agreement, and shall promptly notify Purchaser in writing of any communication from any party to any such Contract regarding such consent or any objection thereto.

(i) **Permits**. To Sellers' knowledge, all Permits necessary for the ownership, use, occupancy, and operation of the Premises as a data center facility (including zoning approvals, building permits, certificates of occupancy, electrical permits for high-density power loads, and any special or conditional use permits) have been duly obtained from the applicable Governmental Authorities, are in full force and effect, and are not subject to any pending or, to Sellers' knowledge, threatened revocation, suspension, modification, or non-renewal proceeding. The current use and operation of the Premises as a data center facility does not violate any applicable zoning Laws, land use restrictions, or conditions of any such Permits. Except as otherwise expressly stated herein, there are no ancillary agreements, third-party consents, or approvals from any Governmental Authorities required, the absence of which would prevent Purchaser from receiving the full benefit of the Permits. Sellers shall use commercially reasonable efforts to obtain any consent of any Governmental Authorities required in connection with the assignment of such Permits to Purchaser and the consummation of the transactions contemplated by this Agreement, and shall promptly notify Purchaser in writing of any communication from any party to any such Permits regarding such consent or any objection thereto.

(j) **Construction; Liens; Development Status**. To Sellers' knowledge, (i) Sellers have delivered to Purchaser a true, correct, and complete description of the current status of all construction and development activities at the Premises, including the percentage of completion of any ongoing construction, (ii) there are no outstanding claims, disputes, or demands by any contractor, subcontractor, materialman, or supplier (including S&P) relating to the Premises or the Improvements that remain unpaid or unresolved, other than as disclosed on the public Bankruptcy Court docket for the Chapter 11 Cases, and (iii) Sellers have made available to Purchaser copies of all performance bonds, payment bonds, letters of credit, and other surety instruments relating to the construction or development of the Improvements, together with a summary of the status of each such instrument.

(k) **Facility Technology Systems**. To Sellers' knowledge, (i) Sellers have made available to Purchaser a true, correct, and complete list of all software licenses, building management

systems (BMS), supervisory control and data acquisition (SCADA) systems, security and access control systems, environmental monitoring systems, and other proprietary technology systems used in connection with the ownership, operation, or management of the Premises (collectively, the "Facility Technology Systems") as set forth on Schedule 17(k), (ii) all Facility Technology Systems that are owned by Sellers are included in the Acquired Assets, and (iii) with respect to any Facility Technology Systems that are licensed or leased from third parties, Sellers have identified all such Contracts to Purchaser and, to Sellers' knowledge, such Contracts are in full force and effect and no party thereto has delivered or received any written notice of termination, cancellation, or material default thereunder. Sellers shall use commercially reasonable efforts to assist Purchaser in obtaining any consents or new licenses required for Purchaser's continued use of the Facility Technology Systems following the Closing.

(l) **Brokerage Agreements**. To Sellers' knowledge, there are no exclusive or continuing brokerage agreements as to the sale of the Premises, or any of the Acquired Assets, or the sale or lease of any of the space at the Premises, or any of the Acquired Assets, that will remain in effect after Closing, save and except those identified in this Agreement.

(m) **Employees**. There are no employees of Sellers or at the Premises for which Purchaser will be responsible after Closing.

(n) **Tax Matters; Sanctions.** Other than as set forth on Schedule 17(n):

**(i)** Each Seller is either (A) a United States person (within the meaning of section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, a "United States person") or (B) a disregarded entity of a United States person. Sellers are not a Prohibited Person, nor are Sellers a "foreign corporation," "foreign partnership," or "foreign estate" as those terms are defined in the Internal Revenue Code of 1986, as amended.

**(ii)** All material Tax Returns relating to the Business or the Acquired Assets that are required by applicable Law to be filed by or with respect to any Seller have been timely filed (taking into account any extension of time within which to file), and all such Tax Returns are true, complete, and accurate in all material respects.

**(iii)** Each of Sellers has timely paid all material Taxes relating to the Business or the Acquired Assets due and owing by it (whether or not shown on any Tax Return), including any material Taxes required to be withheld from amounts owing to, or collected from, any employee, creditor, or other third party, other than Taxes not due as of the date of the Petition Date or the anticipated Closing Date, as to which subsequent payment was not required by reason of the Chapter 11 Cases or Taxes that are being contested in good faith in appropriate proceedings before the applicable Governmental Authority.

**(iv)** No deficiencies for material Taxes relating to the Business or the Acquired Assets have been claimed, proposed or assessed by any Governmental Authority in writing against Sellers except for deficiencies which have been fully satisfied by payment.

**(v)** There are no audits, examinations, investigations or other proceedings ongoing or pending against or with respect to Sellers with respect to any material Taxes relating to the

Business or the Acquired Assets and no written notification has been received by Sellers that such an audit, examination, investigation or other proceeding has been proposed.

**(vi)** No claim has been made by any Governmental Authority (i) in any jurisdiction where any Seller does not file material Tax Returns that it is, or may be, subject to Tax by that jurisdiction or (ii) in a jurisdiction where any Seller has previously filed any material Tax Return that such Seller is or may be subject to additional Taxes.

**(vii)** There are no Encumbrances for material Taxes relating to the Business or the Acquired Assets upon any property or assets of Sellers, except for Permitted Encumbrances.

(o) **Condemnation**. Sellers have not received written notice of any eminent domain or private purchase in lieu of such proceeding that would affect the Premises or any of the Acquired Assets.

(p) **Options; Rights of First Refusal**. Except as set forth in the Ground Lease, Sellers have not granted any option or right of first refusal or first opportunity to any party (other than Purchaser pursuant to this Agreement) to acquire any interest in any portion of the Acquired Assets.

(q) **Disclosure of Documents**. Sellers have made available to Purchaser, to Sellers' knowledge, all material Documents in Sellers' possession or control pertaining to the ownership or operation of the Premises or any of the Acquired Assets. Such Documents are, to Sellers' knowledge, the documents of Sellers; Sellers make no representation or warranty as to the accuracy, completeness, or reliability of any third-party reports, studies, or projections, all of which Purchaser relies on at its own risk.

(r) **Utilities**. There are no pending written notices, or, to Sellers' knowledge, oral notices from any utility provider of termination or material curtailment of services that would materially impair operation of the Premises as a data center facility.

(s) **Good Faith**. Sellers have entered into this Agreement in good faith, after arm's-length negotiations with Purchaser, without collusion or fraud, and with the intent that any sale to Purchaser hereunder shall qualify for the protections of section 363(m) of the Bankruptcy Code.

(t) **No Survival; AS-IS Sale; No Other Representations**. Notwithstanding anything to the contrary herein, the representations and warranties of Sellers set forth in this Section 17, and any covenants of Sellers required to be performed at or prior to Closing, shall not survive the Closing and shall terminate and be of no further force or effect as of the Closing, except that the obligations set forth in Section 6 shall survive the Closing in accordance with their respective terms. Except for the express representations and warranties set forth in this Section 17 and the surviving obligations expressly identified in the preceding sentence, the Acquired Assets are being sold on an "AS IS, WHERE IS, WITH ALL FAULTS" basis, without any other representation or warranty of any kind, express or implied, statutory or otherwise, including any implied warranty of merchantability, fitness for a particular purpose, quality, quantity, condition, value, title (subject to entry of the Sale Order), revenues, expenses, operating history, environmental condition, or compliance with Laws, all of which are expressly disclaimed. Purchaser acknowledges that it has had the opportunity to conduct, and has conducted, its own independent investigation, review, and analysis of the Acquired Assets and is relying solely on the results of its own investigation and on the express representations and warranties set forth in this Section 17. From and after

the Closing, except with respect to fraud, Purchaser shall have no right to assert any claim against Sellers, the Debtors' Estates, or any of their respective Affiliates, directors, officers, managers, employees, agents, attorneys, or advisors for any breach of any such representation, warranty, or covenant (other than with respect to the surviving obligations expressly identified above), and no escrow, holdback, or indemnification shall be available to Purchaser in respect thereof (other than as expressly set forth in Section 6(c)).

(u) **Absence of Material Adverse Effect**. Since the Petition Date, there has not been any Material Adverse Effect on the Acquired Assets, taken as a whole.

(v) **Intellectual Property**. To Sellers' knowledge, (i) Sellers own or have valid rights to use all Intellectual Property included in the Acquired Assets, in each case as used in the operation of the Business as currently conducted, (ii) the consummation of the Transactions contemplated hereby, including pursuant to the Sale Order, will not result in the loss of any material rights to use any Intellectual Property included in the Acquired Assets, other than as may arise under applicable non-assignment provisions overridden by the Bankruptcy Code, (iii) Sellers have not received any written notice alleging that the operation of the Business as currently conducted materially infringes the Intellectual Property of any third party, and (iv) all material Contracts pursuant to which any Intellectual Property material to the operation of the Business is licensed to or by Sellers have been made available to Purchaser.

(w) **Condition of the Premises.** The Premises (including, without limitation, all Improvements and Building Systems) is in good working order and condition, and no material repairs thereto are required. The continued maintenance and operation of the Premises as currently maintained and operated is not dependent on facilities located at other property, and the continued maintenance and operation of any other property is not dependent on facilities located on the Premises. No building or other improvement not part of the Premises relies on the Premises or any part thereof or any interest therein to fulfill any requirement of any Governmental Authorities; and no building or other improvements on the Premises relies on any property not included within the Premises to fulfill any requirement of any Governmental Authorities.

**18. Releases**.

(a) As of the Closing, each of Sellers, on behalf of itself and its Affiliates, and each of Sellers' and their Affiliates' representatives, heirs, Estates, successors, or executors, partners, members, equity holders, directors, officers, employees, controlling persons, agents, successors, stockholders, trustees, principals, parents, Subsidiaries, joint ventures, predecessors, and assigns (as applicable) (collectively, the "Seller Releasing Parties"), (i) irrevocably and unconditionally waives, releases, and forever discharges Purchaser, its direct and indirect Subsidiaries, and its and their current, former and future Affiliates, advisors, stockholders, equity holders, members, directors, managers, trustees, principals, officers, employees, agents, controlling persons, parents, Subsidiaries, joint ventures, predecessors, successors, assigns, beneficiaries, heirs or executors (collectively, the "Purchaser Released Parties") from any and all rights, commitments, actions, debts, claims, counterclaims, suits, Causes of Action, Avoidance Actions, damages, demands, losses, obligations, costs, expenses, compensation and other Liabilities of every kind and nature whatsoever, whether known or unknown, matured or contingent and whether arising in Law, in equity or otherwise, in each case based upon facts, circumstances or occurrences existing at or

prior to Closing (collectively, the "Released Claims"), (ii) irrevocably covenants to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Purchaser Released Party with respect to the Released Claims and (iii) represents to the other Parties that Sellers have not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Seller also hereby waives the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim. Notwithstanding the generality of the foregoing, nothing herein constitutes a waiver or release by any Person of, and Released Claims shall not be deemed to include any claim or right expressly arising under this Agreement or any Transaction Document, including any breach of this Agreement. For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Released Claims only include Avoidance Actions to the extent they can or could be asserted against the Purchaser Released Parties.

**19. Covenants of Purchaser and Sellers.**

(a) Purchaser hereby covenants with Sellers that all actions required pursuant to this Agreement which are necessary to effectuate the transactions contemplated herein will be taken promptly and in good faith by Purchaser, and Purchaser shall furnish Sellers with such documents or further assurances as Sellers may reasonably require. Without limiting the foregoing, Purchaser shall use commercially reasonable efforts to satisfy, or cause to be satisfied, all conditions to Closing set forth in Section 22 that are within Purchaser's control, including, without limitation, the Required Amendments set forth in Section 22(g). Sellers hereby covenant with Purchaser that all actions required pursuant to this Agreement which are necessary to effectuate the transactions contemplated herein will be taken promptly and in good faith by Sellers, and Sellers shall furnish Purchaser with such documents or further assurances as Purchaser may reasonably require; *provided, however,* that nothing in this Section 19 shall require Sellers to take any action that would be inconsistent with the Bankruptcy Code, the Bidding Procedures, or the Bidding Procedures Order, or any other Final Order of the Bankruptcy Court.

(b) Between the Effective Date and the Closing Date, Sellers covenant and agree that:

**(i)** Sellers will continue to operate, maintain, and insure the Acquired Assets, including the Premises, in substantially the same manner as Sellers have operated, maintained, and insured the Acquired Assets, including the Premises, during Sellers' ownership of the same. Without limiting the foregoing, Sellers will maintain the Premises (including all Improvements and Building Systems) in substantially the same condition as exists on the Effective Date, ordinary wear and tear excepted, and shall not remove, disable, or materially alter any Building Systems, Facility Technology Systems, or other infrastructure at the Premises without the prior written consent of Purchaser;

**(ii)** Sellers will not sell, transfer, or convey Sellers' interest in or title to the Acquired Assets without Purchaser's prior written consent;

**(iii)** Sellers shall cause each Person holding any Non-Debtor Material Asset to execute and deliver, at or prior to the Closing, such joinders, assignments, conveyances, or other

instruments as may be reasonably necessary to convey to Purchaser (or its designee) the full benefit of each Non-Debtor Material Asset, in form and substance reasonably acceptable to Purchaser;

**(iv)** Sellers shall, and shall cause their Affiliate RCDRC Power, LLC and any other Person (including, without limitation, Sam Tenorio III and any of his Affiliates) holding any interest in or rights under the ESA, to, without the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned, or delayed), (A) not sell, transfer, or convey any of RCDRC Power's interest in or title to the ESA, and (B) not enter into any agreement to amend or modify the ESA in a manner that would materially and adversely affect the rights to be assigned to Purchaser hereunder;

**(v)** Sellers will not enter into any new material Contracts affecting the Acquired Assets (including any material amendments, modifications, or renewals of existing Contracts) that may be binding on Purchaser or the Acquired Assets after Closing without Purchaser's prior written consent;

**(vi)** To the extent Purchaser reasonably requests additional information or documentation during the term of this Agreement relating to the Acquired Assets, Sellers agree to provide same to the extent in Sellers' possession or control, subject to applicable legal privilege, work product protection, confidentiality obligations owed to third parties, and any restrictions imposed by order of the Bankruptcy Court. Until Closing or this Agreement is terminated in accordance with its terms, Sellers shall have an ongoing obligation to provide all Documents that come into their possession or control, subject to the foregoing limitations. For the avoidance of doubt, Purchaser's right of physical access to the Premises, and the limitations thereon, shall be governed exclusively by Section 15;

**(vii)** Sellers will use commercially reasonable efforts to (A) prosecute the Bidding Procedures Order with respect to the Bankruptcy Court's approval of Purchaser's right to the Bid Protections, (B) comply with the Bidding Procedures and the Bidding Procedures Order, (C) prosecute the Sale Motion and obtain entry of the Sale Order, in form and substance reasonably acceptable to Purchaser, and (D) close the Transactions contemplated by this Agreement no later than the Outside Closing Date; and

**(viii)** Sellers shall not, directly or indirectly, solicit, negotiate, or enter into any alternative stalking horse arrangement or agreement with any Person without the prior written consent of Purchaser, which Purchaser may refuse in its sole discretion and for any or no reason; *provided*, *however*, that nothing in this Section 19(b)(viii) shall restrict Sellers from complying with any order of the Bankruptcy Court.

**(ix)** In connection with the assignment of the Ground Lease, Sellers shall use commercially reasonable efforts to negotiate with TAMU to include, in the assignment agreement and any related documentation, provisions confirming that: (A) all applicable TAMU and RELLIS Campus policies, procedures, and administrative requirements including insurance requirements, permit Purchaser to access the Leased Real Property and commence construction operations on the Premises immediately upon the Closing Date without any additional approvals or administrative prerequisites; and (B) TAMU will not impose any new or additional policies, procedures, or access restrictions that would delay or condition Purchaser's commencement of construction. All assignment documents relating to the Ground Lease shall be subject to Purchaser's review and approval in its sole and absolute discretion, prior to execution.

**20. Bankruptcy Court Approval.**

(a) **Bidding Procedures Order**. There shall be no amendment or modification to the Bidding Procedures Order or the Bidding Procedures without the advance written consent of Purchaser, which shall be subject to Purchaser's sole and absolute discretion.

(b) **Sale Order**. If this Agreement is the Successful Bid (as defined in the Bidding Procedures), Sellers shall obtain entry of an order of the Bankruptcy Court (in form and substance reasonably acceptable to Purchaser) (the "Sale Order"), authorizing and approving, among other things: (i) Sellers' entry into and performance under this Agreement; (ii) the sale of the Acquired Assets to Purchaser free and clear of all Encumbrances, other than Permitted Encumbrances, pursuant to section 363(f) of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code (including a transfer free and clear of all transfer, bulk sale, and recording Taxes or levies); (iii) the assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code; (iv) findings that Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and that the transactions contemplated by this Agreement do not constitute an avoidable transfer under section 363(n) of the Bankruptcy Code; (v) the waiver of the stays provided by Bankruptcy Rules 6004(h) and 6006(d); (vi) a finding that Purchaser is not a successor to Sellers and shall have no successor or transferee liability of any kind with respect to any Liabilities of Sellers or the Debtors' estates; and (vii) a finding that the Cure Amounts paid at Closing in connection with the assumption and assignment of the Assigned Contracts constitute the full satisfaction of all monetary defaults under such Assigned Contracts and bar all further cure-related claims against Purchaser or the Acquired Assets. The Sale Order shall be in form and substance reasonably acceptable to Purchaser, and shall be entered by the Bankruptcy Court on or before July 1, 2026, or such later date as may be agreed by Purchaser in its sole discretion.

(c) **Cooperation**. Purchaser shall provide such financial and other information as Sellers may reasonably request in order to demonstrate adequate assurance of future performance under each Assigned Contract pursuant to section 365 of the Bankruptcy Code, and shall reasonably cooperate with Sellers in connection with Sellers' efforts to obtain entry of the Sale Order, including by providing reasonable testimonial or evidentiary support at any hearing before the Bankruptcy Court. All costs and expenses incurred by Purchaser in connection with its obligations under this Section 20, including the costs of demonstrating adequate assurance of future performance, shall be borne solely by Purchaser, subject to Purchaser's right to the Expense Reimbursement pursuant to Section 9 hereof.

**21. Conditions Precedent to Sellers' Obligations to Close.** Sellers' obligation to consummate the Closing hereunder is expressly conditioned on the satisfaction, at or before the time of the Closing hereunder or such earlier date as is specified below, of each of the following conditions (any one or more of which may be waived, in whole or in part, by Sellers at Sellers' option):

(a) Purchaser shall have performed, observed, and complied, in all material respects, with all covenants, agreements, and conditions set forth in this Agreement which Purchaser is required by this Agreement to perform, observe, and comply with, on the part of Purchaser, prior to or as of Closing;

(b) All instruments and documents that Purchaser is required to provide or execute under this Agreement to effect this Agreement and the transactions contemplated hereby shall be delivered to Sellers and shall be in form and substance reasonably satisfactory to Sellers; and

(c) The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, modified in any manner materially adverse to Sellers, or reversed.

**22. Conditions Precedent to Purchaser's Obligations to Close**. Purchaser's obligations hereunder (including, without limitation, its obligation to purchase and accept the Acquired Assets and pay the Purchase Price) are expressly conditioned on the satisfaction, at or before the time of Closing hereunder or such earlier date as is specified below, of each of the following conditions (any one or more of which may be waived, in whole or in part, by Purchaser, in writing, at Purchaser's option in Purchaser's sole and absolute discretion):

(a) all of the representations and warranties of Sellers contained in this Agreement shall have been true and correct when made and on the Closing Date with the same effect as if made on and as of the Closing Date;

(b) Sellers shall have performed, observed, and complied, in all material respects, with all covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with on their part prior to or as of Closing;

(c) no temporary restraining order, preliminary or permanent injunction, or other order of any Governmental Authority of competent jurisdiction shall be in effect that restrains, enjoins, or otherwise prohibits the consummation of the transactions contemplated by this Agreement, and no Action seeking such relief shall be pending;

(d) Purchaser shall have obtained or otherwise received any consents or approvals of any Governmental Authority required by applicable Law to consummate the Transactions;

(e) the Sale Order shall have been entered and shall be a Final Order;

(f) Sellers shall have obtained the Bankruptcy Court's approval of the assumption and assignment of the Assigned Contracts and, where applicable, the Intangible Property to Purchaser;

(g) Purchaser and the applicable counterparties shall have agreed to amendments (each a "Required Amendment") to the following Contracts and each such Required Amendment shall have become effective and binding on Purchaser and the applicable counterparty as of the Closing Date: (i) the Ground Lease (with TAMU), (ii) the ESA (with the City and BTU), (iii) the City Agreements (with the City), (iv) the County Agreements (with the County), (v) the ICA (with BTU), and (vi) the TAMU Easement Agreements (with TAMU). Any Required Amendment with respect to Section 22(g)(i), (g)(ii), and (g)(vi) shall be on terms satisfactory to Purchaser in its sole and absolute discretion. Any Required Amendment with respect to Section 22(g)(iii) through (v) shall be on terms satisfactory to Purchaser in its reasonable discretion. Sellers shall use commercially reasonable efforts in obtaining each Required Amendment, including by facilitating introductions and communications with the applicable counterparties. Notwithstanding the foregoing, the satisfaction of each condition in this Section 22(g) is for the sole benefit

of Purchaser and may be waived by Purchaser, in its sole and absolute discretion, by written notice to Sellers at any time prior to the Closing Date, with respect to any individual Required Amendment or all Required Amendments;

(h) since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing; *provided*, that Purchaser may not terminate this Agreement or decline to close the Transactions on the basis of this condition unless, to the extent Purchaser has knowledge of such Material Adverse Effect, (A) Purchaser has provided written notice to Sellers specifying in reasonable detail the events and conditions alleged to constitute a Material Adverse Effect, and (B) Sellers shall have failed to cure such Material Adverse Effect within five (5) Business Days following receipt of such notice;

(i) no Assigned Contract or Non-Debtor Material Contract shall have been materially terminated, suspended, or adversely modified (other than as contemplated by this Agreement or with the prior written consent of Purchaser) between the date of this Agreement and the Closing;

(j) Sellers shall have provided confirmation, in form and substance reasonably acceptable to Purchaser, that all utilities and critical infrastructure (including electrical power, water, telecommunications, cooling, fire suppression, and fiber connectivity) servicing the Acquired Assets shall be assigned to or otherwise made available to Purchaser as of the Closing for the continued and uninterrupted operation of the Premises as a data center facility at its current capacity;

(k) each Assigned Contract or Non-Debtor Material Contract shall have been duly assigned to Purchaser (or its designee), and all required counterparty consents to such assignments shall have been obtained, in each case in form and substance reasonably acceptable to Purchaser;

(l) each Person holding any Non-Debtor Material Asset shall have executed and delivered such joinders, assignments, conveyances, or other instruments as may be reasonably necessary to convey to Purchaser (or its designee) the full benefit of each Non-Debtor Material Asset, in form and substance reasonably acceptable to Purchaser;

(m) immediately prior to the Closing, neither the DIP Lender nor any other secured creditor shall have commenced any enforcement action, foreclosure proceeding, or other legal action with respect to any of the Acquired Assets that remains pending or unresolved;

(n) Sellers shall have provided confirmation, in form and substance reasonably acceptable to Purchaser, from BTU (or the applicable utility provider) that: (i) electrical service to the Premises under the ESA (or any successor agreement) will continue without interruption through and after the Closing at its full contracted committed capacity; (ii) no curtailment, disconnection, or material reduction in committed capacity is pending or threatened; and (iii) the full contracted electrical capacity under the ESA has not been reallocated, redirected, or diverted to any other property, customer, or account, and remains exclusively committed to the Premises;

(o) to the extent that any electrical capacity under the ESA has been reallocated, redirected, diverted, or otherwise reduced below the full contracted capacity at any time prior to the Closing Date, Sellers shall have caused any applicable Person to have fully restored such capacity and shall have provided written evidence reasonably acceptable to Purchaser that BTU has acknowledged, in writing, that

the full contracted electrical capacity under the ESA is reinstated and exclusively committed to the Premises as of the Closing Date;

(p) all fiber optic and telecommunications services at the Premises shall be continuing in full force and effect as of the Closing, and no provider of any such services shall have delivered written notice of termination, disconnection, or material reduction in service; and

(q) all instruments and documents required on the part of Sellers to effectuate this Agreement and the transactions contemplated hereby, including but not limited to such deliverables set forth in Section 24(b) hereof, shall be delivered to Purchaser and shall be in form and substance reasonably satisfactory to Purchaser, consistent with this Agreement and the Sale Order.

**23. Condition Precedent to Effectiveness of this Agreement**. This Agreement shall be binding upon the Parties upon the Effective Date; *provided, however,* that the obligation of Sellers to consummate the transactions contemplated hereby is expressly conditioned upon entry of the Sale Order by the Bankruptcy Court, and nothing in this Agreement shall obligate Sellers to consummate the transactions contemplated hereby absent such entry.

**24. Closing**.

(a) The closing (the "Closing") of the sale and purchase of the Acquired Assets, the assumption and assignment of the Assigned Contracts, and consummation of such other transactions contemplated hereby (collectively, the "Transactions") pursuant to this Agreement shall occur no later than 5:00 p.m. Central time on July 31, 2026 (the "Outside Closing Date"), or such later date as the Parties may agree in writing (subject to Bankruptcy Court approval to the extent required). The day on which the Closing actually occurs is referred to herein as the "Closing Date."

(b) At or before Closing, Purchaser shall receive from Sellers executed copies of each of the Transaction Documents, including:

**(i)** a duly executed assignment of Sellers' rights and obligations under the Ground Lease (with such amendments or modifications required and agreed to by Purchaser in its sole and absolute discretion) to Purchaser, countersigned by TAMU, free and clear of all Encumbrances, other than the Permitted Encumbrances, and other matters affecting title to, or the use and operation of, the Premises, which assignment, for the avoidance of doubt, shall expressly include an acknowledgment by TAMU that all applicable TAMU and RELLIS Campus policies, procedures, and administrative requirements including insurance requirements, that permit Purchaser to access the Leased Real Property and commence construction operations on the Premises immediately upon the Closing Date, without any additional approvals, waiting periods, or administrative prerequisites, and the form and substance of such Required Amendment (including any assignment documents relating thereto) shall be subject to Purchaser's prior review and approval in its sole and absolute discretion, and shall be in form and substance acceptable to Purchaser in its sole and absolute discretion;

**(ii)** a duly executed assignment of RCDRC Power's rights and obligations under the ESA (with such amendments or modifications required and agreed to by Purchaser in its

reasonable discretion) to Purchaser, countersigned by BTU, which assignment shall be in form and substance acceptable to Purchaser in its reasonable discretion;

**(iii)** a duly executed assignment of Sellers' rights and obligations under the City Agreements (with such amendments or modifications required and agreed to by Purchaser in its reasonable discretion) to Purchaser, countersigned by the City, which assignment shall be in form and substance acceptable to Purchaser in its reasonable discretion;

**(iv)** a duly executed assignment of Sellers' rights and obligations under the County Agreements (with such amendments or modifications required and agreed to by Purchaser in its sole and absolute discretion) to Purchaser, countersigned by the County, which assignment shall be in form and substance acceptable to Purchaser in its reasonable discretion;

**(v)** a duly executed assignment of Sellers' rights and obligations under the ICA (with such amendments or modifications required and agreed to by Purchaser in its reasonable discretion) to Purchaser, countersigned by BTU, which assignment shall be in form and substance acceptable to Purchaser in its sole and absolute discretion;

**(vi)** a duly executed assignment of Sellers' rights and obligations under the TAMU Easement Agreements (with such amendments or modifications required and agreed to by Purchaser in its reasonable discretion) to Purchaser, countersigned by TAMU, which assignment shall be in form and substance acceptable to Purchaser in its reasonable discretion;

**(vii)** a duly executed assignment agreement of Sellers' rights, title, and interests to all Intellectual Property and Intellectual Property Rights owned by (or purported to be owned) or controlled by Sellers, which assignment shall be in form and substance acceptable to Purchaser in its reasonable discretion;

**(viii)** a bill of sale and general assignment conveying to Purchaser all of Sellers' interests in the Acquired Assets, which assignment shall be in form and substance acceptable to Purchaser in its reasonable discretion;

**(ix)** to the extent in Sellers' possession or control: (A) originals or copies of all Assigned Contracts; (B) all Documents related to the ownership, management, and operation of the Acquired Assets; (C) all keys to all entrance doors to, and equipment and utility rooms located in, the Premises; and (D) complete digital (electronic) copies, in native file format (including, without limitation, AutoCAD, Revit, PDF, and BIM formats, as applicable) of all drawings, construction documents, engineering reports and calculations, architectural plans and specifications, shop drawings, as-built drawings, and all other Project Documents (as defined in Section 2(j)), in each case in the most current version in Sellers' possession or control, together with written confirmation from each applicable architect, engineer, or design professional that Purchaser has the unrestricted right to use such Project Documents for any purpose, including construction, renovation, development, permitting, and operation, free of any copyright claim or other restriction;

**(x)** certificates of good standing and such other certificates or resolutions of Sellers authorizing the sale of the Acquired Assets pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of Sellers;

**(xi)** possession of the Premises in substantially the same condition as existed on the Effective Date, ordinary wear and tear excepted, with all Building Systems and Facility Technology Systems in good working order and condition, subject only to the Permitted Encumbrances; and

**(xii)** an IRS Form W-9 duly executed by each Seller (or if a Seller is disregarded as separate from its regarded owner for U.S. federal income tax purposes, a valid and duly executed IRS Form W-9 from such regarded owner) (the "Seller Tax Forms"); and

**(xiii)** such other closing documents as may be reasonably necessary to consummate the transactions contemplated herein, including appropriate entity resolutions and approvals.

(c) **Closing Costs**. Other than the fees and expenses incurred by Purchaser's advisors, all fees, costs, and expenses in consummating the Transactions (including 100% of any Transfer Taxes) shall be the sole and exclusive cost of Sellers, and shall be paid from the Purchase Price if amounts are liquidated as of the Closing Date.

(d) **Closing Statement**. Sellers and Purchaser shall work in good faith to finalize and execute a closing statement describing all funds due to Sellers, and the use of the Purchase Price to satisfy obligations of Sellers contemplated under this Agreement.

(e) **Application of Sale Proceeds**. At the Closing, unless otherwise agreed to by the Parties, the Purchase Price shall be paid to Sellers or otherwise used to satisfy obligations of Sellers contemplated under this Agreement, and Sellers shall retain all net proceeds of the Purchase Price pending further order of the Bankruptcy Court.

**25. Default.**

(a) **Purchaser Default**. If Purchaser shall default in the performance of its obligations under this Agreement to purchase the Acquired Assets, then Sellers shall be entitled, at Sellers' option and as Sellers' sole and exclusive remedies, to take either of the following actions (but not both): (i) terminate this Agreement, in which case the Deposit (together with all accrued interest thereon) shall be released to Sellers as liquidated damages (the Parties acknowledging that Sellers' actual damages would be difficult or impossible to ascertain and that the Deposit represents a reasonable estimate thereof), or (ii) seek specific performance of this Agreement in accordance with Section 33, in which case Sellers' right to the Deposit shall be preserved pending final resolution of such action; *provided*, *however*, if the only condition precedent to closing the Transactions is the failure or inability to obtain Required Amendments, each on terms acceptable to Purchaser in its sole and absolute discretion, and Sellers are entitled to the Deposit pursuant to Section 8(b), then retention of the Deposit shall be Sellers' and their Estates' sole and exclusive remedy against Purchaser or any Affiliates thereof, and Sellers and their Estates shall have no right to specific performance or any other equitable remedy.

(b) **Sellers Default**. If Sellers shall (x) be unable to convey title to the Acquired Assets at the Closing in accordance with the provisions of this Agreement, or (y) otherwise materially default in the performance of their obligations under this Agreement, Purchaser shall have the right to either (i) terminate and cancel this Agreement and receive a return of the Deposit (together with all accrued interest thereon) and payment of Bid Protections (to the extent expressly provided for herein) and this Agreement shall become void and be of no further force or effect, and no Party hereto shall thenceforth have any claim of any nature against the other Party hereto (other than with respect to return of the Deposit, payment of any earned Bid Protections, and any other obligations that expressly survive termination), or (ii) seek specific performance of this Agreement in accordance with Section 33.

**26. Termination**. This Agreement may be terminated at any time prior to the Closing as follows:

(a) Termination by Mutual Consent. This Agreement may be terminated by mutual written consent of Sellers and Purchaser.

(b) Termination by Purchaser. This Agreement may be terminated by Purchaser by written notice to Sellers at any time before the Closing:

**(i)** if any of the conditions precedent to Purchaser's obligation to close, as set forth in Section 22, have not been satisfied as of the Outside Closing Date (as the same may be extended by Purchaser in accordance with Section 24(a));

**(ii)** if there shall be a material breach by Sellers of any representation or warranty, or any covenant, agreement, or obligation in this Agreement, which material breach cannot be cured or has not been cured (or waived by Purchaser) within five (5) Business Days after the giving of written notice by Purchaser to Sellers of such breach;

**(iii)** in the event of a material casualty or material condemnation of the Acquired Assets; *provided* that a casualty or condemnation shall be deemed "material" if (i) the reasonably estimated cost to restore, or the value of the condemned portion, exceeds five percent (5%) of the Purchase Price, (ii) such event damages, destroys, or renders inoperable any Building Systems or other critical infrastructure (including power distribution, cooling, fire suppression, or fiber connectivity systems) necessary for the operation of the Premises as a data center facility, (iii) such event renders the Premises unable to be operated for their intended purpose as a data center facility, or (iv) such event triggers a termination right for the non-Seller party under any of the Assigned Contracts and such termination right is actually exercised by such non-Seller party. In the event of any non-material casualty or condemnation, Purchaser shall proceed to Closing and shall receive an assignment of the applicable insurance or condemnation proceeds (less Sellers' reasonable collection costs), with no reduction in the Purchase Price;

**(iv)** if a Stalking Horse Objection is filed and is not overruled or withdrawn by June 10, 2026, in which case the Deposit shall be returned to Purchaser promptly (and in any event within three (3) Business Days following such termination);

**(v)** if any of the deliverables set forth in Section 24(b) have not been provided to Purchaser prior to the Outside Closing Date (as the same may be extended by Purchaser in accordance with Section 24(a));

**(vi)** if any Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code or if any Chapter 11 Case is dismissed;

**(vii)** if any Seller files a motion requesting, consents to, or fails to timely contest a pleading seeking, or the Bankruptcy Court enters an order for, the appointment of a chapter 11 trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Cases;

**(viii)** if the Bankruptcy Court enters any order that is materially inconsistent with this Agreement, the Bidding Procedures Order, or the Sale Order;

**(ix)** if Sellers or any of their officers, directors, equity holders, agents, or professionals shall solicit, discuss, or enter into any Alternative Transaction involving a different Stalking Horse Purchaser with respect to any of the Acquired Assets without the express written consent of Purchaser;

**(x)** if Purchaser is not designated as the Successful Bidder at the conclusion of any Auction conducted pursuant to the Bidding Procedures with respect to all or any portion of the Acquired Assets;

**(xi)** if the DIP Lender or any other secured creditor shall have commenced any enforcement action, foreclosure proceeding, or other legal action with respect to any of the Acquired Assets; or

**(xii)** if the Sale Order is not entered by the Bankruptcy Court on or before July 1, 2026, or such later date as Purchaser may agree in its sole discretion, or if the Sale Order, once entered, is stayed, reversed, or vacated pursuant to a Final Order.

(c) Termination by Sellers. This Agreement may be terminated by Sellers by written notice to Purchaser at any time before the Closing:

**(i)** by Sellers if any of the conditions precedent to Sellers' obligation to close, as set forth in Section 21, shall not have been satisfied as of the Outside Closing Date; *provided, however,* that Sellers may only terminate this Agreement pursuant to this Section 26(c)(i) if Sellers are not in material breach of this Agreement as of the date of such termination;

**(ii)** if there shall be a material breach by Purchaser of any representation or warranty, or any covenant, agreement, or obligation in this Agreement, which material breach cannot be cured or has not been cured (or waived by Sellers) within five (5) Business Days after the giving of written notice by Sellers to Purchaser of such breach; *provided, however,* Sellers may only terminate this Agreement pursuant to this Section 26(c)(ii) if Sellers are not in material breach of this Agreement as of the date of such termination; and

**(iii)** if the Debtors' boards, managers, officers, directors, or the Chief Restructuring Officer determine in good faith, upon advice of counsel, that continued performance of this Agreement would be inconsistent with their fiduciary duties to the Debtors' estates, creditors, and other parties in interest, including in connection with the consummation of an Alternative Transaction approved by the Bankruptcy Court as a higher or otherwise better transaction;

(d) Termination by Either Sellers or Purchaser. This Agreement may be terminated by either Sellers or Purchaser by written notice at any time before Closing:

**(i)** if there shall be in effect a Final Order of a Governmental Authority of competent jurisdiction restraining, enjoining, making illegal or otherwise prohibiting the consummation of the Transactions set forth in this Agreement; *provided*, that the right to terminate this Agreement under this Section 26(d)(i) shall not be available to Sellers or Purchaser if either Party is then in material breach of any representation, warranty, covenant, or other agreement contained herein; and

**(ii)** by either Sellers or Purchaser, if the Closing shall not have occurred on or before the Outside Closing Date (as the same may be extended in accordance with Section 24(a)); *provided* that the right to terminate this Agreement pursuant to this Section 26(d)(ii) shall not be available to any Party whose material breach of this Agreement, or whose failure to use commercially reasonable efforts to satisfy conditions within its control, shall have caused, or resulted in, the failure of the Closing to occur on or before the Outside Closing Date.

(e) Effect of Termination. In the event of any termination of this Agreement pursuant to this Section 26, (i) this Agreement shall forthwith become void and have no further force or effect, except that Section 8 (Deposit), Section 9 (Bid Protections), Section 25 (Default), this Section 26, Section 27 (Notices), Section 32 (Governing Law), Section 33 (Equitable Relief/Non-Recourse), Section 34 (Remedies), Section 39 (Legal Fees and Expenses), and any other provisions that by their terms survive termination shall survive; (ii) the Deposit shall be disbursed in accordance with Section 8 and Section 25; and (iii) if Purchaser is entitled to the Bid Protections pursuant to Section 9, Sellers shall remain obligated to pay the Bid Protections in accordance with Section 9.

**27. Notices**. All notices, consents, approvals, and other communications under this Agreement shall be in writing and shall be deemed given on the next business day if sent by recognized overnight courier which provides confirmation of delivery (e.g., FedEx) or the third Business Day after mailing by one Party by registered or certified United States mail, postage prepaid and return receipt requested, to the other Party addressed as follows:

**If to Sellers:**

RELLIS Campus Data and Research Center, LLC
5010 Doss Road, Austin, TX 78734
Attention: Pablo Bonjour, Chief Restructuring Officer
Email: pablo@vrg.co

**with a copy to (which shall not constitute notice):**

Okin Adams Bartlett Curry LLP

1113 Vine Street, Suite 240
Houston, Texas 77002
Attention: Christopher Adams; John Thomas Oldham
Email: cadams@okinadams.com; joldham@okinadams.com

**If to Purchaser:**

ThisWay Global, Inc.
801 Barton Springs Rd., Austin, Texas 78704
Attention: Stephan Fabel, Chief Executive Officer
Email: stephan.fabel@thiswayglobal.com

**with a copy to (which shall not constitute notice):**

Cooley LLP
350 South Grand Avenue, Suite 3200
Los Angeles, CA 90071
Attention: Michael S. Neumeister
Email: mneumeister@cooley.com

Any writing which may be mailed pursuant to the foregoing may also be delivered by hand or transmitted by email and shall be effective when received by the addressee. Either Party may, from time to time, specify as its address for purposes of this Agreement any other address upon the giving of ten (10) days' notice thereof to the other Party.

**28.** **Entire Agreement**. Except to the extent expressly set forth otherwise herein, in any other Transaction Document, or in any other written instrument signed by each Party to be bound thereby which makes reference to this Agreement, this Agreement, including all annexes, schedules, and exhibits attached hereto and referenced herein, together with all of the other Transaction Documents, embodies the entire agreement of the Parties in relation to the subject matter hereof, and no representations, warranties, covenants, understandings, agreements, or otherwise in relation thereto exist between or among the Parties. This Agreement supersedes the Letter of Intent in all respects, and the Letter of Intent shall no longer be of any force or effect.

**29.** **Severability**. If any term or provision of this Agreement or the application thereof to any Person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Law.

**30.** **No Assignment**. Without the prior written consent of Purchaser, Sellers shall not, directly or indirectly, assign this Agreement or any of its rights hereunder. Any attempted assignment in violation hereof shall, at the election of Purchaser, be of no force or effect and shall constitute a default by Sellers. Notwithstanding the foregoing, Purchaser may, at any time during the term of this Agreement, without the consent of Sellers, assign this Agreement, in whole or in part, or designate any Person (including any Affiliate of Purchaser or any special-purpose vehicle) to take title to all or any of the Acquired Assets and assume Purchaser's rights and obligations hereunder (any such Person, a "Purchaser Designee"); *provided*, *however*, that (i) Purchaser shall not be released from any obligations under this Agreement (including its

obligation to pay the Purchase Price), all of which Purchaser shall guarantee as a primary obligor and not merely as a surety until such obligations have been fully performed, and Sellers may proceed directly against Purchaser in respect of any such obligation without any requirement to first proceed against the Purchaser Designee; (ii) such Purchaser Designee shall have expressly assumed in writing all of Purchaser's obligations under this Agreement or, with respect to any partial assignment or designation, all of the relevant obligations under this Agreement, which written assumption shall be delivered to Sellers prior to or concurrently with such assignment or designation; and (iii) Purchaser shall provide written notice of such assignment or designation to Sellers within five (5) Business Days following such assignment or designation.

**31. Further Assurances**. From and after the date of this Agreement, without any further consideration, Sellers shall cooperate with Purchaser and shall execute and deliver such documents and take such other actions as Purchaser may reasonably request (prior to, at or after the Closing) for the purpose of evidencing the Transactions and putting Purchaser in possession and control of all of the Acquired Assets. If, following the Closing, any right, property or asset forming part of the Business is found to have been retained by a Seller or any of their Affiliates in error (for example, in cases where such right, property or asset relates exclusively to the Business but was inadvertently retained by a Seller), either directly or indirectly (including in preparation for the separation of the Business from Sellers), such Seller shall transfer, or shall cause their applicable Affiliate to transfer, at no cost to Purchaser, such right, property or asset (and any related Liability) as soon as practicable to Purchaser or an Affiliate of Purchaser indicated by Purchaser.

**32. Governing Law; Consent to Jurisdiction; Waiver of Right to Jury Trial**.

(a) THIS AGREEMENT AND THE RIGHTS AND THE OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS AND, WHERE APPLICABLE, THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAWS OF THE STATE OF TEXAS AND, WHERE APPLICABLE, THE BANKRUPTCY CODE.

(b) THE PARTIES HEREBY IRREVOCABLY AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO: (I) THE IMPLEMENTATION, INTERPRETATION, AND ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT EXECUTED PURSUANT TO, OR IN CONNECTION WITH, THIS AGREEMENT; OR (II) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES, PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION DOCUMENT EXECUTED PURSUANT TO, OR IN CONNECTION WITH, THIS AGREEMENT.

(c) THE PARTIES HEREBY EXPRESSLY AND IRREVOCABLY CONSENT TO, AND AGREE NOT TO CONTEST, THE BANKRUPTCY COURT'S EXCLUSIVE JURISDICTION AND, TO THE EXTENT THE BANKRUPTCY COURT OTHERWISE LACKS JURISDICTION TO

ENTER A FINAL ORDER AND/OR FINAL JUDGMENT UNDER ARTICLE III OF THE UNITED STATES CONSTITUTION, THE PARTIES HEREBY EXPRESSLY CONSENT TO THE BANKRUPTCY COURT'S ENTRY OF FINAL JUDGMENTS AND/OR FINAL ORDERS REGARDING ANY DISPUTE OR OTHER MATTER RELATING TO THE IMPLEMENTATION, INTERPRETATION, OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

(d) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY VOLUNTARILY, KNOWINGLY, AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED, DIRECTLY OR INDIRECTLY, TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS SECTION 32(D). THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 32 AND EXECUTED BY EACH OF THE PARTIES HERETO.

**33. Equitable Relief/Non-Recourse.**

(a) The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that a Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each Party hereby waives (i) any requirement that the other Party post a bond or other security as a condition for obtaining any such relief and (ii) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate.

(b) Each Party hereby agrees not to raise any objections to the availability of equitable remedies to the extent provided for herein, and the Parties further agree that nothing set forth in this Section 33 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 33 prior to or as a condition to exercising any termination right under this Agreement, nor shall the commencement of any legal action or legal proceeding pursuant to this Section 33 or anything set forth in this Section 33 restrict or limit any Party's right to terminate this Agreement in accordance with the terms hereof.

(c) The sole and exclusive remedy of Sellers or the Estates (i) for a breach of any representation or warranty made by Purchaser in this Agreement, any Transaction Document, or in any document delivered pursuant hereto or (ii) for a breach of any covenant made by Purchaser in this

Agreement, any Transaction Document, or in any document delivered pursuant hereto and required to be performed by Purchaser on or prior to the Closing (including but not limited to closing the Transactions), shall, in either case, be limited to either (but not both) of the following: (x) Sellers' right to terminate this Agreement to the extent permitted pursuant to Section 26(c) and to receive the Deposit pursuant to and in accordance with Section 8(b) and Section 25(a), in which case neither Purchaser nor any Affiliate thereof shall have any further liability of any kind (whether in equity or at Law, in Contract, in tort or otherwise), or (y) Sellers' right to seek specific performance in accordance with Section 25(a) and this Section 33.

(d) In the event Sellers terminate this Agreement pursuant to Section 26(a), (c), or (d), the sole and exclusive remedy of Purchaser against Sellers and the Debtors' Estates shall be in either case, limited to either (but not both) of the following: (x) receipt of the Bid Protections and return of the Deposit pursuant to the terms of this Agreement, including but not limited to Sections 8(a) and 9(b), or (y) Purchaser's right to seek specific performance in accordance with Section 25(b) and this Section 33.

**34. Remedies**. All remedies, either under this Agreement or by Law or otherwise afforded to the Parties hereunder, shall be cumulative and not alternative, and any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically, to recover damages by reason of any breach of this Agreement and to exercise all other rights granted by Law, equity or otherwise, subject to and in accordance with Section 25 (Default), Section 32 (Governing Law; Consent to Jurisdiction; Waiver of Right to Jury Trial) and Section 33 (Equitable Relief/Non-Recourse).

**35. Brokers**. Sellers represent and warrant to Purchaser, and Purchaser represents and warrants to Sellers, that there are no real estate brokers, salesmen, or finders involved in this transaction who would be entitled to a commission, finder's fee, or other compensation in connection with this Agreement, the other Transaction Documents, or any of the transactions contemplated thereby, other than Marathon Capital Markets, LLC, whose fees shall be borne by Sellers in accordance with their retention order.

**36. Amendments and Waivers**. Neither this Agreement, nor any of the terms hereof, may be modified, amended, or waived orally, but only by an instrument in writing signed by the Party against which enforcement of the modification, amendment, or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Except as otherwise provided herein, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. The Parties' rights and remedies are cumulative and not alternative. A Party's failure or delay in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will not operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

**37. Interpretation**. The headings of the various subdivisions of this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof. All

pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the Person or Persons may require.

**38.** **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. Except for any closing documents which require original signatures, all closing documents and this Agreement may be executed by the Parties electronically (including via DocuSign).

**39.** **Legal Fees and Expenses.** Except as otherwise set forth herein (including, without limitation, in Section 9 with respect to the Expense Reimbursement), each Party shall bear its own legal fees and expenses.

**40.** **Relationship of Parties**. Nothing contained in this Agreement shall be deemed or construed to create a partnership, joint venture, or agency relationship between Sellers and Purchaser. No Party is, by virtue of this Agreement or the transactions contemplated hereby, authorized as an agent, employee, or legal representative of any other Party. No Party shall have the power to control the activities and operations of any other Party, and the status of each Party is that of an independent contractor.

**41.** **Section Headings**. The headings of Sections in this Agreement are provided for convenience only and will not affect the construction or interpretation of any provision of this Agreement. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement.

**42.** **Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 18(a), the Purchaser Released Parties, (ii) any other Person or Affiliate with respect to any limitations on Claims, remedies or recourse under this Agreement, including but not limited to Section 33, and (iii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

[*Signatures page to follow*]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first set forth above.

**SELLERS:**

RELLIS Campus Data and Research Center, LLC, a Texas limited liability company

By: Pablo Bonjour

Name: Pablo Bonjour

Title: Chief Restructuring Officer

Optimus DataCenters, LLC, a Texas limited liability company

By: Pablo Bonjour

Name: Pablo Bonjour

Title: Chief Restructuring Officer

**PURCHASER:**

ThisWay Global, Inc., a Delaware corporation

By: ______________________________

Name: Stephan Fabel

Title: Chief Executive Officer

# ANNEX 1

## Definitions

As used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms used but not defined in this Agreement (including this **Annex 1**) shall have the meanings ascribed to them in the Bidding Procedures or the Bankruptcy Code, as applicable.

"**Acquired Assets**" has the meaning set forth in Section 2.

"**Action**" means any litigation, claim, action, suit, audit, assessment, arbitration, mediation, inquiry, proceeding, or investigation, in each case, by or before any Governmental Authority or any arbitrator or arbitration panel or any mediator or mediation panel.

"**Additional Deposit**" has the meaning set forth in Section 8.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation**" has the meaning set forth in Section 6(f) hereof.

"**Alternative Successful Bidder**" means any Successful Bidder other than Purchaser.

"**Alternative Transaction**" means any transaction (or series of related transactions) for the sale, transfer, or other disposition of all or substantially all of the Acquired Assets (or any material portion thereof, or any equity interests of the Debtors), to a Person other than Purchaser.

"**Appurtenances**" has the meaning set forth in Section 2(c).

"**Assigned Avoidance Actions**" means any Avoidance Actions with respect to rights, property, or assets necessary for the ownership, operation, possession, enjoyment, or control of the Acquired Assets or the Premises, either prior to or after the Closing Date.

"**Assigned Contract List Modification Deadline**" has the meaning set forth in Section 12.

"**Assigned Contracts**" has the meaning set forth in Section 2(f).

"**Assumed Liabilities**" has the meaning set forth in Section 3.

"**Auction**" means the auction conducted by the Debtors pursuant to the Bidding Procedures, if any.

"**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or similar actions or remedies that may be brought by or on behalf of Sellers or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies arising under chapter 5 and section 724(a) of the Bankruptcy Code.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rule**" means the Federal Rules of Bankruptcy Procedure, as such rules are in effect as of the Effective Date and as subsequently modified or amended.

"**Bid Deadline**" means the deadline by which any Potential Bidder must deliver its bid for any of the Acquired Assets, as established in the Bidding Procedures.

"**Bid Protections**" has the meaning set forth in Section 9(a).

"**Bidding Procedures**" has the meaning set forth in the Bidding Procedures Order.

"**Bidding Procedures Motion**" has the meaning set forth in the recitals.

"**Bidding Procedures Order**" has the meaning set forth in the recitals.

"**Breakup Fee**" has the meaning set forth in Section 9(a).

"**BTU**" has the meaning set forth in the recitals.

"**Building Systems**" means all mechanical, electrical, plumbing, HVAC, fire protection, fire suppression, life safety, elevator, power distribution, cooling, ventilation, backup generation, uninterruptible power supply, and other building systems and infrastructure located at or servicing the Premises.

"**Business**" has the meaning set forth in Section 2.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks in Houston, Texas are authorized or required by Law to be closed.

"**Cause of Action**" means any and all claims, demands, actions, causes of action, choses in action, counterclaims, judgments, costs, expenses, damages, and liabilities (whether known or unknown), including Avoidance Actions.

"**Chapter 11 Cases**" has the meaning set forth in the recitals.

"**Chapter 380 Agreement**" has the meaning set forth in the recitals.

"**City**" has the meaning set forth in the recitals.

"**City Abatement Agreements**" has the meaning set forth in the recitals.

"**City Agreements**" has the meaning set forth in the recitals.

"**Claim**" means, collectively, all rights, claims (as that term is defined in section 101(5) of the Bankruptcy Code) and causes of action, whether class, individual or otherwise in nature, under contract or in law or in equity, known or unknown, contingent or matured, liquidated or unliquidated and all rights and remedies with respect thereto.

"**Closing**" has the meaning set forth in Section 24(a).

"**Closing Date**" has the meaning set forth in Section 24(a).

"**Consultation Parties**" means the parties designated as such in the Bidding Procedures.

"**Contracts**" means with respect to any Person, any indentures, contracts, grants, leases, options, agreements, instruments, licenses, undertakings, and other commitments, whether written or oral, to which such Person or such Person's properties are bound.

"**County**" has the meaning set forth in the recitals.

"**County Agreements**" has the meaning set forth in the recitals.

**"Cure Amounts"** means the monetary amounts required to satisfy all Cure Claims in connection with the assumption and assignment of the Assigned Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code or other applicable law.

"**Cure Claim**" means (i) with respect to each of the Assigned Contracts, all Claims arising from or relating to any act, event, default or occurrence prior to the Petition Date that are required to be paid pursuant to section 365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts to Purchaser, and (ii) with respect to Pending Asset Orders, such Claims that are required to be paid to any applicable third party to result in the completion, transfer, and delivery to Purchaser of the completed goods, equipment, property, or other assets subject to such Pending Asset Orders; *provided*, that, with respect to the Cure Claims in subsection (ii) hereof, Sellers and Purchaser shall negotiate in good faith and determine prior to the Closing Date whether such Cure Claims shall constitute a credit against the Purchase Price (which credit shall not exceed $500,000), or shall be the obligation of Purchaser.

"**Cure Notice**" means any motion, notice, or other document served by the Debtors upon a Contract counterparty identifying one or more Contracts as Contracts that may, potentially, be assumed and assigned to Purchaser, pursuant to section 365 of the Bankruptcy Code and this Agreement.

"**Debtors**" has the meaning set forth in the recitals. For the avoidance of doubt, Sellers and Debtors are referred to in this Agreement interchangeably, and the use of one term or the other does not refer to or contemplate any different capacity or party for any purpose.

"**DIP Lender**" means Twelve Bridge Capital, LLC.

"**DIP Orders**" means the interim order [Docket No. 74] and the Final Order [Docket No. 138] approving the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Secured Post-Petition Financing; (II) Granting Priming Liens and Superpriority Claims; (III) Granting Adequate Protection; (IV) Schedule a Final Hearing; and (V) Granting Related Relief* [Docket No. 47].

"**DIP Superpriority Claims**" means the superpriority administrative expense claims granted to the DIP Lender in the Chapter 11 Cases pursuant to the DIP Orders.

"**Disputed Cure Claim**" means any Cure Claim that the applicable Contract counterparty asserts exceeds the proposed Cure Amount set forth in any Cure Notice.

"**Deposit**" has the meaning set forth in Section 8.

"**Documents**" means files, documents, instruments, papers, books, reports (financial and otherwise), records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation, user documentation, marketing documentation, and other similar materials, in each case whether or not in electronic form.

"**Early Termination Outside Date**" has the meaning set forth in Section 14.

"**Early Termination Right**" has the meaning set forth in Section 14.

"**Effective Date**" means the first date on which this Agreement has been fully executed by the Parties.

"**Employee Benefit Plan**" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA, each other deferred compensation, bonus or incentive compensation, pension, retiree medical, disability or life insurance plan, program, Contract, agreement or arrangement, each employment, severance, change-of-control and each other employee benefit or compensation plan, program, Contract, agreement or arrangement, in each case (i) that is maintained, sponsored, administered or contributed or required to be contributed to by any Seller or any of its Subsidiaries for the benefit of Business Employees or former Business Employees, or (ii) with respect to which the Seller or its direct and indirect Subsidiaries has any Liability.

"**Encumbrances**" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement, restriction on use, transfer, receipt of income or other attribute of ownership, and all other impositions, imperfections, defects, limitations, or restrictions of any nature or kind whatsoever.

"**Environmental Condition**" means (i) any pollution or contamination of the environment, nuisance, trespass, damage to the Premises or any other real property, personal property or natural resource or harm or alleged harm to human health or safety, or any other condition relating to the release, use, generation, treatment, storage, introduction, handling, processing, transportation or transfer of any Hazardous Materials occurring prior to the Closing Date by Sellers or any other Person related to the Business or the Acquired Assets, including the post-Closing migration or degradation of Hazardous Materials that exist prior to or as of the Closing Date that, in each case, is or may be in violation of or creates or may create Liability under any Environmental Law, whether or not at the time the facts and circumstances resulting in the condition occurred or were created were a violation of or created Liability under any Environmental Law; and (ii) any noncompliance or alleged noncompliance with Environmental Laws related to the Business, the Acquired Assets or the Premises that occurred prior to or is continuing as of the Closing Date.

"**Environmental Law**" means any Law relating to the protection of the environment, natural resources, or human health and safety (to the extent relating to exposure to Hazardous Materials), including the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Clean Water Act (33 U.S.C.

§§ 1251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), and any analogous state or local Laws.

"**Equity Interests**" means, with respect to a Person, any (a) membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or stock or equity appreciation rights, "phantom" stock rights, stock-based performance units, or other similar rights) or other ownership interests of such Person, or (b) any securities (including debt securities or other indebtedness), options, warrants, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, or sale or repurchase of or exercisable or exchangeable for or convertible into, or other rights to acquire any of the items in clause (a) of such Person.

"**ESA**" has the meaning set forth in the recitals.

"**Estate**" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtors' Chapter 11 Case.

"**Excluded Assets**" has the meaning set forth in Section 5.

"**Excluded Liabilities**" has the meaning set forth in Section 4.

"**Expense Reimbursement**" has the meaning set forth in Section 9(a).

"**Facility Technology Systems**" has the meaning set forth in Section 17(k).

"**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal has expired and as to which no appeal shall then be pending, or (b) if an appeal has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied.

"**Government Contract**" means any Contract (including any purchase, delivery, or task order, basic ordering agreement, pricing agreement, letter contract, grant, cooperative agreement, other transactional authority agreement, or change order) between any Seller, any Subsidiary of any Seller, or any joint venture of which any Seller or any of its direct and indirect Subsidiaries is a member, on the one hand, and any Governmental Authority or any prime contractor or subcontractor (at any tier) of any Governmental Authority, on the other hand.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, official, or other instrumentality of the government of the United States or of any foreign country, any state or any political subdivision of any such government.

"**Ground Lease**" has the meaning set forth in the recitals.

"**Hazardous Materials**" means any substance, material, or waste that is regulated, classified, or otherwise characterized under any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and petroleum by-products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead-based paint, radon, and per- and polyfluoroalkyl substances (PFAS).

"**ICA**" has the meaning set forth in the recitals.

"**Improvements**" has the meaning set forth in Section 2(b).

"**Initial Deposit**" has the meaning set forth in Section 8.

"**Intangible Property**" has the meaning set forth in Section 2(j).

"**Intellectual Property**" means algorithms, apparatus, databases, data collections, diagrams, formulae, inventions (whether or not patentable), know-how, logos, marks (including brand names, product names, logos, and slogans), trade secrets, mask works, methods, processes, proprietary information, protocols, schematics, specifications, software, software code (in any form, including Source Code and executable or object code), techniques, user interfaces, URLs, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of and documentation with respect to the foregoing, such as specifications, instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries).

"**Intellectual Property Rights**" means all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, copyrights, moral rights and mask works; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patent and industrial property rights; (e) other proprietary rights in Intellectual Property; and (f) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in clauses (a) through (e) above.

"**Laws**" means all Federal, state, local, foreign, municipal, or other laws, statutes, common law, rules, codes, regulations, rulings, restrictions, ordinances, orders, or other requirement or rule of law issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Authority.

"**Leasehold Interest**" has the meaning set forth in Section 2(a).

"**Leased Real Property**" has the meaning set forth in the recitals.

"**Letter of Intent**" has the meaning set forth in the recitals.

"**Liabilities**" means any and all debts, losses, liabilities, claims (including "claims" as defined in the Bankruptcy Code), damages, fines, costs, royalties, warranties, proceedings, deficiencies, or obligations of any nature, whether known or unknown, absolute, accrued, contingent, or otherwise.

"**Material Adverse Effect**" means any event, change, effect, development, condition, or occurrence that, individually or in the aggregate, has had, or would reasonably be expected to have, (a) a material adverse effect on the business, assets, liabilities, financial condition, or results of operations of the Acquired Assets, taken as a whole, (b) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement, (c) a material impairment, restriction, or prevention of Purchaser's ability to own, operate, use, develop, or otherwise utilize the Acquired Assets for their intended purpose as a data center facility, (d) any default, breach, termination, suspension, or curtailment under any Assigned Contract or Non-Debtor Material Contract that has not been cured prior to Closing, or (e) any

casualty, damage, destruction, condemnation, or taking affecting the Acquired Assets that has not been fully repaired or restored prior to Closing; *provided*, *however*, that none of the following, individually or in the aggregate, shall be deemed to constitute, or shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic, financial, or market conditions; (ii) changes in conditions generally affecting the data center industry; (iii) changes in applicable Law or accounting standards; (iv) the filing or pendency of the Chapter 11 Cases or any actions taken pursuant to orders of the Bankruptcy Court; (v) the announcement or pendency of the transactions contemplated by this Agreement; or (vi) any natural disaster, act of God, pandemic, or outbreak or escalation of hostilities or acts of terrorism; *provided*, *further*, that the exceptions in clauses (i), (ii), (iii), and (vi) shall not apply to the extent such event, change, effect, development, condition, or occurrence has a disproportionate adverse effect on the Acquired Assets relative to other participants in the data center industry; *provided, further*, that the occurrence of a material casualty or material condemnation of the Acquired Assets as described in Section 26(b)(iii) shall be deemed a Material Adverse Effect.

"**Non-Debtor Material Assets**" means any assets (other than Non-Debtor Material Contracts) that are held in the name of, or beneficially owned by, any Person other than Sellers (including, without limitation, Sam Tenorio III or any of his Affiliates) and that are necessary for the ownership, operation, possession, enjoyment, or control of the Acquired Assets or the Premises as a data center facility, including any real property interests, personal property, intellectual property, licenses, permits, or other rights appurtenant thereto.

"**Non-Debtor Material Contracts**" means any Contracts that are material to the ownership, use, or operation of the Acquired Assets and that are held in the name of any Person other than Sellers (including, without limitation, Sam Tenorio III or any of his Affiliates), including the ESA, to the extent such Contracts are not executory contracts or unexpired leases of the Debtors subject to assumption and assignment under section 365 of the Bankruptcy Code.

"**Outside Closing Date**" has the meaning set forth in Section 24(a).

"**Parties**" has the meaning set forth in the preamble.

"**Permits**" means all applications, notifications, licenses, permits (including special use permits), franchises, rights, certificates, approvals, consents, waivers, clearances, exemptions (including non-conforming exemptions), classifications, registrations, variances (including zoning variances), easements, rights of way, orders, tariffs, rate schedules, and other similar documents and authorizations issued by any Person to any Sellers and used, or held for use, which are necessary for Sellers to carry on the Business in substantially the manner in which it is now being conducted.

"**Permitted Encumbrances**" means (i) Encumbrances for utilities and current Taxes not yet due and payable; (ii) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the ownership, use, or operation of the Acquired Assets as a data center facility, or the use or occupancy of any Real Property as it relates to such operations, and which do not impair or restrict the delivery of electrical power, fiber optic connectivity, telecommunications services, or cooling capacity to the Premises; (iii) applicable zoning Laws, building codes, land use restrictions, and

other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); and (iv) the Assumed Liabilities.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, joint venture, trust, association, union, entity, or other form of business organization or any Governmental Authority.

"**Petition Date**" has the meaning set forth in the recitals.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"**Potential Bidder**" means a Person that has been or may be qualified by the Debtors to participate in the bidding process under the Bidding Procedures.

"**Pre-Closing Tax Period**" means any taxable period ending on or prior to the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"**Priority Assigned Contracts**" has the meaning set forth in Section 2(e).

"**Property Taxes**" means real property, personal property, or similar ad valorem Taxes.

"**Purchase Price**" has the meaning set forth in Section 7.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Designee**" has the meaning set forth in Section 30.

"**Qualified Bid**" means a bid that satisfies the requirements set forth in the Bidding Procedures.

"**Qualified Bidder**" means a Person submitting a Qualified Bid in accordance with the Bidding Procedures.

"**Required Amendment**" has the meaning set forth in Section 22(g).

"**Real Property**" means right, title, and interest in and to real property, including, without limitation, land, and all rights, privileges, rights of way, and easements appurtenant thereto.

"**RCDRC Power**" has the meaning set forth in the recitals.

"**RELLIS**" has the meaning set forth in the preamble.

"**Retained Professional**" means any Person retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

"**Stalking Horse Objection**" means any objection filed by any party in interest in the Chapter 11 Cases to (a) the designation of Purchaser as the Stalking Horse Purchaser, (b) the Bid Protections, or (c) any other material term of this Agreement as approved or to be approved pursuant to the Bidding Procedures Order.

"**Sale Hearing**" means the hearing before the Bankruptcy Court to consider the approval of the Sale Order.

"**Sale Motion**" has the meaning set forth in the recitals (which is the Bidding Procedures Motion).

"**Sale Order**" has the meaning set forth in Section 20(b).

"**S&P**" means Satterfield & Pontikes Construction, Inc.

"**Sellers**" has the meaning set forth in the preamble. For the avoidance of doubt, Sellers and Debtors are referred to in this Agreement interchangeably, and the use of one term or the other does not refer to or contemplate any different capacity or party for any purpose.

"**Sellers' Retained Professionals**" means all advisors, including but not limited to counsel, financial advisory firms, investment banks, accountants, or brokers, currently or previously retained by the Debtors or their Estates, including any Retained Professionals of Sellers.

"**Stalking Horse Bid**" means the bid reflecting the transactions set forth by this Agreement, as such bid may be modified to reflect any overbid by Purchaser at the Auction.

"**Stalking Horse Designation Notice**" has the meaning set forth in the recitals.

"**Straddle Period**" means any taxable period that includes, but does not end on, the Closing Date.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, trustees, or other governing body of such Person is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association, or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"**Successful Bid**" means the bid (or bids) selected by the Debtors as the highest or otherwise best Qualified Bid in accordance with the Bidding Procedures.

"**Successful Bidder**" means the Person submitting the Successful Bid in accordance with the Bidding Procedures.

"**TAMU**" has the meaning set forth in the recitals.

"**TAMU Easement Agreements**" means that (i) Amended and Restated Temporary Construction Easement Agreement (Underground Electric Line), dated as of November 2024, by and between TAMU and RELLIS, and (ii) Amended and Restated Easement Agreement (Temporary Construction Access), dated as of November 14, 2024, by and between TAMU and RELLIS, and (iii) such other grants of easements or related land or use rights by and between TAMU or any Affiliate thereof, on the one hand, and any Seller or Affiliate thereof, on the other hand.

"**Tangible Personal Property**" means all trade fixtures, furniture, furnishings, fittings, equipment, machinery, apparatus, appliances and other articles of tangible personal property owned by Sellers and located on the Premises as of the Effective Date and used or usable in connection with the occupation or operation of all or any part of the Premises, but only to the extent transferable. The term "Tangible Personal Property" does not include any Excluded Assets.

"**Tax**" means (i) any tax, charge, fee, levy, or other assessment including any net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, payroll, employment, social security, withholding, unemployment, excise, estimated, stamp, occupancy, occupation, property, or other similar charges in the nature of a tax of any kind whatsoever, including any interest or penalties thereon, and additions to tax or additional amounts imposed by any Governmental Authority, whether disputed or not, or (ii) any liability for the payment of any taxes, interest, penalty, addition to tax, or like additional amount resulting from the application of Treasury Regulation § 1.1502-6 or comparable Law.

"**Tax Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Tax Returns**" means any declaration, return, report, estimate, information return, schedule, statement, or other document filed, permitted to be filed, or required to be filed with a Governmental Authority with respect to Taxes.

"**Transaction Documents**" means collectively, (i) the Bidding Procedures Order, (ii) the Sale Order, (iii) this Agreement, and (iv) any and all other agreements, instruments, or documents entered into in connection with, or contemplated by, this Agreement, including each agreement, instrument, or document a form of which is attached as an exhibit to this Agreement.

"**Transactions**" has the meaning set forth in Section 24(a).